|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| SAMUELS JEWELERS, INC.,[1] | : | Case No. 18-_____( ___) |
|  | : |  |
| Debtor. | : |  |
|  | : |  |

**DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS:
(I) AUTHORIZING THE DEBTOR TO ASSUME THE CONSULTING AGREEMENT;
(II) AUTHORIZING AND APPROVING THE CONDUCT OF STORE CLOSING OR
SIMILAR THEMED SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL
LIENS, CLAIMS AND ENCUMBRANCES; AND (III) GRANTING RELATED RELIEF**

The above-captioned debtor (the "Debtor") moves, pursuant to sections 105, 363, 365 and 554 of the Bankruptcy Code and Rules 2002, 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of (1) an interim order in the form attached hereto as Exhibit A (the "Interim Order"):  (i) finding that the Consulting Agreement dated as of June 29, 2018, by and between the Debtor and a contractual joint venture comprised of Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC (the "Consulting Agreement"), a copy of which is attached as Exhibit 1 to the Interim Order, is assumed on an interim basis; (ii) authorizing the Debtor to begin store closing or similar themed sales in accordance with the terms of the store closing sale guidelines (the "Sale Guidelines"), a copy of which is attached as Exhibit 2 to the Interim Order, with such sales to be free and clear of all liens, claims and encumbrances; and (iii) granting certain related relief, on an interim basis (collectively, the "Inventory Sale Relief"), and (2) following service of this motion and after an opportunity to be heard at a final hearing (the "Final Hearing"), a final order (the "Final Order"),

---

[1] The last four digits of the Debtor's taxpayer identification number are 6316 and its address is 2914 Montopolis Drive, Suite 200, Austin, Texas 78741.

authorizing the assumption of the Consulting Agreement and granting the Inventory Sale Relief on a final basis.  In support of this motion, the Debtor incorporates the statements contained in the Declaration of Robert J. Duffy in Support of First Day Pleadings (the "First Day Declaration") filed contemporaneously herewith, and further respectfully represents as follows:

## Background

1.     On the date hereof (the "Petition Date"), the Debtor commenced a case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[2]  The Debtor is continuing in possession of its properties and is managing its businesses, as a debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.     Samuels Jewelers, Inc. ("Samuels Jewelers") operates more than 100 specialty retail jewelry stores located across the United States in shopping malls, strip centers and as stand-alone stores.  Samuels Jewelers sells fine jewelry items in a wide range of styles and prices, with a principal emphasis on diamond and gemstone jewelry, and has been serving jewelry customers since its founding in 1891.

3.     Additional information regarding the Debtor and this case, including the Debtor's business, corporate structure, financial condition, and the reasons for and objectives of this case, is set forth in the First Day Declaration.

***The Proposed Inventory Sales***

4.     Subject to a "fiduciary out" in the Consulting Agreement that permits the Debtor to, among other things, pursue a going concern sale of some or all of its stores and assets if an acceptable offer materializes during these bankruptcy cases, the Debtor seeks initiate an

---

[2]     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

inventory sale process that includes store closing and similarly themed sales (the "<u>Inventory Sales,</u>") at the Debtor's retail locations (each a "<u>Store</u>" and collectively, the "<u>Stores</u>").

5.        Prior to the Petition Date, the Debtor's management, with the assistance of its advisors, performed an analysis of the Debtor's financial performance. Such analysis included a comprehensive review of the performance of each store, the amount of Debtor's inventory on hand (the "<u>Merchandise</u>"), and the markets in which the Debtor operates. As a result of this analysis, the Debtor has determined that it is necessary to initiate an inventory sale process in order to best maximize the value of these estates for the benefit of all creditors. Specifically, when coupled with the deadline for decisions on lease assumption and rejection set forth in section 365(d)(4), it is critical that the Debtor commence its inventory sale process as soon as possible in order to utilize the full 210-day post-petition period to sell Merchandise and pursue any alternative value maximizing transactions.

***The Debtor's Selection of the Consultant***

6.        To maximize the value of the property of the Debtor's estate that is attributable to the Stores, as well as certain of the associated furniture, fixtures and equipment (the "<u>Offered FF&E</u>" and, together with the Merchandise, the "<u>Sale Assets</u>"), the Debtor and its advisors contacted each of the four leading national asset disposition firms (the "<u>Disposition Firms</u>") that specialize in, among other things, the large scale sale of assets of the type and scale of that owned by the Debtor.[3] Ultimately, these four Disposition Firms submitted two bids, with Gordon Brothers[4] and Hilco submitting a joint bid and Tiger and Great American submitting a

---

[3]      The Disposition Firms contacted by the Debtor are as follows: Gordon Brothers Retail Partners, LLC ("<u>Gordon Brothers</u>"); Hilco Merchant Resources, LLC ("<u>Hilco</u>"); Tiger Capital Group, LLC ("<u>Tiger</u>"); and Great American Group, LLC ("<u>Great American</u>").

competing joint bid.

7.      Both bids contemplated asset disposition consulting agreements. Asset disposition consulting agreements typically provide, in contrast to other agreements in which disposition firms take on all costs and responsibilities of managing closing sales and in return pay a guaranteed percentage of the cost of sold merchandise, that, for an agreed upon fee, an asset disposition firm will give advice and assistance regarding any store closing sales and provide management oversight for the sales, but the asset disposition firm will not take on all costs and responsibilities of the sales.

8.      After multiple rounds of negotiations among the Disposition Firms and the Debtors with respect to the bids submitted by the two joint ventures, which resulted in significant reductions and concessions, the Debtor, together with its advisors, determined that entering into the Consulting Agreement with the contractual joint venture comprised of Gordon Brothers and Hilco (together, "Consultant") would minimize costs and maximize the value received from the Sale Assets. Prior to the Petition Date, the Debtor and the Consultant executed the Consulting Agreement.

**Assumption of the Consulting Agreement and Beginning the Inventory Sales**

9.      By this motion, the Debtor is seeking the entry of interim and final orders authorizing the assumption of the Consulting Agreement and the Inventory Sales on the terms set forth in the Sale Guidelines. This Court has previously entered "first day" relief authorizing

---

(continued…)

[4]     Gordon Brothers Retail Partners, LLC's parent company, Gordon Brothers Group, owns a minority interest in, has certain contractual relationships with, and from time to time may provide contractual services to, Gordon Brothers Finance Company ("Finance Company") in the ordinary course of its business. Finance Company is a secured lender to the Debtor. Pursuant to Section 10(B) of the Consulting Agreement, the Debtor waived any actual or perceived conflict resulting from any of the foregoing.

assumption of pre-petition agreements on an interim basis to permit the commencement of inventory sales, subject to a final hearing. See, e.g., In re Bon-Ton Stores, Inc., Case No. 18 10248 (MFW) (Bankr. D. Del. Feb. 7, 2018); In re Aerogroup Int'l Inc., Case No. 17-11962 (KJC) (Bankr. D. Del. Sept. 19, 2017); In re Sports Authority Holdings, Inc., Case No. 16-10527 (MFW) (Bankr. D. Del. Mar. 3, 2016); In re RadioShack Corp., Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015).

**The Consulting Agreement**

10.     Pursuant to the Consulting Agreement, the Consultant has served and will continue to serve as the exclusive independent consultant to the Debtor in connection with the sale of the Sale Assets.  Assumption of the Consulting Agreement will allow the Debtor to utilize the experience and resources of the Consultant in performing sales in a format that allows the Debtor to retain control over the sale process and will provide the maximum benefit to the estate.

11.     The primary services provided by the Consultant can be summarized as follows: [5]

(i)     Recommend appropriate discounting to effectively sell all of the Merchandise and appropriate point-of-purchase, point-of-sale, and other internal and external advertising in connection therewith in accordance with mutually agreed upon themed sales, including only from and after the entry of the Approval Order, as a "going out of business" or "store closing" sale;

(ii)    Provide qualified supervision to oversee the conduct of the Sale;

(iii)   Maintain focused and constant communication with store-level employees and managers to keep them abreast of strategy and

---

[5]     Capitalized terms not otherwise defined herein have the meanings given to them in the Consulting Agreement.  To the extent that this summary differs in any way from the terms set forth in the Consulting Agreement, the terms of the Consulting Agreement control.  The Debtor refers the Court to the Consulting Agreement attached as Exhibit 1 to the Interim Order for a full exposition of the terms and conditions of the Consulting Agreement.

timing and to properly effect store-level communication by the Debtor's employees to customers and others about the Sale;

(iv)     Establish and monitor accounting functions for the Sale, including evaluation of sales of the Debtor's goods located at the stores by category, sales reporting and expense monitoring;

(v)      Recommend loss prevention strategies;

(vi)     Coordinate with the Debtor so that the operation of the stores is being properly maintained including ongoing customer service and housekeeping activities;

(vii)    Recommend appropriate staffing levels for the stores and appropriate bonus and/or incentive programs (to be funded by the Debtor) for store employees; and

(viii)   Cause its employees, consultants and professionals to comply with the Debtor's loss prevention policies

12.    In consideration of its services, the Debtor shall pay the Consultant:

(i)      a "Base Fee" equal to (a) 1.25% of Gross Direct Merchandise Proceeds plus (b) 1.00% of Gross Wholesale Merchandise proceeds plus (c) 1.25% of the Gross Margin of Merchant Consignment Goods and Additional Consultant Goods;

(ii)     if Wells Fargo has been indefeasibly paid in full any amounts owed by the Debtor, a "Store Incentive Fee" from available funds of an additional 0.50% of Gross Direct Merchandise Proceeds and of the Gross Margin of Merchant Consignment Goods and Additional Consultant Goods, in each case back to dollar one;

(iii)    if Wells Fargo and GBFC have been indefeasibly paid in full any amounts owed by the Debtor, a "Global Incentive Fee" equal to 10.0% of Net Proceeds; and

(iv)     an amount equal to five percent (5.0%) of the cost value of the Additional Consultant Goods actually sold in the Sale as a sourcing fee (the "Additional Consultant Goods Fee").

13.    As previously discussed, the Consulting Agreement also includes a

"fiduciary out" provision that allows the Debtor to terminate the Consulting Agreement to pursue,

among other things, a going-concern or partial going-concern sale, so long as the Debtor

terminates the Consulting Agreement "prior to the point at which Consultant has materially

performed" its obligations; provided that Consultant will be entitled to receive payment of all fees earned, all reimbursable expenses incurred, all Additional Consultant Goods sold before the effectiveness of such termination, and any other amounts incurred to Consultant under the Consulting Agreement prior to such termination.

## Basis for Relief Requested

14.     The Debtor requests authority to:  (a) assume the Consulting Agreement; (b) conduct store closing or similar themed sales pursuant to the Sale Guidelines, with such sales to be free and clear of all liens, claims and encumbrances; and (c) receive certain related relief.

### *The Court Should Authorize the Assumption of the Consulting Agreement*

15.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  See, e.g., In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject an executory contract is governed by the business judgment standard and it can only be overturned if the decision was a product of bad faith, whim or caprice); see also In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

16.     The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).  Any more exacting scrutiny would slow the

administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. See Richmond Leasing Co. v. Capital Bank, 762 F.2d 1303, 1311 (5th Cir. 1985).

17.     The assumption of the Consulting Agreement is beneficial to the Debtor's estate, and therefore is a reasonable exercise of the Debtor's business judgment. As previously discussed, in order to maximize the value of its estate, the Debtor must sell a significant amount of inventory prior to the conclusion of the 210-day period to assume or reject leases. Any delay in commencing the Inventory Sales will jeopardize the value that can be recovered during this bankruptcy case. In addition, the Consultant brings significant experience and expertise to assist the Debtor conducting the Inventory Sales over the next 210 days. The Debtor and its advisors engaged in substantial efforts soliciting bids and negotiating with other national asset disposition firms before selecting the Consultant, and the terms set forth in the Consulting Agreement are the best alternative for the conduct of the Inventory Sales. The terms of the Consulting Agreement are the results of arm's length bargaining and are the best terms available to the Debtor, as tested through a reasonable diligence process.

18.     The Consultant has extensive expertise in conducting asset disposition sales and can oversee, and assist in the management and implementation of, the Inventory Sales in an efficient and cost-effective manner. Assumption of the Consulting Agreement will enable the Debtor to utilize the skills and resources of the Consultant to effectively and efficiently conduct the Inventory Sales for the benefit of all stakeholders. If the Consulting Agreement is not assumed on an interim basis, there will be tremendous harm to all stakeholders. The estate would lose the benefit of the momentum and preparation that began prior to the Petition Date.

RLF1 19822472v.1

Delay in or interruption of the Inventory Sales would lead to loss of value and increased administrative expense. Finally, given that the Consultant is already familiar with the Debtor's businesses and has commenced the Inventory Sales, replacing the Consultant with an alternative asset disposition firm would be difficult and highly inefficient.

***The Debtor Has a Valid Business Justification for the Inventory Sales***

19. Section 363(b)(1) of the Bankruptcy Code, which governs asset sales outside of a debtor's ordinary course of business, provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). When selling assets outside of the ordinary course of business, a debtor must articulate a valid business justification to obtain court approval. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Abbotts Dairies, Inc., 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of Lionel Corp. and requiring good faith); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the Abbotts Dairies decision); Dai-Icho Kangyo Bank v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999) (same). When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business

judgment rule has "vitality by analogy" in Chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted).

20. Store closing or asset disposition sales are a routine occurrence in chapter 11 cases involving retail debtors. See Ames Dept. Stores, 136 B.R. at 359 (noting that liquidation sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"). As such, bankruptcy courts in this jurisdiction have approved similar store closing sales. See, e.g., In re Rockport Co., LLC, Case No. 18-11145 (LSS) (Bankr. D. Del. Jun. 13, 2018); In re Bon-Ton Stores, Inc., Case No. 18 10248 (MFW) (Bankr. D. Del. Feb. 7, 2018); In re Aerogroup Int'l Inc., Case No. 17-11962 (KJC) (Bankr. D. Del. Sept. 19, 2017); In re Sports Authority Holdings, Inc., Case No. 16-10527 (MFW) (Bankr. D. Del. Mar. 3, 2016); In re RadioShack Corp., Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015).

21. Sufficient business justification exists to approve the proposed Inventory Sales under section 363(b)(1). The Debtor, with the assistance of its advisors, has determined that the Inventory Sales, on the expedited basis set forth herein, represent the best alternative to maximize recoveries to the Debtor's estate with respect to the Sale Assets. There is a meaningful amount of Merchandise that, in the aggregate, will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced asset disposition firm. Finally, to the extent there is another path that can provide even greater recoveries to the estate, the Debtor retains the ability to terminate the Consulting Agreement on ten days' notice, so long as the Consultant has not materially performed its obligations under the Consulting Agreement and the Consultant is compensated as provided in the Consulting Agreement.

***The Court Should Approve of the Sale of the Sale Assets Free and Clear of all Liens, Encumbrances and Other Interests under Bankruptcy Code Section 363(f)***

22. The Debtor requests approval to sell the Sale Assets on a final "as is" basis,

free and clear of any and all liens, claims and encumbrances in accordance with section 363(f) of

the Bankruptcy Code.  A debtor in possession may sell property under sections 363(b) and 363(f)

"free and clear of any interest in such property of an entity other than the estate" if any one of the

following conditions is satisfied:  (a) applicable non-bankruptcy law permits sale of such

property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the

price at which such property is to be sold is greater than the aggregate value of all liens on such

property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a

legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f);

Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988)

(noting that since section 363(f) is written in the disjunctive, the court may approve a sale free

and clear if any one subsection is met).  Moreover, the Third Circuit has indicated that a debtor

possesses broad authority to sell assets free and clear of liens.  See In re TWA Inc., 322 F.3d 283,

289 (3d Cir. 2003).

     23.     Although the term "any interest" is not defined in the Bankruptcy Code,

the Third Circuit has noted that the trend in modern cases is toward "a broader interpretation

which includes other obligations that may flow from ownership of the property."  Folger Adam

Security, Inc. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 258-59 (3d Cir. 2000).  As the Fourth

Circuit held in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-82 (4th Cir. 1996) (cited with

approval by the Third Circuit in Folger Adam), the scope of section 363(f) is not limited to in

rem interests in a debtor's assets.  Thus, a debtor can sell its assets under section 363(f) "free and

clear of successor liability that otherwise would have arisen under federal statute."  Folger Adam,

209 F.3d at 258.

     24.     The Debtor's prepetition secured lenders and proposed DIP lenders

support the assumption of the Consulting Agreement and recognize the benefits provided to the estates.  With respect to any other party asserting a lien, claim, or encumbrance against the Sale Assets, the Debtor anticipates that it will be able to satisfy one or more of the conditions set forth in section 363(f).  In connection with the sale of the Sale Assets, the Debtor proposes that any liens, claims, and encumbrances asserted against the Sale Assets be transferred to and attach to the amounts earned by the Debtor under the Inventory Sales.

***The Court Should Approve the Proposed Sale Guidelines***

25.     As a necessary part of this process, the Debtor requests the authority to conduct the Inventory Sales in accordance with the Sale Guidelines and without complying with applicable state and local laws, statutes, rules and/or ordinances governing store closing, liquidation or similar sales (collectively, the "Liquidation Laws").  Although the Debtor intends to comply with state and local health and safety laws and consumer protection laws in conducting the Inventory Sales, many Liquidation Laws require special and cumbersome licenses, waiting periods, time limits and other procedures for store closing, liquidation or similar sales.

26.     To eliminate the time, delay and expense associated with the administrative procedures necessary to comply with the Liquidation Laws, the Debtor proposes the Sale Guidelines as a way to streamline the administrative burdens on its estate while still adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Laws that may apply to the Inventory Sales.  As such, the Debtor believes the Sale Guidelines mitigate any concerns that its landlords or governmental agencies may raise with respect to the Inventory Sales, and therefore, the below requested relief seeking the waiver of certain state and local laws and lease provisions is appropriate.

*The Court Should Waive Compliance With Laws Regarding Inventory Sales*

27.     Bankruptcy courts have consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code. See Belculfine v. Aloe (In re Shenango Group, Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . .  [A] state statute [] cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), aff'd, 112 F.3d 633 (3d Cir. 1997).  Courts have found that preemption of state law is not appropriate if the laws deal with public health and safety.  See Baker & Drake, Inc. v. Public Serv. Comm'n of Nev. (In re Baker & Drake,  Inc.), 35 F.3d 1348, 1353-54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure).  However, preemption is appropriate where the only state laws involved concern economic regulation rather than the protection of public health and safety. See In re Baker & Drake, Inc., 35 F.3d at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

28.     Under the circumstances of this case, enforcing the strict requirements of the Liquidation Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtor's ability to maximize estate assets for the benefit of creditors.  Accordingly, authorizing the Inventory Sales without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and similar items is necessary and appropriate.  The requested waiver is narrowly

tailored to facilitate the successful consummation of Inventory Sales. The Debtor does not seek a general waiver of all state and local requirements, but only those that apply specifically to liquidation sales. In fact, the Debtor will comply with applicable state and local public health and safety laws, and applicable tax, labor, employment, environmental and consumer protection laws, including consumer laws regulating deceptive practices and false advertising.

29. Further, this Court has recognized that the Bankruptcy Code preempts certain state laws and have granted relief similar to that requested herein. See, e.g., In re Rockport Co., LLC, Case No. 18-11145 (LSS) (Bankr. D. Del. Jun. 13, 2018) (stating that the debtors were authorized to conduct the store closing sales under the terms of the order "without any further showing of compliance" with liquidation laws); In re Bon-Ton Stores, Inc., Case No. 18-10248 (MFW) (Bankr. D. Del. Feb. 7, 2018) (stating that the debtors are authorized to conduct the closing sales under the terms of the order "without the necessity of showing compliance" with liquidation laws); In re Aerogroup Int'l Inc., Case No. 17-11962 (KJC) (Bankr. D. Del. Sept. 19, 2017) (stating that "each and every federal, state, or local agency, departmental or governmental unit with regulatory authority over the Retail Inventory Liquidation Sales and all newspapers and other advertising media in which the Retail Inventory Liquidation Sales are advertised shall consider this Interim Order as binding authority that no further approval, license, or permit of any governmental unit shall be required, nor shall the Debtors be required to post any bond, to conduct the Retail Inventory Liquidation Sales"); In re Sports Authority Holdings, Inc., Case No. 16-10527 (MFW) (Bankr. D. Del. Mar. 3, 2016); (stating that "the Debtors shall be presumed to be in compliance with any Liquidation Laws and are authorized on an interim basis to conduct the Closing Sales in accordance with the terms of this Interim Order and the Sale Guidelines without the necessity of showing compliance with any Liquidation Laws during

the Interim Period"); <u>In re RadioShack Corp.</u>, Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6,

2015). (stating that "[p]rovided that the Inventory Liquidation Sales and the sale of Merchandise

and FF&E are conducted in accordance with the terms of this Interim Order, the Consulting

Agreement and the Sale Guidelines, and in light of the provisions in the laws of many

Governmental Units that exempt court-ordered sales from their provisions, the Debtors shall be

presumed to be in compliance with any GOB Laws and Liquidation Laws" without the necessity

of further showing compliance with any such GOB Laws and Liquidation Laws.).

***The Court Should Waive Compliance with Restrictions in the Leases***

30.     Certain of the Debtor's leases governing the premises of the stores subject

to any Inventory Sales may contain provisions purporting to restrict or prohibit the Debtor from

conducting store closing, liquidation or similar sales.  Such provisions have been held to be

unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's

ability to properly administer its reorganization case and maximize the value of its assets under

section 363 of the Bankruptcy Code.  <u>Ames Dep't Stores</u>, 136 B.R. at 359 (deciding that

enforcement of such lease restrictions would "contravene overriding federal policy requiring

debtor to maximize estate assets. . . ."); <u>In re R. H. Macy and Co., Inc.</u>, 170 B.R. 69, 73-74

(Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a

covenant to remain open throughout the lease term, because the debtor had a duty to maximize

the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and

closing the store.); <u>In re Tobago Bay Trading Co.</u>, 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990)

(finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of

creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); <u>In

re Lisbon Shops, Inc.</u>, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease

provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

31.     In addition, this Court has held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable.  See, e.g., In re Rockport Co., LLC, Case No. 18-11145 (LSS) (Bankr. D. Del. Jun. 13, 2018); In re Bon-Ton Stores, Inc., Case No. 18-10248 (MFW) (Bankr. D. Del. Feb. 7, 2018); In re Aerogroup Int'l Inc., Case No. 17-11962 (KJC) (Bankr. D. Del. Sept. 19, 2017); In re Sports Authority Holdings, Inc., Case No. 16-10527 (MFW) (Bankr. D. Del. Mar. 3, 2016); In re RadioShack Corp., Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015).  Thus, as a result of the above and to the extent that such provisions or restrictions exist in any of the leases of the stores subject to the Inventory Sales, the Debtor requests that the Court authorize the Debtor and/or the Consultant to conduct any liquidation sales without interference by any landlords or other persons affected, directly or indirectly, by the liquidation sales.

***The Court Should Approve the Abandonment of Certain Property In Connection with Any Inventory Sales***

32.     After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. §554(a); see also Hanover Ins. Co. v. Tyco Indus., Inc., 500 F.2d 654, 657 (3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim").

33.     The Debtor is seeking to sell certain Offered FF&E remaining in the Stores.  However, the Debtor may determine that the costs associated with holding or selling certain property or Offered FF&E exceeds the proceeds that will be realized upon its sale, or that such property is not sellable at all.  In such event, the property is of inconsequential value and benefit to the estate and/or may be burdensome to retain.

34.     To maximize the value of the Debtor's assets and to minimize the costs to the estate, the Debtor respectfully requests authority to abandon any of its remaining Offered FF&E or other property located at any of the Stores without incurring liability to any person or entity.  The Debtor further requests that the landlord of each Store with any abandoned Offered FF&E or other property be authorized to dispose of such property without liability to any third parties.

35.     Notwithstanding the foregoing, the Debtor will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (that is, information that alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtor's hardware, software, computers or cash registers or similar equipment that are to be sold or abandoned.

***The Court Should Find That The Debtor Should Be Exempt From Any "Fast Pay" Laws***

36.     Many states in which the Debtor operates also have laws and regulations that require the Debtor to pay an employee substantially contemporaneously with his or her termination (the "Fast Pay Laws").  In many cases, these laws require the payment to occur either immediately or within a period of only a few days from the date such employee is terminated.  The sweeping nature of any Inventory Sales may result in a number of employees being terminated.  The Debtor's payroll systems may be unable to process the payroll information associated with these terminations in a manner that will be compliant with these state laws and regulations.

37.     As set forth above, the Bankruptcy Code preempts state and local laws

that conflict with its underlying policies.  Preemption is appropriate where, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety.

38.     To be clear, the Debtor intends to pay its terminated employees as expeditiously as possible and under normal payment procedures.  If the Debtor was required to technically comply with these state laws and regulations in its Inventory Sales, its efforts to engage in the Inventory Sales and stem unnecessary payroll costs may be hampered.  Indeed, if forced to comply, the Debtor could face the choice of (a) having to incur the costs of keeping employees "employed" after the conclusion of the Inventory Sales while payroll is prepared or (b) staging terminations to the detriment of the Debtor's estate.  Both of these choices will provide no benefit to the Debtor's estate and will only increase the administrative costs of conducting the Inventory Sales.

39.     Accordingly, the Debtor respectfully submits that, at least in regard to the proposed Inventory Sales, Fast Pay Laws are at odds with the underlying policies of the Bankruptcy Code and, as such, the Debtor should be granted relief from their requirements.  See, e.g., In re Bon-Ton Stores, Inc., Case No. 18 10248 (MFW) (Bankr. D. Del. Feb. 7, 2018); In re Aerogroup Int'l Inc., Case No. 17-11962 (KJC) (Bankr. D. Del. Sept. 19, 2017); In re RadioShack Corp., Case No. 15-10197 (BLS) (Bankr. D. Del. Feb. 6, 2015)..

**The Court Should Authorize the Payment of Bonuses to Employees**

40.     Through this motion, the Debtor is requesting the authority, but not the obligation, to pay bonuses (the "Bonuses") to certain employees who remain in the employ of the Debtor during the Inventory Sales.  The Debtor believes that the Bonuses will motivate employees during the Inventory Sales and will enable the Debtor to retain those employees necessary to successfully complete the Inventory Sales.  The amount of the Bonuses will vary

depending upon a number of factors, including the employee's position with the Debtor and length of service. The total aggregate cost of the Bonus program, however, will not exceed 10% of the base payroll, including taxes and typical benefits, for all employees working at the Stores.

41.     This Court has the authority, pursuant to sections 105 and 363(b) of the Bankruptcy Code, to authorize the Debtor to pay the Bonuses. Bonuses are a typical practice in many store inventory sales, and courts in this jurisdiction have also approved such payments when debtors choose to enter into consulting agreements with asset disposition firms. See In re Rockport Co., LLC, Case No. 18-11145 (LSS) (Bankr. D. Del. Jun. 13, 2018); In re Bon Ton Stores, Inc., Case No. 18 10248 (MFW) (Bankr. D. Del. Feb. 7, 2018); In re Aerogroup Int'l Inc., Case No. 17-11962 (KJC) (Bankr. D. Del. Sept. 19, 2017); In re Sports Authority Holdings, Inc., Case No. 16-10527 (MFW) (Bankr. D. Del. Mar. 3, 2016); In re RadioShack Corp., Case No. 15 10197 (BLS) (Bankr. D. Del. Feb. 6, 2015).

42.     In this case, payment of the Bonuses in connection with the Inventory Sales will aid in maximizing the value of the Debtor's estate by inducing employees who are needed to manage and complete the Inventory Sales to remain in the employ of the Debtor and to maximize the returns from such sales. Therefore, the bonuses are justified by a sound business purpose and should be approved.

### **Request for Waiver of Stay**

43.     The Debtor also seeks a waiver of any stay of the effectiveness of the orders approving the relief requested in this motion and the Order. Bankruptcy Rule 6003(b) provides, in relevant part, that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate" Further, pursuant to Bankruptcy Rule 6004(h), an order authorizing the

use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, the Debtor submits that ample cause exists to justify (a) the immediate entry of an order granting the relief sought herein and (b) a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h).

### Consent to Jurisdiction

44.     Pursuant to Local Rule 9013-1(f), the Debtor consents to the entry of a final judgment or order with respect to this application if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

### Notice

45.     Notice of this motion will be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtor's largest unsecured creditors, as identified in its chapter 11 petition; (c) counsel to Wells Fargo Bank, National Association; (d) counsel to GB Credit Partners, LLC; and (e) all parties entitled to notice pursuant to Local Rule 9013-1(m). Due to the nature of the relief requested herein, the Debtor respectfully submits that no further notice of this motion is necessary.

### No Prior Request

46.     No prior request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtor respectfully requests that the Court (i) enter the Interim Order, substantially in the form attached hereto as Exhibit A, granting, on an interim basis, (a) the Inventory Sale Relief, and (b) such other and further relief to the Debtor as the Court may deem proper, (ii) set a date for a Final Hearing on the assumption of the Consulting Agreement and the Inventory Sale Relief sought in this motion, and (iii) establish objection and

reply deadlines for the Final Hearing, and (iv) grant such other relief as the Court deems just and proper.

Dated: August 7, 2018
      Wilmington, Delaware

Respectfully submitted,

*/s/ Zachary I. Shapiro*

Daniel J. DeFranceschi (DE 2732)
Zachary I. Shapiro (DE 5103)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
E-mail: defranceschi@rlf.com
       shapiro@rlf.com

-and-

Gregory M. Gordon (TX 08435300)
Amanda S. Rush (TX 24079422)
Jonathan M. Fisher (TX 24082999)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail: gmgordon@jonesday.com
       asrush@jonesday.com
       jmfisher@jonesday.com

-and-

Paul M. Green (TX 24059854)
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone: (832) 239-3939
Facsimile: (832) 239-3600
E-mail: pmgreen@jonesday.com

PROPOSED ATTORNEYS FOR DEBTOR

**EXHIBIT A**

**(Proposed Order)**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| SAMUELS JEWELERS, INC.,[1] | : | Case No. 18-_____ ( ___ ) |
|  | : |  |
| Debtor. | : | Related to Docket No. _____ |
|  | : |  |

## INTERIM ORDER:  (I) AUTHORIZING
## THE DEBTOR TO OPERATE UNDER THE CONSULTING AGREEMENT;
## (II) AUTHORIZING AND APPROVING THE CONDUCT OF STORE CLOSING OR
## SIMILAR THEMED SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL
## LIENS, CLAIMS AND ENCUMBRANCES; AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the Debtor for the entry of an interim order

(the "Interim Order"), pursuant to Bankruptcy Code sections 105, 363, and 365 and Bankruptcy

Rules 2002 and 6004; (a) authorizing the Debtor to operate under the consulting agreement dated

as of February 4, 2015, by and between the Debtor and a contractual joint venture comprised of

Gordon Brothers Retail Partners and Hilco Merchant Resources, LLC (the "Consulting

Agreement"), a copy of which is attached as Exhibit 1 to this Interim Order; (b) authorizing the

Debtor to conduct store closing or similar themed sales (collectively, the "Inventory Sales") in

accordance with the terms or the store closing sale guidelines (the "Sale Guidelines"), a copy of

which is attached as Exhibit 2 to this Interim Order, with such sales to be free and clear of all

liens, claims, encumbrances, defenses (including, without limitation, rights of setoff and

recoupment) and interests, including, without limitation, security interests of whatever kind or

nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust,

---

[1] The last four digits of the Debtor's taxpayer identification number are 6316 and its address is 2914 Montopolis Drive, Suite 200, Austin, Texas 78741.

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion or the Consulting Agreement.

hypothecations, liens, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, the "Encumbrances"); (c) authorizing the Debtor to pay customary retention bonuses to certain employees; and (d) granting certain related relief, on an interim basis (collectively, the "Inventory Sale Relief"); and the Court having reviewed the Motion and the First Day Declaration and having considered the statements of counsel and the evidence adduced with respect to the Motion at a hearing before the Court (the "Hearing"); the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, (ii) venue is proper in this district pursuant to 28 U.S.C. § 1409, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iv) the notice of the Motion and the Hearing was sufficient under the circumstances, and (v) there is good cause to waive the stay of Bankruptcy Rule 6004(h); after due deliberation determined that the relief requested in the Motion is necessary on an interim basis and essential for the Debtor's reorganization and such

relief is in the best interests of the Debtor, its estate and its creditors; and upon the record herein; and after due deliberation thereon; and good and sufficient cause have been shown; it is hereby:

FOUND AND DETERMINED THAT:[3]

A.     The Debtor has advanced sound business reasons for assumption of the Consulting Agreement, on an interim basis subject to the Final Hearing, as set forth in the Motion and at the Hearing, and operating under the Consulting Agreement is a reasonable exercise of the Debtor's business judgment and in the best interests of the Debtor and its estate.

B.     The conduct of the Inventory Sales will provide an efficient means for the Debtor to dispose of the Sale Assets.

C.     The Consulting Agreement was negotiated, proposed and entered into by the Consultant and the Debtor without collusion, in good faith and from arm's length bargaining positions.

D.     Assumption of the Consulting Agreement on an interim basis is a sound exercise of the Debtor's business judgment.

E.     The Debtor has represented that it is not seeking to either sell or lease personally identifiable information during the course of the Inventory Sales; *provided, however*, that the Consultant will be authorized to distribute emails and promotional materials to the Debtor's customers consistent with the Debtor's existing policies on the use of consumer information.

F.     The Debtor and the Consultant may sell the Sale Assets free and clear of all Encumbrances as provided for herein because, in each case, one or more of the standards set

---

[3]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.  See Fed. R. Bankr. P. 7052.

forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. Those holders of any such Encumbrances who did not object, or who withdrew their objections, to the entry of this Interim Order are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of any such Encumbrances who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having such Encumbrances attaching to the proceeds of the sale of the applicable Sale Assets with the same validity and priority and to the same extent and amount that any such Encumbrances had with respect to such Sale Assets. Notwithstanding anything contrary in this Order, the liens of Wells Fargo Bank, National Association ("Wells Fargo") and GB Credit Partners, LLC ("GBFC" and, together with Wells Fargo, in their capacities both as prepetition and postpetition lenders, the "Lenders") shall attach to the proceeds of the sale with the same validity and priority and to the same extent and amounts as their liens had with respect to the Sale Assets.

G. The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtor and its estate, and the Debtor has demonstrated good, sufficient and sound business purposes and justifications for the relief approved herein.

H. The Inventory Sales are in the best interest of the Debtor's estate.

I. The entry of this Interim Order is in the best interest of the Debtor and its estate, creditors and interest holders and all other parties in interest herein; and now therefore it is hereby.

**ORDERED THAT:**

1. The Motion, on an interim basis, is GRANTED as provided herein.

2. On _____, 2018, at _____ __.m (prevailing Eastern Time), a hearing (the "Final Hearing") will be held before this Court to consider the Inventory Sale Relief requested in the Motion, on a final basis. All objections, if any, to the Motion shall

- 4 -

be in writing and filed with this Court and served on counsel for the Debtor, any duly appointed

statutory committee, counsel for the Debtor's prepetition secured lenders, counsel for the

Debtor's proposed DIP lenders, and the Consultant, so as to be received on or before

_____, 2018 at _____ __.m. (prevailing Eastern Time). The Debtor shall file

any reply(s) to such objections on or before _____, 2018 at _____ __.m.

(prevailing Eastern Time) and serve such replies on the objecting parties, any duly appointed

committee and the Consultant.

        3.      The Debtor is authorized and empowered to take any and all further

actions as may be reasonably necessary or appropriate to give effect to this Interim Order.

        4.      To the extent of any conflict between this Interim Order, the Sale

Guidelines and the Consulting Agreement, the terms of this Interim Order shall control over all

other documents and the Sale Guidelines (as modified by any Side Letter (as defined herein))

shall control over the Consulting Agreement.

        5.      Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall take

effect immediately upon its entry.

**A.**      **Assumption of the Consulting Agreement**

        6.      The Consulting Agreement, a copy of which is attached to this Interim

Order as <u>Exhibit 1</u>, is hereby assumed on an interim basis pending entry of a final order pursuant

to section 365 of the Bankruptcy Code. The Debtor is authorized to act and perform in

accordance with the terms of the Consulting Agreement, including, making payments required

by the Consulting Agreement to the Consultant without the need for any application of the

Consultant or a further order of the Court. Notwithstanding this or any other provision of this

Interim Order, nothing shall prevent or be construed to prevent any of the Consultant and their

affiliates (individually, as part of a joint venture, or otherwise) from bidding on the Debtor's

- 5 -

assets pursuant to an agency agreement or otherwise, and Consultant is hereby authorized to bid on or otherwise acquire such assets notwithstanding anything to the contrary in the Bankruptcy Code or other applicable law, provided that such transaction or acquisition is approved by separate order of this Court.

7.     Subject to the restrictions set forth in this Interim Order and the Sale Guidelines, the Debtor and the Consultant hereby are authorized to take any and all actions as may be necessary or desirable to implement the Consulting Agreement and the Inventory Sales; and each of the transactions contemplated by the Consulting Agreement, and any actions taken by the Debtor and the Consultant necessary or desirable to implement the Consulting Agreement and/or the Inventory Sales prior to the date of this Interim Order, hereby are approved and ratified.

**B.     Authority To Engage in Inventory Sales**

8.     The Debtor is authorized, on an interim basis pending the Final Hearing, pursuant to 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately begin and conduct Inventory Sales at the Stores in accordance with this Interim Order, the Sale Guidelines, the Consulting Agreement and any Side Letter.

9.     The Sale Guidelines are approved in their entirety on an interim basis.

10.     The Debtor is authorized to discontinue operations at the Stores in accordance with this Interim Order and the Sale Guidelines.

11.     All entities that are presently in possession of some or all of the Merchandise or Offered FF&E in which the Debtor holds an interest that are or may be subject to the Consulting Agreement or this Interim Order hereby are directed to surrender possession of such Merchandise or Offered FF&E to the Debtor or the Consultant.

- 6 -

12.     Subject to the provisions herein in paragraphs 14, 16, 17 and 27, neither the Debtor nor the Consultant nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined in Bankruptcy Code section 101(27)) or landlord, to conduct the Inventory Sales and to take the related actions authorized herein.

## C.     Conduct of the Inventory Sales

13.     All newspapers and other advertising media in which the Inventory Sales may be advertised and all landlords are directed to accept this Interim Order as binding authority so as to authorize the Debtor and the Consultant to conduct the Inventory Sales and the sale of Merchandise and Offered FF&E pursuant to the Consulting Agreement, including, without limitation, to conduct and advertise the sale of the Merchandise and Offered FF&E in the manner contemplated by and in accordance with this Interim Order, the Sale Guidelines and the Consulting Agreement.

14.     Nothing in this Interim Order or the Consulting Agreement releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order.  Nothing contained in this Interim Order or in the Consulting Agreement shall in any way (a) diminish the obligation of any entity to comply with environmental laws, or (b) diminish the obligations of the Debtor to comply with environmental laws consistent with its rights and obligations as a debtor in possession under the Bankruptcy Code.  Nothing herein shall be construed to be a determination that the Consultant is an operator with respect to any environmental law or regulation.  Moreover, the sale of the Merchandise and Offered FF&E shall not be exempt from, and the Consultant shall be required

- 7 -

to comply with, laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws").  Nothing in this Interim Order shall alter or affect the Debtor's and Consultant's obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Interim Order shall be deemed to bar any Governmental Unit from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtor's or the Consultant's right to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Interim Order, or otherwise, pursuant to Paragraph 27 hereunder.  Notwithstanding any other provision in this Interim Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Interim Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code.  Nothing in this Interim Order shall be deemed to have made any rulings on any such issues.

15.    Except to the extent of the reserved rights of Governmental Units expressly granted elsewhere in this Interim Order, during the Inventory Sales, the Debtor and Consultant are hereby authorized to take such actions as may be necessary and appropriate to implement the Consulting Agreement and to conduct the sale without necessity of further order of this Court as provided in the Consulting Agreement or the Sale Guidelines, including, but not limited to, advertising the sale as a "store closing sale", "sale on everything", "everything must go", or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall Stores, and at enclosed mall Stores to the extent the applicable Store entrance

- 8 -

does not require entry into the enclosed mall common area), use of sign-walkers and street signage.

16.     Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise and Offered FF&E, to the extent that, prior to the Final Hearing, disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners or other advertising and the Debtor and the Consultant are unable to resolve the matter consensually with a Governmental Unit, any party may request an immediate telephonic hearing with this Court pursuant to these provisions. Such hearing will, to the extent practicable, be scheduled initially no later than the earlier of (a) the Final Hearing or (b) within two (2) business days of such request. This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

17.     Except as expressly provided in the Consulting Agreement, the sale of the Merchandise and Offered FF&E shall be conducted by the Debtor and the Consultant notwithstanding any restrictive provision of any lease, sublease or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Inventory Sales, the rejection of leases, abandonment of assets, or "going dark" provisions. The Consultant and landlords of the Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Consultant and any such landlords, provided that nothing in such Side Letters affects the provisions of Paragraphs 14, 16, 17 and 27 of this Interim Order. In the event of any conflict between the Sale Guidelines and any Side Letter, the terms of such Side Letter shall control.

RLF1 19822472v.1

18.     Except as expressly provided for herein or in the Sale Guidelines, and

except with respect to any Governmental Unit (as to which Paragraphs 14, 16, 17 and 27 of this

Interim Order shall apply), no person or entity, including, but not limited to, any landlord,

licensor, service providers, utilities, and creditor, shall take any action to directly or indirectly

prevent, interfere with, or otherwise hinder consummation of the Inventory Sales or the sale of

Merchandise or Offered FF&E, or the advertising and promotion (including the posting of signs

and exterior banners or the use of sign-walkers) of such sales, and all such parties and persons of

every nature and description, including, but  not limited to, any landlord, licensor, service

providers, utilities, and creditor and all those acting for or on behalf of such parties, are

prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding,

the conduct of the Inventory Sales and/or (b) instituting any action or proceeding in any court

(other than in the Bankruptcy Court) or administrative body seeking an order or judgment against,

among others, the Debtor, the Consultant, or the landlords at the Stores that might in any way

directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the

Inventory Sales or sale of the Merchandise or Offered FF&E or other liquidation sales at the

Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease,

sublease, license, or contract based upon any relief authorized herein.

19.     In accordance with and subject to the terms and conditions of the

Consulting Agreement, the Consultant shall have the right to use the Stores and all related Store

services, furniture, fixtures, equipment and other assets of the Debtor for the purpose of

conducting the Inventory Sales, free of any interference from any entity or person, subject to

compliance with the Sale Guidelines and this Interim Order and subject to Paragraphs 14, 16, 17

and 27 of this Interim Order.

- 10 -

20.     Until September 21, 2018, the Consultant shall accept the Debtor's validly-issued gift certificates and gift cards that were issued by the Debtor prior to the Sale Commencement Date in accordance with the Debtor's gift certificate and gift card policies and procedures, as such policies and procedures existed on the Petition Date, and accept returns of merchandise sold by the Debtor prior to the Sale Commencement Date, provided that such return is otherwise in compliance with the Debtor's return policies in effect as of the date such item was purchased and the customer is not repurchasing the same item so as to take advantage of the sale price being offered by the Consultant.

21.     All sales of Sale Assets shall be "as is" and final.  However, as to the Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."  Further, as to the Stores, the Debtor and/or the Consultant shall accept return of any goods purchased during the Inventory Sales that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within seven days of purchase, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect. Signs stating that "[r]efunds may only be for merchandise having a latent defect, when returned within 7 days of purchase" will be posted at the cash register area of the Stores.

22.     The Consultant shall not be liable for sales taxes except as expressly provided in the Consulting Agreement and the payment of any and all sales taxes is the responsibility of the Debtor.  The Debtor is directed to remit all taxes arising from the Inventory Sales to the applicable Governmental Units as and when due, provided that in the case of a bona fide dispute the Debtor is only directed to pay such taxes upon the resolution of the dispute, if

- 11 -

and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For

the avoidance of doubt, sales taxes collected and held in trust by the Debtor shall not be used to

pay any creditor or any other party, other than the applicable Governmental Unit for which the

sales taxes are collected.  The Consultant shall collect, remit to the Debtor and account for sales

taxes as and to the extent provided in the Consulting Agreement.  This Interim Order does not

enjoin, suspend or restrain the assessment, levy or collection of any tax under state law, and does

not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

23.     Pursuant to section 363(f) of the Bankruptcy Code, the Consultant, on

behalf of the Debtor, is authorized to sell and all sales of Merchandise or Offered FF&E (each as

defined in the Consulting Agreement) pursuant to the Inventory Sales, whether by the Consultant

or the Debtor, shall be free and clear of any and all Encumbrances; provided, however, that any

such Encumbrances shall attach to the proceeds of the Inventory Sales with the same validity, in

the amount, with the same priority as, and to the same extent that any such liens, claims, and

encumbrances have with respect to the Merchandise and Offered FF&E, subject to any claims

and defenses that the Debtor may possess with respect thereto and the Consultant's fees and

expenses (as provided in the Consulting Agreement).

24.     To the extent that the Debtor proposes to sell or abandon Offered FF&E

which may contain personal and/or confidential information about the Debtor's employees and/or

customers (the "Confidential Information"), the Debtor shall remove the Confidential

Information from such items of Offered FF&E before such sale or abandonment.

25.     The Debtor and/or the Consultant (as the case may be) are authorized and

empowered to transfer Merchandise and Offered FF&E among the Stores.  The Consultant is

authorized to sell the Debtor's Offered FF&E and abandon the same, in each case, as provided

- 12 -

for and in accordance with the terms of the Consulting Agreement

**D.      Dispute Resolution Procedures With Governmental Units**

26.      To the extent that the sale of Merchandise or Offered FF&E is subject to any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws (each a "GOB Law," and collectively, the "GOB Laws"), including laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale of the Interim Sale Assets (collectively, the "Liquidation Laws"), the dispute resolution procedures in this section shall apply.

27.      Provided that the Inventory Sales and the sale of Merchandise and Offered FF&E are conducted in accordance with the terms of this Interim Order, the Consulting Agreement and the Sale Guidelines, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, the Debtor shall be presumed to be in compliance with any GOB Laws and Liquidation Laws and, subject to Paragraphs 14, 16, 17 and 26 herein, are authorized to conduct the Inventory Sales in accordance with the terms of this Order and the Sale Guidelines without the necessity of further showing compliance with any such GOB Laws and Liquidation Laws.  However, to the extent there is a dispute arising from or relating to the Inventory Sales, this Interim Order, the Agreement, or the Sale Guidelines, which dispute relates to any Liquidation Laws (a "Reserved Dispute"), the following procedures shall apply:

a.      Except as otherwise provided in paragraph 16, the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute.  Any time within 14 days following service of this Final Order, any

- 13 -

Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute on the following parties so as to ensure delivery thereof within 1 business day thereafter: Jones Day, 2727 N. Harwood, Dallas, Texas (Attn: Jonathan Fisher, Esq.); (b) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Zachary Shapiro, Esq.).; (c) Gordon Brothers Retail Partners, LLC, 800 Boylston Street, 27th Floor, Boston, MA 02199 (Attn: Mackenzie Shea, Esq. Associate General Counsel); (d) Hilco Merchant Resources, LLC, 5 Revere Drive, Suite 206, Northbrook, IL 60062 (Attn: Ian S. Fredericks, Esq. Strategic Growth Chief Legal Officer); and (e) Katten Muchin Rosenman LLP, 575 Madison Avenue, New York, NY 10022 (Attn: Steven J. Reisman, Esq. and Cindi M. Giglio, Esq.).

b.  If the Debtor, the Consultant and the Governmental Unit are unable to resolve the Reserved Dispute within 14 days of service of the notice, the aggrieved party may file a motion with this Court requesting that this Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

c.  Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of this Order or to limit or interfere with the Debtor's or the Consultant's ability to conduct or to continue to conduct the Sales pursuant to this Order and the Consulting Agreement, absent further order of this Court

28.  Within three (3) business days of entry of this Interim Order, the Debtor shall serve copies of this Order, the Consulting Agreement and the Sale Guidelines via e-mail, facsimile or regular mail, on: (a) the Attorney General's office for each state where the Inventory Sales are being held, (b) the county consumer protection agency or similar agency for each county where the Inventory Sales are being held, (c) the division of consumer protection for each state where the Inventory Sales are being held; (d) the chief legal counsel for the local jurisdiction; and (e) the Debtor's landlords of the Stores.

**E.    Liens Granted to Consultant**

29.  Pursuant to Bankruptcy Code section 364(d), Debtor's payment obligations to Consultant under the Consulting Agreement on account of the Cost of Goods Sold

- 14 -

for Additional Consultant Goods (as defined below) sold in the Inventory Sales and the Base Fee shall be secured by (and Debtor hereby grants to Consultant) a first priority security interest in and lien on the Segregated Account and all funds on deposit therein. Such security interest and lien is (a) validly created, (b) senior to all other liens on such collateral (to the extent permitted by applicable law), including, without limitation, any liens in favor of the Lenders, regardless of whether such liens arose before or after the Petition Date, (c) effective immediately, and (d) shall be deemed perfected as of the effective date of the Consulting Agreement pursuant to this Interim Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties; provided that the Consultant is authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying the Consultant's interest. The Lenders each hereby expressly consent to such arrangements (including as to the priority of such security interest and lien granted to Consultant).

30.     If and to the extent Debtor fails to pay Consultant all or any portion of the Store Incentive Fee and it is determined that GBFC received any Gross Direct Merchandise Proceeds, Gross Wholesale Merchandise Proceeds, or Gross Other Asset Proceeds hereunder prior to payment of such Store Incentive Fee to Consultant, GBFC shall, within two business days of Consultant's request, pay to Consultant such unpaid amount, but only to the extent of such proceeds received.

31.     Debtor's payment obligations to Consultant under the Consulting Agreement on account of the Incentive Fees or any other amounts payable thereunder shall be secured by (and Debtor hereby grants to Consultant) a third priority security interest in and lien on all assets of the Debtor, junior and subordinate only to the liens of the Lenders. Such security

- 15 -

interest and lien created hereunder is (a) validly created, (b) junior and subordinate in all respects to the liens of the Lenders on such collateral, (c) effective immediately, and (d) shall be deemed perfected as of the effective date of the Consulting Agreement pursuant to this Interim Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties; provided that the Consultant is authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying the Consultant's interest. Until the indefeasible repayment in full in cash of all obligations owed to the Lenders, the Consultant will not assert, collect or enforce any rights against the collateral or any part thereof or take any action to foreclose or realize upon the collateral. In the event the Lenders release their liens on the collateral in connection with a sale or other disposition of the collateral, the Consultant shall release its lien upon the collateral so long as the Consultant's lien attaches to the proceeds of the sale consistent with the priorities set forth herein

## F. Additional Consultant Goods

32. During the Inventory Sales, the Consultant is authorized on an interim basis to supplement the Merchandise in the Inventory Sales with goods of like kind and quality as customarily sold in the Stores (the "Additional Consultant Goods"). Sales of Additional Consultant Goods shall be run through the Debtor's cash register systems; *provided, however*, that the Consultant shall mark the Additional Consultant Goods using either a unique SKU or department number or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise. The Consultant also shall provide reasonable customer notification in the Inventory Sales that Additional Consultant Goods are being included in the Inventory Sales, including by an explanatory customer notification sign in each Closing Store, and refer in such sign how a reasonable customer may distinguish the Additional Consultant

- 16 -

Goods from the Merchandise.  The Consultant shall further include in its printed advertisements that additional merchandise has been purchased by the Consultant and is being added to the Debtor's merchandise.

33.     Additional Consultant Goods shall be consigned to the Debtor as a true consignment under Article 9 of the UCC.  The Consultant is hereby granted a first-priority security interest in (a) the Additional Consultant Goods and (b) the Additional Consultant Good proceeds, which security interest shall be deemed perfected pursuant to this Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties; provided that the Consultant is authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying the Consultant's interest in the Additional Consultant Goods as consigned goods thereunder and the Debtor as the consignee therefor, and the Consultant's security interest in such Additional Consultant Goods and Additional Consultant Goods proceeds.  With respect to Additional Consultant Goods included during the interim sale period, but unsold as of the Final Hearing and Additional Consultant Goods to be included in the Inventory Sales from and after the Final Hearing, all parties' rights, including the right to object, are expressly reserved and not waived.

## G.     Other Provisions.

34.     The Consulting Agreement and related documents may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court.

35.     Subject to the entry of a Final Order, nothing contained in any plan confirmed in the Debtors' chapter 11 cases or any order of this Court confirming such plan or in any other order in this chapter 11 cases (including any order entered after any conversion of this

- 17 -

case to a case under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Consulting Agreement or the terms of this Order.

36.     The Consultant is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Order, the various procedures contemplated herein, any issues related to or otherwise connected to the Inventory Sales, and the Consulting Agreement.

37.     The Debtor shall have the authority, but not the obligation, to pay store closing bonuses (the "Store Closing Bonuses") to store-level and certain field employees who remain in the employ of the Debtor during the Inventory Sales.  The Debtor shall have the authority to determine the individual amounts of each Store Closing Bonus, except that the total aggregate cost of the Store Closing Bonus program will not exceed 10% of the base payroll, including taxes and typical benefits, for all employees working at the Stores.

38.     To the extent the Debtor is subject to any state "fast pay" laws in connection with the Inventory Sales, the Debtor shall be presumed to be in compliance with such laws to the extent, in applicable states, such payroll payments are made by the later of:  (a) the Debtor's next regularly scheduled payroll; and (b) seven calendar days following the termination date of the relevant employee, and in all such cases consistent with, and subject to, any previous orders of this Court regarding payment of same.

39.     The Consultant shall not be liable for any claims against the Debtor, and the Debtor shall not be liable for any claims against Consultant, in each case, other than as expressly provided for in the Consulting Agreement.

40.     Except with respect to any Governmental Unit (as to which the provisions of Paragraphs 14, 16, 17 and 27 of this Interim Order shall apply), this Court shall retain

- 18 -

exclusive jurisdiction with regard to all issues or disputes relating to this Interim Order or the Consulting Agreement, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (b) any claim of the Debtor, the landlords and/or the Consultant for protection from interference with the Inventory Sales, (c) any other disputes related to the Inventory Sales, and (d) to protect the Debtor and/or the Consultant against any assertions of Encumbrances. No such parties or person shall take any action against the Debtor, the Consultant, the landlords or the Inventory Sales until this Court has resolved such dispute. This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

Dated: _____, 2018       _____

     Wilmington, Delaware      UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT 1**

**(Consulting Agreement)**

 

June 30, 2018

To:    Samuels Jewelers, Inc.
       2914 Montopolis Drive Suite 200
       Austin, TX 78741

From:  Gordon Brothers Retail Partners, LLC
       800 Boylston Street, 27th Floor
       Boston, MA 02199

       -and-

       Hilco Merchant Resources, LLC
       5 Revere Drive, Suite 206
       Northbrook, Illinois 60062

Re:    Liquidation Consulting Agreement

Ladies and Gentlemen:

This letter shall serve as the agreement (the "Agreement") between (a) a contractual joint venture comprised of Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC (together, "Consultant") and (b) Samuels Jewelers, Inc. ("Merchant") pursuant to which Consultant shall serve as the exclusive liquidation consultant to Merchant to, subject to the terms and conditions set forth herein, (i) sell all of the Merchandise (as hereinafter defined) pursuant to appropriate mutually agreed upon themed sales as provided for herein (collectively, the "Sale") at Merchant's retail stores identified on Exhibit A attached hereto (each a "Store" and collectively, the "Stores"), or, with Merchant's consent, on a wholesale basis or through alternative channels, and (ii) sell all of the Offered FF&E (as hereinafter defined) in the Stores and in Merchant's distribution center identified on Exhibit A (the "Distribution Center").

## 1.    CONSULTANT'S SERVICES RELATED TO SALE

(A)    Merchant hereby retains Consultant as its exclusive, independent consultant to conduct the Sale at the Stores during the Sale Term (as hereinafter defined), and in connection therewith, Consultant shall, throughout the Sale Term:

       (i)    Recommend appropriate discounting to effectively sell all of the Merchandise and recommend appropriate point-of-purchase, point-of-sale, and other internal

and external advertising in connection therewith in accordance with mutually agreed upon themed sales, including only from and after the entry of the Approval Order, as a "going out of business" or "store closing" sale.

(ii)    Provide qualified supervision to oversee the conduct of the Sale.

(iii)    Maintain focused and constant communication with Store-level employees and managers to keep them abreast of strategy and timing and to properly effect Store-level communication by Merchant's employees to customers and others about the Sale.

(iv)    Establish and monitor accounting functions for the Sale, including evaluation of sales of Merchant's goods located at the Stores by category, sales reporting and expense monitoring.

(v)    Recommend loss prevention strategies.

(vi)    Coordinate with Merchant so that the operation of the Stores is being properly maintained including ongoing customer service and housekeeping activities.

(vii)    Recommend appropriate staffing levels for the Stores and appropriate bonus and/or incentive programs (to be funded by Merchant) for Store employees.

(viii)    Only if Merchant desires to advertise the Sale as a "going out of business" or "store closing" sale prior to entry of the Approval Order, advise Merchant with respect to the legal requirements of applicable state and local "going out of business" laws. In connection with such obligation, Consultant will (i) advise Merchant of the applicable waiting period under such laws, and/or (ii) prepare (in Merchant's name and for Merchant's signature) all permitting paperwork as may be necessary under such laws, deliver all such paperwork to Merchant, and file, on behalf of Merchant, all such paperwork where necessary, and/or (iii) advise where permitting paperwork and/or waiting periods do not apply.

(ix)    Cause its employees, consultants and professionals to comply with Merchant's loss prevention policies.

(B)    Notwithstanding any other provision of the Agreement, in the event that Merchant's board of directors determines in good faith that it is not in the best interests of Merchant and its stakeholders to proceed further with the transactions contemplated under the Agreement prior to the point at which Consultant has materially performed hereunder, Merchant may terminate the Agreement without liability upon ten (10) days' prior written notice to Consultant; provided that Consultant will be entitled to receive payment of: all fees earned, all reimbursable expenses incurred, all Additional Consultant Goods sold before the effectiveness of such termination, and any other amounts incurred to Consultant hereunder prior to such termination.

## 2.    SALE TERM; VACATING STORES

(A)    The term "Sale Term" with respect to each respective Store shall commence on or about the date identified on Exhibit B ("Sale Commencement Date") and shall end on the date identified on Exhibit B ("Sale Termination Date"); provided, however, that Merchant may determine an earlier Sale Termination Date with respect to any one or more Stores (on a Store-by-Store basis), subject to payment to Consultant of the amounts set forth in Section 1(B) above as attributable to the Store(s) to which the earlier Sale Termination Date applies.  Merchant and Consultant may mutually agree upon a later Sale Termination Date.

(B)    Upon the conclusion of the Sale Term at each Store, Consultant shall leave such Store in broom clean condition, subject to Consultant's right pursuant to Section 6 below to abandon in a neat and orderly manner all unsold Offered FF&E and all Retained FF&E.

## 3.    CONSULTANT'S EXPENSES RELATED TO SALE

(A)    All expenses incident to the conduct of the Sale and the operation of the Stores during the Sale Term (including without limitation all Consultant Controlled Expenses and all other store-level and corporate expenses associated with the Sale) shall be borne by Merchant; except solely for any of the specifically enumerated "Consultant Controlled Expenses" that exceed the aggregate budgeted amount (as provided in Section 3(B) below) for such Consultant Controlled Expenses, which excess Consultant Controlled Expenses will be borne by Consultant without reimbursement.

(B)    Attached hereto as Exhibit B is an expense budget for the "Consultant Controlled Expenses."  Consultant will advance funds for the Consultant Controlled Expenses, and Merchant shall reimburse Consultant therefor (up to the aggregate budgeted amount) in connection with each weekly reconciliation contemplated by Section 5(B) below upon presentation of reasonable documentation for such actually-incurred expenses.  The parties may from time to time mutually agree in writing, in consultation with Wells Fargo Bank, N.A. ("Wells Fargo") and Gordon Brothers Finance Company ("GBFC"), to increase the budget of Consultant Controlled Expenses based upon circumstances of the Sale.

## 4.    CONSULTANT'S COMPENSATION FOR SALE AND OTHER ASSETS

(A)    As used herein, the following terms shall have the following meanings:

  (i)    "Cost of Goods Sold" shall mean (1) with respect to Merchant Consignment Goods, the applicable invoice costs, taxes, procurement, shipping, freight, duty, and ticketing expenses; (2) with respect to Additional Consultant Goods, the applicable invoice costs, taxes, procurement (including the Additional Consultant Goods Fee), shipping, freight, duty, and ticketing expenses; or (3) in respect of repair, service or warranty sales, all out-of-pocket costs directly associated with providing the service.

(ii)     "Cost Value" with respect to each item of Merchandise sold shall be determined by reference to the per unit cost in Merchant's books and records, maintained in the ordinary course consistent with historic practices.

(iii)    "Direct Merchandise" shall mean the inventory actually sold in the Stores during the Sale Term (excluding Merchant Consignment Goods and Additional Consultant Goods), or with Merchant's consent, inventory sold through alternative channels (including without limitation through Merchant's or third party e-commerce platforms), the aggregate amount of which shall be determined using the gross rings inventory taking method.

(iv)     "Gross Direct Merchandise Proceeds" shall mean the gross proceeds of all sales of Direct Merchandise made during the Sale Term, net only of sales taxes, plus the Gross Margin from repair, service and warranty earned during the Sale Term.

(v)      "Gross Margin" shall mean gross proceeds of the applicable sales less the applicable Cost of Goods Sold.

(vi)     "Gross Other Asset Proceeds" shall mean, collectively, all proceeds received on account of the sale, collection, or other disposition of (a) any and all accounts receivable, (b) all of Merchant's owned and leased real estate rights and interests, including without limitation, those real properties on which the Stores and Distribution Center are located that are identified on Exhibit A, together with all non-store fixed assets (including without limitation, vehicles, rolling stock, lift trucks, etc.), (c) any and all intellectual property rights and interests relating to Merchant, Merchant's business, and/or related brands (including without limitation, trademarks, tradenames, customer lists, email lists, domain names, social media sites), (d) any and all litigation or claims and causes of action, (e) the Offered FF&E pursuant to Section 6 below, (f) Merchant Consignment Goods, and (g) the Additional Consultant Goods pursuant to Section 7 below.

(vii)    "Gross Wholesale Merchandise Proceeds" shall mean the gross proceeds of all sales of Wholesale Merchandise made during the Sale Term, net only of sales taxes.

(viii)   "Merchandise" shall mean the Direct Merchandise and Wholesale Merchandise.

(ix)     "Merchant Consignment Goods" shall mean goods on memo, whether located currently or subsequently during the Sale Term in the Stores and/or Distribution Center, that are procured and secured on Merchant's credit.

(x)      "Net Proceeds" shall mean the following, determined as of the time of the Final Reconciliation:  (a) the aggregate amount of Gross Direct Merchandise Proceeds, Gross Wholesale Proceeds, and Gross Other Asset Proceeds; less (b) the sum of (i) all Costs of Goods Sold; (ii) all FF&E Expenses (as hereinafter defined); (iii) all expenses incident to the conduct of the Sale and the operation of the Stores

(including without limitation all Consultant Controlled Expenses and all other store-level expenses); (iv) all corporate and overhead expenses; (v) all restructuring costs; (vi) all professional fees; and (vii) all other amounts required to be paid or funded prior to the indefeasible pay down of all amounts owed to Wells Fargo and GBFC as contemplated by Sections 4(B)(ii) and 4(B)(iii) below, in the case of each of the preceding clauses (i) through (vii) to the extent incurred and paid or reserved for prior to the indefeasible pay down of all amounts owed to Wells Fargo and GBFC as contemplated by Sections 4(B)(ii) and 4(B)(iii) below; and less (c) the amount paid to indefeasibly pay down all amounts owed to Wells Fargo and GBFC as contemplated by Sections 4(B)(ii) and 4(B)(iii) below.

(xi)     "Retail Value" shall be determined using the "gross rings" method.

(xii)    "Wholesale Merchandise" shall mean the inventory sold on a wholesale basis during the Sale Term.

(B)     In consideration of its services hereunder related to the Sale, Merchant shall pay Consultant:

(i)      a "Base Fee" equal to (a) 1.25% of Gross Direct Merchandise Proceeds plus (b) 1.00% of Gross Wholesale Merchandise Proceeds plus (c) 1.25% of the Gross Margin of Merchant Consignment Goods and Additional Consultant Goods;

(ii)     if Wells Fargo has been indefeasibly paid in full any amounts owed by Merchant and its affiliated debtors and debtors in possession in any jointly administered chapter 11 cases, a "Store Incentive Fee" from available funds of an additional 0.50% of Gross Direct Merchandise Proceeds and of the Gross Margin of Merchant Consignment Goods and Additional Consultant Goods, in each case back to dollar one; and

(iii)    if Wells Fargo and GBFC have been indefeasibly paid in full any amounts owed by Merchant and its affiliated debtors and debtors in possession in any jointly administered chapter 11 cases, a "Global Incentive Fee" equal to 10.0% of Net Proceeds.

(C)     On a weekly basis in connection with each weekly reconciliation contemplated by Section 5(B) below, Merchant shall pay Consultant an amount equal to (1) the Base Fee, (2) the Cost of Goods Sold of any Additional Consultant Goods sold, and (3) if and when the condition in Section 4(B)(ii) above is satisfied, the Store Incentive Fee, in each case on account of the prior week's sales as an advance on account of the fees or amounts payable hereunder.  The parties shall determine the Net Proceeds in connection with the Final Reconciliation; and thus, at such time the definitive Global Incentive Fee also will be determined in connection with the Final Reconciliation.  Immediately thereafter (and as part of the Final Reconciliation), Merchant shall pay Consultant any additional amount owed on account of the Base Fee, the Store Incentive Fee, or the Global Incentive Fee or, in the event any weekly reconciled amount is incorrect, Consultant shall reimburse Merchant for any overpayment attributable to such error.

## 5.     CONDUCT OF SALE; OTHER SALE MATTERS

(A)     Merchant shall have control over the personnel in the Stores and shall handle the cash, debit and charge card payments for all Merchandise, Merchant Consignment Goods, and Additional Consultant Goods in accordance with Merchant's normal cash management procedures, subject to Consultant's right to audit any such items.  Merchant (and not Consultant) shall be responsible for ensuring that the Sale, and the operation of the Stores (before, during, and after the Sale Term) shall be conducted in compliance with all applicable laws and regulations.

(B)     The parties will meet on each Wednesday during the Sale Term to review any Sale matters reasonably requested by either party; and all amounts payable or reimbursable to Consultant for the prior week (or the partial week in the case of the first and last weeks) shall be reconciled and paid immediately thereafter.  No later than twenty (20) days following the end of the Sale, the parties shall complete a final reconciliation and settlement of all amounts contemplated by the Agreement ("Final Reconciliation").  In the event Merchant has not sold or disposed of all of the assets included within the calculation of Gross Other Asset Proceeds as of the Final Reconciliation, the parties shall, in good faith, mutually agree upon an equitable adjustment to the Global Incentive Fee. From time to time upon request, each party shall prepare and deliver to the other party such other reports as either party may reasonably request.  Each party to the Agreement shall, at all times during the Sale Term and during the one (1) year period thereafter, provide the other with access to all information, books and records relating to the Sale and to the Agreement.  All records and reports shall be made available to Consultant and Merchant during regular business hours upon reasonable notice.

(C)     Merchant shall be solely responsible for the computing, collecting, holding, reporting, and paying all sales taxes associated with the sale of Merchandise, Merchant Consignment Goods, and Additional Consultant Goods during the Sale Term, and Consultant shall have absolutely no responsibilities or liabilities therefor.

(D)     Although Consultant shall undertake its obligations under the Agreement in a manner designed to achieve the desired results of the Sale and to maximize the recovery to Merchant, Merchant expressly acknowledges that Consultant is not guaranteeing the results of the Sale.

(E)     Merchant acknowledges that (i) the parties are not conducting an inventory of Merchant's goods located at the Stores; (ii) Consultant has made no independent assessment of the beginning levels of such goods; and (iii) Consultant shall not bear any liability for shrink or other loss to Merchant's inventory located at the Stores (including without limitation Merchandise).

(F)     All sales of Merchandise during the Sale shall be made in the name, and on behalf, of Merchant.  Consultant may determine to sell Merchandise in the Stores, or, with Merchant's consent, on a wholesale basis or through alternative channels (including through Merchant's or third party e-commerce platforms).

(G) After the entry of the Approval Order, all sales of Merchandise in the Stores during the Sale Term shall be "final sales" and "as is," and all advertisements and sales receipts will reflect the same.

(H) Consultant shall, during the Sale Term at the Stores, cooperate with Merchant in respect of Merchant's procedures governing returns of goods otherwise sold by Merchant (e.g., not in the Stores during the Sale Term).

(I) Subject to and upon entry of the Approval Order, Merchant will permit the Sale to be, and shall ensure that the Sale otherwise may be, advertised as a "going out of business," "store closing" or other mutually agreed upon handle throughout the remaining term of the Sale.

(J) Prior to the execution hereof, and as a condition to Consultant's obligations under, the Agreement, Merchant funded to Consultant $300,000, $150,000 of which Consultant will apply to the first reimbursable Consultant Controlled Expenses until exhausted, and $150,000 of which (the "Special Purpose Payment") shall be held by Consultant until the Final Reconciliation (and Merchant shall not apply the Special Purpose Payment to, or otherwise offset any portion of the Special Purpose Payment against, any weekly reimbursement, payment of fees, or other amount owing to Consultant under the Agreement prior to the Final Reconciliation), at which time it will be available for application by Consultant for all of Consultant's reimbursable fees and expenses, including without limitation for signage, supervision fees, travel, and any other out-of-pocket expenses incurred in connection with the Sale, and for any portion of the Base Fee, Incentive Fees, and Cost of Goods Sold of Additional Consultant Goods earned but not yet remitted to Consultant. Without limiting any of Consultant's other rights, Consultant may apply the Special Purpose Payment to any unpaid obligation owing by Merchant to Consultant under the Agreement in the event of termination sooner than the Final Reconciliation. Any portion of the Special Purpose Payment not used to pay amounts explicitly contemplated by the Agreement shall be returned to Merchant within three days following the Final Reconciliation and payment by Merchant to Consultant of all amounts then due and payable hereunder.

(K) Merchant, Consultant, Wells Fargo, and GBFC hereby agree to the following provisions:

(i) Merchant shall establish a segregated account into which solely the proceeds of Additional Consultant Goods sold in the Sale shall be deposited (the "Segregated Account") on a daily basis.

(ii) Each week, Merchant shall wire, from the Segregated Account, (x) to Consultant the Cost of Goods Sold with respect to the Additional Consultant Goods sold during each then prior week and (y) to Merchant's operating account reasonably acceptable to the Lenders the balance of the proceeds of Additional Consultant Goods for the then prior week.

(iii) Consultant shall notify Merchant, Wells Fargo, and GBFC of any shortfall in such payment on a weekly basis, in which case, Merchant shall promptly pay to Consultant funds in the amount of such shortfall.

(iv) Merchant's payment obligations to Consultant under this Agreement on account of the Cost of Goods Sold for Additional Consultant Goods sold in the Sale and the Base Fee shall be secured by (and Merchant hereby grants to Consultant) a first priority security interest in and lien on the Segregated Account and all funds on deposit therein. Such security interest and lien created hereunder is (a) validly created, (b) effective immediately upon execution of this Agreement, (c) senior to all other liens on such collateral (to the extent permitted by applicable law), and including, without limitation, any liens in favor of the Lenders. Wells Fargo and GBFC each hereby expressly consents to such arrangements (including as to the priority of such security interest and lien granted to Consultant). Consultant is hereby authorized to deliver (and Merchant shall cooperate with Consultant with respect to the delivery of) all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by Consultant in connection with the security interests and liens granted under this Agreement.

(v) If and to the extent Merchant fails to pay Consultant all or any portion of the Store Incentive Fee owed hereunder and it is determined that GBFC received any Gross Direct Merchandise Proceeds Gross Wholesale Merchandise Proceeds, or Gross Other Asset Proceeds hereunder prior to payment of such Store Incentive Fee to Consultant, GBFC shall, within two (2) business days of Consultant's request, pay to Consultant such unpaid amount, but only to the extent of such proceeds received.

(vi) Merchant's payment obligations to Consultant under this Agreement on account of the Inventive Fees or any other amounts payable hereunder shall be secured by (and Merchant hereby grants to Consultant) a third priority security interest in and lien on all assets of the Merchant, junior and subordinate only to the liens of Wells Fargo and GBFC. Such security interest and lien created hereunder is (a) validly created, (b) effective upon immediately upon execution of this Agreement, (c) junior and subordination in all respects to the liens of Wells Fargo and GBFC on such collateral. Consultant is hereby authorized to deliver (and Merchant shall cooperate with Consultant with respect to the delivery of) all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by Consultant in connection with the security interests and liens granted under this Agreement. Until the indefeasible repayment in full in cash of all obligations owed to Wells Fargo and GBFC, the Consultant will not assert, collect or enforce any rights against the collateral or any part thereof or take any action to foreclose or realize upon the collateral. In the event Wells Fargo or GBFC release their liens on the collateral in connection with a sale or other disposition of the collateral, the Consultant shall release its lien upon the collateral so long as the Consultant's lien attach to the proceeds of the sale consistent with the priorities set forth herein

(vii) The provisions of this Section 5(K) shall survive the termination or rejection of this Agreement as to Lenders.

**6.**     **FF&E**

(A)     Promptly following the entry of the Approval Order, Merchant shall inform Consultant of those items of furniture, fixtures, and equipment located at the Stores and Distribution Center which are not to be sold (because Merchant does not have the right to sell such items, because Merchant wishes to retain such items for itself, or otherwise) (collectively, "Retained FF&E").

(B)     With respect to all furniture, fixtures, and equipment located at the Stores and Distribution Center as of the Sale Commencement Date which is not Retained FF&E (collectively, the "Offered FF&E"), Consultant shall have the right to sell such Offered FF&E during the Sale Term.

(C)     Merchant shall reimburse Consultant for its reasonable sale expenses associated with the sale of the Offered FF&E, not to exceed the amount shown on an FF&E expense budget (which shall be in addition to the Consultant Controlled Expenses budget), to be mutually and reasonably agreed to by the parties promptly after Merchant identifies/designates/distinguishes between the Offered FF&E and Retained FF&E ("FF&E Expenses").

(D)     Consultant shall have the right to abandon any unsold Offered FF&E (and all Retained FF&E) at the Stores and Distribution Center at the conclusion of the Sale Term without liability to Merchant or any third party.

**7.**     **ADDITIONAL CONSULTANT GOODS**

(A)     In connection with the Sale, Consultant may supplement the Sale with additional goods procured by Consultant on its credit which are of like kind, and no lesser quality to the other Merchandise in the Sale ("Additional Consultant Goods"), subject to Merchant's consent, not to be unreasonably withheld or delayed.  For the avoidance of doubt, Merchant Consignment Goods (i.e., inventory on memo sourced and funded by Merchant on its credit) will not be considered Additional Consultant Goods hereunder.  Sales of Additional Consultant Goods shall be run through Merchant's cash register systems; provided, however, that Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise.  Consultant and Merchant shall also cooperate so as to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Merchant goods.  Additionally, Consultant shall provide signage in the Stores notifying customers that the Additional Consultant Goods have been included in the Sale.  Upon the sale of any Additional Consultant Goods to a customer, any sales taxes associated therewith will be collected from the consumer at the point of sale and thereafter remitted by Merchant to the applicable authorities.

(B)     Merchant shall pay to Consultant an amount equal to five percent (5.0%) of the cost value of the Additional Consultant Goods actually sold in the Sale as a sourcing fee (the "Additional Consultant Goods Fee").  Merchant shall pay Consultant its Cost of Goods Sold in connection with each weekly sale reconciliation with respect to sales of Additional Consultant Goods sold during each then prior week (or at such other mutually agreed upon time) from the proceeds

thereof and the Approval Order shall contain protections in connection therewith, including the establishment by Merchant of a segregated account.

(C)     Consultant and Merchant intend that the transactions relating to the Additional Consultant Goods are, and shall be construed as, a true consignment from Consultant to Merchant in all respects and not a consignment for security purposes.  At all times and for all purposes the Additional Consultant Goods and their proceeds shall be the exclusive property of Consultant, and no other person or entity shall have any claim against any of the Additional Consultant Goods or their proceeds.  The Additional Consultant Goods shall at all times remain subject to the exclusive control of Consultant.

(D)     Merchant shall, at Consultant's sole cost and expense, insure the Additional Consultant Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.  Consultant shall be responsible for payment of any deductible (but only in relation to the Additional Consultant Goods) under any such insurance in the event of any casualty affecting the Additional Consultant Goods.

(E)     Merchant acknowledges, and the Approval Order shall provide, that the Additional Consultant Goods shall be consigned to Merchant as a true consignment under Article 9 of the Uniform Commercial Code (the "UCC").  Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds, and Consultant is hereby authorized to file UCC financing statements and provide notifications to any prior secured parties.

## 8.     INSURANCE; RISK OF LOSS

(A)     During the Sale Term, (a) Merchant shall maintain (at its expense) insurance with respect to the Merchandise in amounts and on such terms and conditions as are consistent with Merchant's ordinary course operations, and (b) each of Merchant and Consultant shall maintain (at each party's respective expense) comprehensive liability insurance covering injuries to persons and property in or in connection with the Stores, in such amounts as are reasonable and consistent with its ordinary practices, for bodily injury, personal injury and/or property damage. Each party shall be added as an additional insured on all such insurance of the other party, all such insurance shall provide that it shall be non-cancelable and non-changeable except after 30 days' prior written notice to the other party, and each party shall provide the other with certificates of all such insurance prior to the commencement of the Sale.

(B)     Notwithstanding any other provision of the Agreement, Merchant and Consultant agree that Consultant shall not be deemed to be in possession or control of the Stores, or the Merchandise or other assets located therein or associated therewith, or of Merchant's employees located at the Stores.  Notwithstanding any other provision of the Agreement, but subject to Consultant's obligations under Section 9(A) below, Merchant and Consultant agree that Consultant does not assume any of Merchant's obligations or liabilities with respect to the Stores, or the Merchandise or other assets located therein or associated therewith, or of Merchant's employees located at the Stores.

(C)     Notwithstanding any other provision of the Agreement, Merchant and Consultant agree that Merchant shall bear all responsibility for customer warranty or product liability claims arising from or relating to any Merchandise and/or Merchant Consignment Goods. Notwithstanding any other provision of the Agreement, but subject to Consultant's obligations under Section 9(A) below, Merchant and Consultant agree that Merchant shall bear all responsibility for all other liability claims of customers, employees and other persons arising from events occurring at the Stores, and Merchandise and Merchant Consignment Goods sold in the Stores, before, during and after the Sale Term.

## 9.     **INDEMNIFICATION**

(A)     Consultant shall indemnify and hold Merchant and its affiliates, and their respective officers, directors, employees, consultants, and independent contractors (collectively, "Merchant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to:

> (i)     Consultant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

> (ii)     any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Merchant by Consultant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives (including without limitation any supervisors);

> (iii)     any claims by any party engaged by Consultant as an employee or independent contractor (including without limitation any non-Merchant employee supervisor) arising out of such employment or engagement;

> (iv)     any consumer warranty or products liability claims relating to any Additional Consultant Goods; and/or

> (v)     the negligence, willful misconduct or unlawful acts of Consultant, its affiliates or their respective officers, directors, employees, consultants, independent contractors or representatives.

(B)     Merchant shall indemnify and hold Consultant, its affiliates and their respective officers, directors, employees, consultants, and independent contractors (collectively, "Consultant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to:

> (i)     Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

(ii)    any claims by any party engaged by Merchant as an employee or independent contractor arising out of such engagement;

(iii)   any consumer warranty or products liability claims relating to any Merchandise and Merchant Consignment Goods;

(iv)    the negligence, willful misconduct or unlawful acts of Merchant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives; and/or

(v)     any action taken against Consultant by any domestic or foreign governmental authority or agency as a result of Merchant's affiliation with Gitanjali Group and Consultant's performance hereunder.

## 10.    **MISCELLANEOUS**

(A)    In the event Merchant becomes subject to the jurisdiction of any United States Bankruptcy Court (the "Bankruptcy Court"), the Agreement, including retention of Consultant and conduct of the Sale as set forth herein, would be subject to the approval of such Bankruptcy Court.  Merchant shall promptly, as part of its "first day" filings seek to have the Agreement, and the transactions contemplated by the Agreement assumed/approved by such Bankruptcy Court pursuant to a motion and order and upon terms therein acceptable to both Merchant and Consultant, which order (the "Approval Order") shall specifically provide, among other things, that: (i) Merchant accepts the Agreement and the transactions contemplated by the Agreement, including (without limitation) with respect to the payment of all fees and reimbursement of expenses, (ii) authorizing the Sale without the necessity of complying with federal or provincial rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that would otherwise govern the Sale; (iii) authorizing the Sale notwithstanding restrictions in leases, occupancy agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents; and (iv) take all further actions as are necessary or appropriate to carry out the terms and conditions of the Agreement.  Merchant shall provide Consultant with drafts of the motion seeking the Approval Order and the debtor in possession financing order two (2) days prior to the filing thereof, which order shall be reasonably acceptable to Consultant as to the provisions relevant to this Agreement.

(B)    Consultant hereby discloses, and Merchant hereby acknowledges, that Consultant's parent company, Gordon Brothers Group, LLC ("GBG"), owns a minority interest in, has certain contractual relationships with, and from time to time may provide contractual services to, Gordon Brothers Finance Company ("Finance Company") in the ordinary course of its business. Finance Company is a secured lender to Merchant.  Merchant is retaining Consultant pursuant to the Agreement in consultation with Finance Company.  Merchant hereby waives any actual or perceived conflict resulting from any of the foregoing.

(C)    The Agreement constitutes the entire agreement between the parties with respect to the matters contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

The Agreement may not be modified except in a written instrument executed by each of the parties hereto. No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party. The failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder. Nothing contained in the Agreement shall be deemed to create any relationship between Merchant and Consultant other than that of Consultant as an independent contractor of Merchant, and it is stipulated that the parties are not partners or joint venturers in any way. As between Consultant and Merchant, Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC will be jointly and severally liable for Consultant's obligations hereunder. Unless expressly set forth herein to the contrary, to the extent that either party's consent is required/requested hereunder, such consent shall not be unreasonably withheld or delayed. The Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns; provided, however, that the Agreement may not be assigned by either party without the prior written consent of the other. Written notices contemplated by the Agreement shall be sent by email (i) if to Merchant c/o Rajesh Motwani at rajesh.motwani@smjw.com, Bhavesh Shah at bhavesh.shah@smjw.com and Paul Green at pmgreen@jonesday.com; and (ii) if to Consultant c/o Mackenzie Shea at mshea@gordonbrothers.com and Ian Fredericks at ifredericks@hilcoglobal.com.

**[Signature Page Follows]**

Very truly yours,

**Gordon Brothers Retail Partners, LLC**

By: _____

Name: Rick Edwards

Title: Co-President, Retail

-and-

**Hilco Merchant Resources, LLC**

By: _____
Name:  Ryan Lawlor
Title:  VP & AGC, Managing Member

Agreed and Accepted:

**Samuels Jewelers, Inc.**

By: _____

Name: **FARHAD K. WADIA**
Title:   **CEO**
Address:  2914, MONTOPOLIS
 DRIVE,
AUSTIN
TX, 78741

*[Signature Page to Liquidation Consulting Agreement]*

Acknowledged and Agreed:

**Wells Fargo Bank N.A.**

By: _Y. Sonia Anandraj_
Name: Y. Sonia Anandraj
Title: Director
Address: One Boston Place, 19th FL
Boston, MA 02108

-and-

**Gordon Brothers Finance Company** , LLC

By: _____

Name: Lisa Carleton

Title: Managing Director

Address: 800 Brighton Street

Boston, MA

Exhibits:

Exhibit A        Stores and Distribution Center
Exhibit B        Budget of Consultant Controlled Expenses

# Samuels Jewelers, Inc.
## Store List

| Store No. | Brand | Store | Address | City | State | Zip Code | Telephone No. | Fax No. | Square Ft | Lease Expiration | Landlord |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 109 | Samuels Jewelers | Hemet Valley | 2200 W. Florida | Hemet | CA | 92545 | (951) 652-7891 | (951) 652-1408 | 1,085 | 12/31/2020 | M C Strauss |
| 124 | Samuels Jewelers | Montclair | 5132 Montclair Plaza | Montclair | CA | 91763 | (909) 621-2903 | (909) 624-5101 | 1,350 | 1/31/2026 | CIM |
| 129 | Samuels Jewelers | Torrance | 3525 W Carson St #297A | Torrance | CA | 90248 | (310) 214-1851 | (310) 214-1853 | 1,029 | 8/15/2027 | Simon |
| 145 | Samuels Jewelers | Stonewood Center | 251 Stonewood St #B13 | Downey | CA | 90241 | (562) 622-0814 | (562) 622-0894 | 1,202 | 1/31/2028 | Macerich |
| 147 | Samuels Jewelers | Sierra Vista | 1050 Shaw Avenue, A-25 | Clovis | CA | 93612 | (559) 324-9727 | (559) 324-9719 | 1,245 | 9/30/2019 | LandValue |
| 157 | Samuels Jewelers | Palm Desert | 72840 Hwy. 111 Sp. #413 | Palm Desert | CA | 92260 | (760) 346-8030 | (760) 341-1219 | 1,497 | 6/30/2020 | Westfield |
| 163 | Samuels Jewelers | The Oaks Mall | 350 W Hillcrest Dr M001 | Thousand Oaks | CA | 91319 | (805) 230-1076 | (805) 230-2132 | 1,306 | 1/31/2027 | Macerich |
| 167 | Samuels Jewelers | Victorville | Mall Of Victor Valley #257, 14400 Bear Valley Road | Victorville | CA | 92392 | (760) 241-3161 | (760) 241-7259 | 1,221 | 1/31/2027 | Macerich |
| 208 | Samuels Diamonds | Galleria at Roseville | 1173 Galleria Blvd. #221 | Roseville | CA | 95678 | (916) 742-6477 | (916) 780-1140 | 972 | 1/31/2019 | Westfield |
| 222 | Samuels Jewelers | Stoneridge Shopping Center | 2105 Stoneridge Mall Rd #B203 | Pleasanton | CA | 94588 | (925) 201-0014 | (925) 201-0023 | 3,497 | 2/29/2020 | Simon |
| 231 | Samuels Jewelers | Sunrise | 5917 Sunrise Mall | Citrus Heights | CA | 95610 | (916) 961-3444 | (916) 961-4368 | 1,497 | 1/31/2028 | Spinoso |
| 245 | Samuels Jewelers | Oakridge | 171 Oakridge Mall | San Jose | CA | 95123 | (408) 578-5555 | (408) 578-5757 | 1,522 | 1/31/2023 | Westfield |
| 252 | Samuels Jewelers | Arden Fair | 1689 Arden Way, #2126 | Sacramento | CA | 95815 | (916) 925-0867 | (916) 925-7387 | 1,499 | 12/31/2023 | Macerich |
| 253 | Samuels Diamonds | Modesto | 504 Vintage Mall | Modesto | CA | 95356 | (209) 527-8183 | (209) 527-0652 | 1,328 | 1/31/2028 | Macerich |
| 256 | Samuels Jewelers | Stockton | 5308 Pacific Ave. #25 | Stockton | CA | 95207 | (209) 957-5914 | (209) 957-4230 | 1,363 | 2/28/2022 | Stone Brothers |
| 266 | Samuels Diamonds | Stevenscreek | 2855 Stevens Creek Blvd., Space K-163 | Santa Clara | CA | 95050 | (408) 244-4333 | (408) 244-9440 | 1,050 | 2/28/2027 | Westfield |
| 310 | Samuels Jewelers | Salem | Salem Centre #210 480 Center St. N.E. | Salem | OR | 97301 | (503) 371-6003 | (503) 371-9726 | 2,086 | 12/31/2022 | JLL |
| 311 | Samuels Jewelers | Medford | Rogue Valley Mall #2047, 1600 N. Riverside | Medford | OR | 97501 | (541) 772-4766 | (541) 772-5131 | 1,460 | 1/31/2022 | JLL |
| 314 | Rogers Jewelers | Pines Mall | Pines Mall, US 65S and Commerce Rd. 2901 Pines Mall Rd. | Pine Bluff | AR | 71601 | (870) 534-4100 | (870) 535-7146 | 1,494 | 1/31/2027 | Anil Dadlani |
| 355 | Andrews Jewelers | Polaris Fashion Place | 1500 Polaris Parkway, Space 2196 | Columbus | OH | 43240 | (614) 786-1630 | (614) 786-1633 | 2,089 | 10/31/2019 | WP Glimcher |
| 356 | Samuels Jewelers | Mall @ Sierra Vista | 2200 El Mercado Loop, Space 1134 | Sierra Vista | AZ | 85635 | (520) 452-1788 | (520) 452-1792 | 1,332 | 12/31/2019 | Rouse |
| 369 | Samuels Jewelers | Arrowhead | 7700 West Arrowhead Towne Center, #2250 | Glendale | AZ | 85308 | (623) 979-4735 | (623) 979-4431 | 1,400 | 1/31/2028 | Macerich |
| 403 | Samuels Jewelers | Town West Square | 4600 W Kellogg Dr, Space Q16 | Wichita | KS | 67209 | (316) 941-9762 | (316) 941-9816 | 1,533 | 8/31/2026 | Washington Prime |
| 404 | Samuels Jewelers | Town East Square | 7700 E Kellogg Dr, Space H04 | Wichita | KS | 67207 | (316) 686-1724 | (316) 686-1735 | 1,368 | 8/31/2026 | Simon |
| 454 | Samuels Jewelers | Defiance | 1500 North Clinton | Defiance | OH | 43512 | (419) 784-4110 | (419) 784-4412 | 1,633 | 4/30/2021 | JJ Gumberg |
| 508 | Samuels Jewelers | Town East Mall | 350 W Hillcrest Dr M001 | Mesquite | TX | 75126 | (972) 613-4570 | (972) 61-4583 | 1,599 | 10/31/2026 | GGP |
| 516 | Samuels Jewelers | Mc Allan | 2200 S 10TH ST #X03 | McAllen | TX | 78503 | (956)-267-4252 | (956)-992-0692 | 1,093 | 10/31/2022 | Simon |
| 524 | Samuels Diamonds | Amarillo | 7200 W 45th Avenue, Suite 11 | Amarillo | TX | 79109 | (806) 358-7211 | (806) 358-6597 | 2,475 | 6/30/2020 | James Schrader |
| 528 | Samuels Jewelers | College Station | 1500 Harvey Road #6002 | College Stat. | TX | 77840 | (979) 764-0424 | (979) 764-9480 | 1,360 | 6/30/2026 | CBL |
| 529 | Samuels Jewelers | Killeen Mall | 2100 Ws. Young Dr., #1072 | Killeen | TX | 76543 | (254) 699-6404 | (254) 699-1518 | 1,013 | 12/31/2023 | JLL |
| 530 | Samuels Jewelers | Prien Lake Mall | 496 W Prien Lake Rd E01D | Lake Charles | LA | 70601 | (337) 477-8909 | (337)478-8988 | 1,656 | 11/30/2025 | Simon |
| 532 | Samuels Jewelers | Mall Of Abilene | 4310 Buffalo Gap Rd. #1290 | Abilene | TX | 79606 | (325) 695-2080 | (325) 695-0660 | 1,360 | 6/30/2023 | JLL |
| 533 | Samuels Jewelers | Parkdale Mall | 6155 Eastex Freeway, space A-132 | Beaumont | TX | 77706 | (409) 234-4820 | (409) 347-0201 | 1,589 | 10/31/2022 | CBL |
| 536 | Samuels Jewelers | Central Mall | 3100 Highway 365, Port arthur, suite 146 | Port Arthur | TX | 77642 | (409) 724-1706 | (409) 724-1825 | 1,195 | 1/31/2024 | JLL |
| 538 | Samuels Jewelers | Lake Jackson | 100 W. Hwy. 332, #1478 | Lake Jackson | TX | 77566 | (979) 297-6199 | (979) 297-6194 | 1,418 | 12/31/2019 | Centennial |
| 545 | Samuels Jewelers | Music City | 4101 E. 42Nd. St. #H-10 | Odessa | TX | 79762 | (432) 366-1769 | (432) 366-6137 | 1,659 | 9/30/2018 | ICA |
| 547 | Samuels Jewelers | Cielo Vista Mall | 8401 Gateway Blvd W | El Paso | TX | 79925 | (915) 881-8387 | (915) 881-8658 | 1,197 | 8/31/2026 | Simon |
| 548 | Samuels Jewelers | Wichita Falls | 3111 Midwestern Parkway, #342 | Wichita Falls | TX | 76308 | (940) 692-8481 | (940) 692-7829 | 1,726 | 12/31/2019 | Rouse |
| 550 | Samuels Jewelers | The Woodlands | 1201 Lake Woodlands Drive, Space 2090 | The Woodlands | TX | 77380 | (281) 298-5571 | (281) 298-2866 | 1,644 | 12/31/2023 | GGP |
| 554 | Andrews Jewelers | The Mall at Tuttle Crossin | 5043 Tuttle Crossing Blvd., Suite 271 | Dublin | OH | 43016 | (614) 760-8390 | (614) 760-8393 | 1,330 | 4/30/2019 | Westfield |
| 557 | Samuels Jewelers | Broadway Square | 4601 S Broadway Ave B23 | Tyler | TX | 75703 | (903) 939-0232 | (903) 939-0472 | 1,102 | 10/31/2025 | Simon |
| 558 | Samuels Jewelers | Stonebriar Mall | 2601 Preston Road #2026 | Frisco | TX | 75033 | (469) 362-5344 | (469) 362-5363 | 1,572 | 10/31/2026 | GGP |
| 561 | Samuels Diamonds | Corpus Christi | 5425 South Padre Island Drive, #157 | Corpus Christi | TX | 78411 | (361) 994-5212 | (361) 994-6520 | 4,136 | 6/30/2020 | Weingarten |
| 566 | Rogers Jewelers | Pinnacle Hills Promenade | 2203 S. Promenade Bldv. Suite 2165 | Rogers | AR | 72758 | (479) 621-5143 | (479) 621-8962 | 1,689 | 9/30/2018 | GGP |
| 567 | Samuels Diamonds | La Frontera | 104 Sundance Pkwy | Round Rock | TX | 78681 | (512) 600-0140 | (512) 600-0276 | 3,992 | 8/21/2022 | Martin Capital |
| 581 | Samuels Jewelers | Woodland Hills | 7021 S. Memorial #274 | Tulsa | OK | 74133 | (918) 250-8501 | (918) 252-3854 | 1,104 | 6/30/2025 | Simon |
| 586 | Samuels Jewelers | Sunrise Mall | 2370 North Expressway Space 1074 | Brownsville | TX | 78521 | (956) 574-9735 | (956) 574-9756 | 1,423 | 4/30/2025 | CBL |
| 604 | Rogers Jewelers | Northgate Mall | 9717 Colerain Ave. | Cincinnati | OH | 45251 | (513) 741-3344 | (513) 741-0193 | 1,616 | 2/28/2022 | Tabani |
| 605 | Rogers Jewelers | Tri-County Mall | 11700 Princeton Pike | Cincinnati | OH | 45246 | (513) 671-1329 | (513) 671-1329 | 1,809 | 1/31/2019 | Singhaiyi |
| 606 | Rogers Jewelers | Florence Mall | 2020 Florence Mall | Florence | KY | 41042 | (859) 525-0200 | (859) 525-1196 | 2,482 | 8/31/2019 | GGP |
| 607 | Rogers Jewelers | Towne Mall | 3461 Towne Blvd. | Franklin | OH | 45005 | (513) 423-9268 | (513) 423-9754 | 1,749 | 3/31/2020 | CBL |
| 608 | Andrews Jewelers | Markland Mall | 1205 S. Reed Rd. | Kokomo | IN | 46902 | (765) 457-6688 | (765) 452-1167 | 1,000 | 1/31/2021 | Simon |
| 609 | Rogers Jewelers | Richmond Square | 3801 E. Main St. | Richmond | IN | 47374 | (765) 962-0559 | (765) 966-5079 | 1,400 | 1/31/2021 | Hull Property Group |
| 612 | Rogers Jewelers | West Park Mall | 3049 William Street Suite 247 | Cape Girardeau | MO | 63703 | (573) 339-0011 | (573) 339-0014 | 1,200 | 6/30/2024 | Madison Marquette |
| 615 | Rogers Jewelers | Lindale Mall | 4444 First Ave. N.E.; Suite 121 | Cedar Rapids | IA | 52402 | (319) 378-1100 | (319) 378-1244 | 1,290 | 1/31/2026 | WP Glimcher |
| 619 | Rogers Jewelers | Eastwood Mall | 555 Youngstown Warren Rd. #914 | Niles | OH | 44446 | (330) 550-0420 | (330) 505-0433 | 2,445 | 12/31/2025 | Cafaro |
| 624 | Rogers Jewelers | Central Mall | 2400 Richmond Rd & Kennedy Lane Space # 78 | Texarkana | TX | 75503 | (903) 223-7022 | (903) 223-1023 | 1,250 | 1/31/2023 | JLL |
| 627 | Andrews Jewelers | Battlefield Mall | 2825 South Glenstone | Springfield | MO | 65804 | (417) 887-0604 | (417) 887-0294 | 1,779 | 12/31/2019 | Simon |
| 629 | Rogers Jewelers | Empire Mall | 780 W. Empire Mall | Sioux Falls | SD | 57106 | (605) 361-9700 | (605) 361-5203 | 1,062 | 8/31/2023 | Simon |
| 630 | Rogers Jewelers | Kenwood Towne Centre | 7875 Montgomery Rd. | Cincinnati | OH | 45236 | (513) 745-9966 | (513) 745-9985 | 1,345 | 10/31/2018 | GGP |

# Samuels Jewelers, Inc.
## Store List

| Store No. | Brand | Store | Address | City | State | Zip Code | Telephone No. | Fax No. | Square Ft | Lease Expiration | Landlord |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 633 | Rogers Jewelers | Eastgate Mall | 4601-414 Eastgate Blvd. | Cincinnati | OH | 45245 | (513) 753-8800 | (513) 753-8230 | 1,186 | 2/28/2022 | CBL |
| 634 | Andrews Jewelers | Muncie Mall | 3501, N. Granville Ave., | Muncie | IN | 47303 | (765) 288-3400 | (765) 288-1046 | 1,074 | 1/31/2021 | Simon |
| 636 | Rogers Jewelers | Westfield Shopping | 274 Westfield Shopping Town Gateway, Pavilion 2 | Lincoln | NE | 68505 | (402) 467-3600 | (402) 467-3715 | 1,600 | 6/30/2024 | Westfield |
| 642 | Andrews Jewelers | Tippecanoe Mall | 2415 SagamorePkwy. South Suite A-14 | Lafayette | IN | 47905 | (765) 449-0112 | (765) 449-0525 | 1,387 | 1/31/2026 | Simon |
| 643 | Andrews Jewelers | Greenwood Park | 1251 US 31N | Greenwood | IN | 46142 | (317)-889-4200 | (317) 889-0265 | 1,695 | 1/31/2026 | Simon |
| 644 | Andrews Jewelers | University Park Mall | 6501 Grape Rd 484A | Mishawaka | IN | 46545 | (574) 271-1910 | (574) 271-1947 | 1,747 | 2/2/2026 | Simon |
| 647 | Andrews Jewelers | Ohio Valley Mall | Unit 640 Mall Road | St. Clairsville | OH | 43950 | (740) 695-5394 | (740) 695-5491 | 1,002 | 12/31/2023 | Cafaro |
| 649 | Andrews Jewelers | Sandusky Mall | 4314 Milan Road Suite 540 | Sandusky | OH | 44870 | (419) 6276249 | (419) 627-6260 | 1,428 | 1/31/2018 | Cafaro |
| 650 | Andrews Jewelers | Eastland Mall | 2725 Eastland Mall | Columbus | OH | 43232 | (614) 861-5115 | (614) 861-6804 | 1,152 | 1/31/2020 | WP Glimcher |
| 651 | Rogers Jewelers | Mall at Fairfield Commons | 2727 N. Fairfield Commons, Ste. B42 | Beavercreek | OH | 45431 | (937) 320-1151 | (937) 320-0355 | 1,473 | 1/31/2020 | WP Glimcher |
| 652 | Rogers Jewelers | Dayton Mall | 2700 Miamisburg-Centerville Road Space 920 | Dayton | OH | 45459 | (937) 438-1068 | (937) 438-3462 | 1,325 | 1/31/2020 | WP Glimcher |
| 653 | Rogers Jewelers | Central Mall | 5111 Rogers Ave. Space 131 | Ft. Smith | AR | 72903 | (479) 478-7071 | (479) 478-7071 | 1,293 | 1/31/2020 | JLL |
| 657 | Andrews Jewelers | Easton Town Center | 4049 The Strand East | Columbus | OH | 43219 | (614) 472-0057 | (614) 472-0054 | 1,434 | 1/31/2022 | Steiner |
| 658 | Rogers Jewelers | Charleston Town Center | 3000 CharlestonTown Center, Space 2076 | Charleston | WV | 25389 | (304) 345-0058 | (304) 345-0056 | 1,190 | 6/30/2021 | Forest City/QIC/CBRE |
| 659 | Andrews Jewelers | River Valley Mall | 1635 River Valley Circle South, Space 233 | Lancaster | OH | 43130 | (740) 653-0059 | (740) 653-2830 | 1,226 | 1/31/2021 | RVM LLC (from Glimcher) |
| 660 | Rogers Jewelers | Grand Central Mall | 100 Grand Central Mall, Space 220 | Parkersburg | WV | 26101 | (304) 485-9360 | (304)485-9366 | 1,353 | 12/31/2017 | WP Glimcher |
| 661 | Rogers Jewelers | Huntington Mall | Rt. 60 & Mall Road, Unit #625 | Barboursville | WV | 25504 | (304) 736-0061 | (304) 736-4030 | 2,407 | 4/30/2021 | Cafaro |
| 663 | Rogers Jewelers | Jordan Creek Town | 101 Jordan Creek Parkway Suite 12180 | West Des Moines | IA | 50266 | (515) 224-2093 | (515) 224-4052 | 1,848 | 1/31/2026 | GGP |
| 664 | Rogers Jewelers | Mccain Mall | 3929 McCain Blvd., Space F09 | North Little Rock | AR | 72116 | (501) 812-6424 | 501-812-6411 | 1,437 | 1/31/2019 | Simon |
| 669 | Rogers Jewelers | Liberty Center | 7139 Foundry Row F 122 | Liberty Township | OH | 45069 | (513)-755-2942 | (513)755-3024 | 1,800 | 1/31/2026 | Steiner |
| 705 | Samuels Jewelers | Coeur D'Alene | 200 W. Hanley Ave., C-301 | Coeur D'Alene | ID | 83814 | (208) 762-2323 | (208) 762-2283 | 1,280 | 1/31/2019 | Star-West |
| 713 | Schubach Jewelers | Fashion Place | 6191 S. State | Murray | UT | 84107 | (801) 262-9471 | (801) 265-9420 | 1,518 | 12/31/2026 | Simon |
| 714 | Schubach Jewelers | Valley Fair | 3601 S. 2700 West C-110 | West Valley | UT | 84119 | (801) 968-9035 | (801) 964-0881 | 1,775 | 10/31/2022 | Vestar |
| 716 | Schubach Jewelers | Orem | D-59 University Mall | Orem | UT | 84058 | (801) 235-9160 | (801) 226-8783 | 1,597 | 1/31/2022 | Woodbury |
| 718 | Schubach Jewelers | Logan | 1300 N. Main | Logan | UT | 84341 | (435) 753-2990 | (435) 753-7131 | 1,206 | 12/31/2022 | Simon |
| 719 | Schubach Jewelers | South Towne Center | 10450 State Street | Sandy | UT | 84070 | (801) 572-0410 | (801) 572-8829 | 1,536 | 5/31/2018 | Pacific Retail |
| 720 | Schubach Jewelers | Layton | 1028 Layton Hills Mall | Layton | UT | 84041 | (801) 546-3469 | (801) 546-9551 | 1,795 | 1/31/2024 | CBL |
| 721 | Schubach Jewelers | Provo | 1200 Towne Centre Blvd Space 1084 | Provo | UT | 84601 | (801) 852-5025 | (801) 852-5027 | 1,495 | 12/31/2018 | Sigal |
| 731 | Samuels Jewelers | Rimrock/Schubach | 300 S. 24Th St. West | Billings | MT | 59102 | (406) 656-7224 | (406) 656-6949 | 2,450 | 1/31/2019 | CIM |
| 734 | Samuels Jewelers | Missoula | South Gate Mall | Missoula | MT | 59801 | (406) 721-1952 | (406) 549-9540 | 1,720 | 11/30/2022 | SMA/Lambros |
| 735 | Samuels Jewelers | Bozeman | 2825 West Main 2J1 | Bozeman | MT | 59715 | (406) 587-2350 | (406) 586-7582 | 1,200 | 1/31/2022 | Gallatin Mall Group |
| 770 | Samuels Diamonds | Rock Springs | 2441 Foothill Blvd. | Rock Springs | WY | 82901 | (307) 382-5373 | (307) 382-7805 | 1,435 | 1/31/2020 | Rouse |
| 771 | Samuels Jewelers | Cheyenne | Frontier Mall 1400 Dell Range Blvd | Cheyenne | WY | 82009 | (307) 778-3030 | (307) 635-1723 | 1,438 | 1/31/2023 | GGP |
| 785 | Samuels Diamonds | Village at The Peaks | 1248 South Hover Rd Unit 100 | Longmont | CO | 80501 | (303) 651-2187 | (303) 651-9046 | 2,000 | 1/31/2025 | Simon |
| 787 | Samuels Jewelers | Flat Iron Crossing | One West Flatiron Circle, #2016 | Broomfield | CO | 80021 | (303) 469-0505 | (303) 469-9140 | 1,370 | 1/31/2028 | Macerich |
| 789 | Samuels Jewelers | Pueblo Mall | 3429 Dillon Drive Space H2B | Pueblo | CO | 81008 | (719) 543-7041 | (719) 543-7567 | 1,465 | 10/31/2025 | WP Glimcher |
| 793 | Samuels Jewelers | Chapel Hills | 1710 Briargate Blvd. | Colorado Springs | CO | 80920 | (719) 598-3900 | (719) 598-6905 | 1,192 | 5/30/2024 | Simon |
| 796 | Samuels Jewelers | Mesa | 2424 U.S. Highway 6 & 50 | Grand Junction | CO | 81505 | (970) 241-0345 | (970) 243-4076 | 1,220 | 2/1/2019 | Simon |
| 871 | Samuels Jewelers | The Avenues | 10300 Southside Blvd #1520A/B | Jacksonville | FL | 32034 | (904) 538-9375 | (904) 538-9377 | 1,336 | 10/31/2027 | Simon |
| 872 | Samuels Jewelers | Altamonte | 451 E Altamonte Dr #1349 | Altamonte Springs | FL | 32701 | (407) 262-8135 | (407) 262-8137 | 1,561 | 10/31/2026 | GGP |
| 24801 | Samuels Jewelers | Claypool Hill Mall | Claypool Hill Mall | Cedar Bluff | VA | 24609 | (276) 964-6890 | (276) 964-6582 | 2,059 | 1/31/2019 | GGP |
| 42685 | Samuels Jewelers | Somerset Mall | 4150 S. Hwy. 27/Somerset Mall | Somerset | KY | 42501 | (606) 678-4111 | (606) 451-0691 | 1,800 | 5/31/2020 | Macerich |
| 63404 | Samuels Jewelers | South County Mall | 75 South County Centerway | St. Louis | MO | 63129 | (314) 894-2503 | (314) 894-7256 | 1,312 | 1/31/2018 | CBL |
| 75552 | Samuels Jewelers | Longview Mall | 3500 Mccann Road #L-8 | Longview | TX | 75605 | (903) 758-4955 | (903) 758-4990 | 1,085 | 10/31/2022 | Simon |
| 78906 | Samuels Diamonds | North Austin | 9607 Research Blvd, Building F, Suite 100 | Austin | TX | 78759 | (512) 343-6363 | (512) 338-1803 | 2,603 | 1/31/2020 | Simon |
| 78907 | Samuels Jewelers | San Antonio | 25 N.E. Loop 410, Suite 130 | San Antonio | TX | 78216 | (210) 366-9688 | (210) 366-9680 | 2,725 | 3/31/2019 | RPD Properties |
| 78910 | Samuels Diamonds | South Austin | 5400 Brodie Lane, Space 1100 | Sunset Valley | TX | 78745 | (512) 892-3973 | (512) 892-3975 | 2,998 | 5/31/2024 | Ross |
| 79903 | Samuels Diamonds | Quaker Avenue | 7310 Quaker Avenue | Lubbock | TX | 79424 | (806) 791-5515 | (806) 791-3332 | 2,906 | 9/16/2019 | Alhambra Mortgage/ Rushing |
| 79909 | Samuels Diamonds | El Paso East | 11325 Pellicano | El Paso | TX | 79936 | (915) 590-9296 | (915) 590-9299 | 1,930 | 1/20/2020 | Silverman Company |
| 85368 | Samuels Jewelers | Superstition | 6555 East Southern Avenue, Space 2304 | Mesa | AZ | 85206 | (480) 654-5985 | (480) 654-6057 | 1,474 | 12/31/2020 | Macerich |
| 95254 | Samuels Jewelers | West Valley Mall | 3200 North Naglee Road | Tracy | CA | 95304 | (209) 830-6680 | (209) 830-6504 | 943 | 1/31/2022 | Rouse |

**111    Total Stores**

**176,668**

**CORPORATE AND DC:**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Corporate Office/DC | | 2914 Montopolis Dr | Austin | TX | | (512) 369-1400 | | | | |

<u>**Exhibit B**</u>

**Samuels Jewelers, Inc.**
**Budget of Consultant Controlled Expenses**

| | |
|---|---|
| # of Stores | 112 |
| Sale Term: | 7/2/18-2/17/19 |
| # of Days | 231 |
| # of Weeks | 33.0 |

| | | |
|---|---|---|
| In store signage | $ | 168,000 |
| Media/Production/Signwalkers | $ | 1,739,200 |
| **Subtotal Advertising** | **$** | **1,907,200** |
| | | |
| Supervision | $ | 1,474,594 |
| Miscellaneous | $ | 200,000 |
| | | |
| **Total Consultant Controlled Expenses** | **$** | **3,581,794** |

1) This expense budget is based upon the above Sale Term. Any changes to the Sale Term may result in adjustments to the expense budget, which will be agreed upon by Merchant and Consultant.

2) The supervision expense above does not include our senior merchant Joe Mcleish. He will not be billed to Merchant.

3) Any legal expenses associated with landlord and side letters shall be in addition to and not part of miscellaneous above.

# **EXHIBIT 2**

**(Sale Guidelines)**

_____

|   |   :   |   |
|---|---|---|
| In re | : | Chapter 11 |
|   | : |   |
| SAMUELS JEWELERS, INC.,[1] | : | Case No. 18-_____( ___) |
|   | : |   |
| Debtor. | : |   |
|   | : |   |

_____ :

## <u>SALE GUIDELINES</u>

The following procedures shall apply to the Sale[2] to be held at the Stores:

1. The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

2. The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

3. On "shopping center" property, the Merchant or the Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Store's premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that the Merchant and the Consultant may solicit customers in the Stores themselves. On "shopping center" property, the Merchant and the Consultant shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4. At the conclusion of the Sale, the Merchant shall vacate the Stores in broom clean condition, and shall leave the Stores in the same condition as on the Sale Commencement Date, ordinary wear and tear excepted, <u>provided</u>, <u>however</u>, that the Consultant and the Merchant hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Store.

5. Subject to the entry of the final Approval Order: (a) the Consultant and the Merchant may abandon any Offered FF&E and Merchandise not sold in the Sale at the Stores at the earlier of the conclusion of the Sale or the applicable Sale Termination Date; (b) any abandoned Offered FF&E and Merchandise left in a Store after a lease is rejected shall be

---

[1] The last four digits of the Debtor's taxpayer identification number are 6316 and its address is 2914 Montopolis Drive, Suite 200, Austin, Texas 78741.

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Consulting Agreement.

deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant.

6. The Consultant and the Merchant may advertise the sale as a "sale on everything", "everything must go", or similar themed sale. The Consultant and the Merchant may also advertise the sale as a "store closing" and have a "countdown to closing" sign prominently displayed in a manner consistent with these Sale Guidelines.

7. Consultant and the Merchant shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Consultant and the Merchant shall not use neon or day-glo on its display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines. In addition, the Consultant and the Merchant shall be permitted to utilize exterior banners at (a) non-enclosed mall Stores and (b) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall not be wider than the storefront of the Store. In addition, the Consultant and the Merchant shall be permitted to utilize sign-walkers in a safe and professional manner. Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Consultant and the Merchant any additional restrictions not contained in the applicable lease agreement.

8. Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

9. Except with respect to the hanging of exterior banners, the Consultant and the Merchant shall not make any alterations to the storefront or exterior walls of any Stores.

10. The Consultant and the Merchant shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or signage or banners in a Store shall not constitute an alteration to a Store.

11. The Consultant and the Merchant shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

12. Subject to the provisions of the Consulting Agreement, the Consultant and the Merchant shall have the right to sell all Offered FF&E. The Consultant and the Merchant may advertise the sale of the Offered FF&E in a manner consistent with these guidelines at the Stores. The purchasers of any Offered FF&E sold during the sale shall be permitted to remove the Offered FF&E either through the back shipping areas at any time, or through other areas after Store business hours.

13. At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Store's premises as set forth in the applicable leases. The Consultant, the Merchant and their

agents and representatives shall continue to have exclusive and unfettered access to the Stores until the respective Stores are turned back to the landlord in a manner consistent with the lease rejection procedures approved by the Court.

14.     Postpetition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.

15.     The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

16.     If and to the extent that the landlord of any Store affected hereby contends that the Consultant or the Merchant are in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant' counsel and the Consultant's counsel as follows: (i) Jones Day, 2727 N. Harwood, Dallas, Texas 75201 (Attn: Jonathan Fisher, Esq., jmfisher@jonesday.com); and (ii) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Zachary Shapiro, Esq., shapiro@rlf.com); (iii) Gordon Brothers Retail Partners, LLC, 800 Boylston Street, 27th Floor, Boston, MA 02199 (Attn: Mackenzie Shea, Esq. Associate General Counsel); (iv) Hilco Merchant Resources, LLC, 5 Revere Drive, Suite 206, Northbrook, IL 60062 (Attn: Ian S. Fredericks, Esq. Strategic Growth Chief Legal Officer); and (v) Katten Muchin Rosenman LLP, 575 Madison Avenue, New York, NY 10022 (Attn: Steven J. Reisman, Esq. and Cindi M. Giglio, Esq.).