## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| SAMUELS JEWELERS, INC.,[1] | : | Case No. 18-11818 (KJC) |
| | : | |
| Debtor. | : | |
| | : | |

## DECLARATION OF ROBERT J. DUFFY
## IN SUPPORT OF FIRST DAY PLEADINGS

Robert J. Duffy, being first duly sworn, deposes and states as follows:

1.      Although employed by Berkeley Research Group, LLC ("BRG"), I have been engaged by Samuels Jewelers, Inc., the debtor in the above-captioned chapter 11 case (the "Debtor"), to serve as Co-Chief Restructuring Officer.  Beginning on February 20, 2018, I, along with others at BRG, provided certain financial advisory services to the Debtor.  In connection with providing those services and, later, in performing my role as Co-Chief Restructuring Officer effective June 25, 2018, I have become familiar with the Debtor's history, day-to-day operations, business and financial affairs, and books and records, as well as the Debtor's restructuring efforts.

2.      I am and have been a Managing Director with BRG since May 24, 2016. BRG is a professional services firm with an office located at 2200 Powell Street, Suite 1200, Emeryville, California, 94608.

3.      BRG's practice consists of senior financial, management consulting, accounting, and other professionals who specialize in providing financial, business, and strategic

---

[1]      The last four digits of the Debtor's taxpayer identification number are 6316 and its address is 2914 Montopolis Drive, Suite 200, Austin, Texas 78741.

assistance frequently in situations involving underperforming and distressed businesses. BRG

serves underperforming companies, debtors, and secured and unsecured creditors, equity holders,

and other parties in both in-court and out-of-court engagements similar to the Debtor in the State

of Delaware and elsewhere. BRG's professionals have experience working on cases with similar

fact scenarios in which they were presented with issues and performed analyses similar to the

work at hand in this case.

4.      Before joining BRG in 2016, I spent 14 years at FTI Consulting, Inc. and

14 years at PricewaterhouseCoopers. Most recently before joining BRG, I was the Global

Practice Leader of the FTI Consulting Corporate Finance/Restructuring practice having joined

FTI Consulting, Inc. following its 2002 acquisition of the restructuring practice at

PricewaterhouseCoopers. Between 1988 and 2002, I worked in restructuring at

PricewaterhouseCoopers and was a Partner at the time of the sale of its restructuring practice to

FTI Consulting, Inc. in 2002. I have over thirty years of experience in the restructuring industry

serving as an advisor to private equity firms, corporations, lenders, and boards of directors of

underperforming businesses and companies in transition. I have an undergraduate degree from

Babson College and a MBA degree from the Kellogg Graduate School of Management at

Northwestern University. Among other organizations, I have been active in American

Bankruptcy Institute, Turnaround Management Association and Association of Insolvency

Accountants. I am a fellow of the American College of Bankruptcy.

5.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary

petition with this Court for relief under chapter 11 the Bankruptcy Code.

6.      To minimize the adverse effects of filing for chapter 11 protection while at

the same time maximizing value for the benefit of stakeholders, the Debtor has filed a number of

pleadings requesting various kinds of "first day" relief (collectively, the "First Day Pleadings")
concurrently with the filing of this declaration (this "Declaration").  I submit this Declaration in
support of the Debtor's petition for relief under chapter 11 of the Bankruptcy Code and the First
Day Pleadings.

7.      I am familiar with the contents of each First Day Pleading (including the
exhibits and other attachments to such motions) and, to the best of my knowledge, after
reasonable inquiry, believe the relief sought in each First Day Pleading:  (a) is necessary to
enable the Debtor to operate in chapter 11 with minimal disruption; (b) is critical to the Debtor's
efforts to preserve value and maximize recoveries; and (c) best serves the Debtor's estate and the
creditors' interests.  Further, it is my belief that the relief sought in the First Day Pleadings is
narrowly tailored and necessary to achieve the goals of this chapter 11 case.

8.      Except as otherwise indicated, all statements set forth in this Declaration
are based upon:  (a) my personal knowledge; (b) information supplied to me by other members
of the Debtor's management or the Debtor's professionals that I believe in good faith to be
reliable; (c) my review of relevant documents; or (d) my opinion based upon my experience and
knowledge of the Debtor's operations and financial condition.  If called upon to testify, I could
and would testify to the facts set forth in this Declaration.  I am authorized by the Debtor to
submit this Declaration.

9.      Part I of this Declaration provides an overview of the Debtor's corporate
structure, business and prepetition indebtedness.  Part II describes the circumstances surrounding
the commencement of this chapter 11 case.  Part III sets forth relevant facts in support of certain
key motions and the First Day Pleadings.

RLF1 19824269v.1

# I.
## THE DEBTOR'S BUSINESS

A.    <u>History</u>

    1.    I understand that Samuels Jewelers, Inc. ("<u>Samuels Jewelers</u>") traces its origins to a regional jewelry chain founded in 1891 that was acquired by the Debtor's predecessor Barry's Jewelers, Inc. ("<u>Barry's Jewelers</u>").  Barry's Jewelers was founded in 1956 by David Blum and Gerson Fox in Los Angeles, California.  The company began as a single store that, within a few years, grew into a small, regional chain.  As I understand it, Barry's Jewelers continued to flourish throughout the next several years, with stores concentrated primarily in southern California.

    2.    Beginning in 1982, it is my understanding that Barry's Jewelers began to take advantage of an economic climate of more lenient credit standards and increased consumer spending and in part due to the rapid expansion of indoor shopping malls in the 1980s, became one of the fastest-growing jewelry chains in the country, opening several new stores of its own and acquiring Mission Jewelers from the Zale Corporation and Samuels Jewelers from Peoples Jewelers.  In 1986, Barry's Jewelers went public, and between that year and the next, grew to 104 stores, becoming one of the fastest expanding jewelry chains in the country.  By 1990, I understand that Barry's Jewelers counted among its divisions not only Samuels Jewelers and Mission Jewelers, which were the company's two strongest acquisitions but also Gold Art Creations, Hatfield Jewelers, A. Hirsch & Son, Schubach and Ringmaker.

    3.    After almost a decade of successful growth and acquisitions, in 1990, I understand that Barry's Jewelers began to experience financial distress.  Ultimately, on February 26, 1992, Barry's Jewelers commenced a prepackaged a chapter 11 bankruptcy case, from which it emerged on June 30, 1992.  By the middle of the decade, Barry's Jewelers was again profitable.

By 1995, it had constructed ambitious plans for growth and increased profitability. Nevertheless, I understand that Barry's Jewelers was again ailing by the end of 1996, largely as a result of increased competition. On May 11, 1997, Barry's Jewelers again filed for chapter 11 protection. On September 16, 1998, Barry's Jewelers confirmed a plan of reorganization pursuant to which, among other things, the former holders of Barry's Jewelers' senior secured notes received approximately 4.75 million shares of common stock in exchange for $15 million in cash and their notes. Additionally, pursuant to the plan, approximately 250,000 shares of restricted common stock were issued to certain members of Barry's Jewelers' new management team. On October 2, 1998, the plan became effective, with funds managed by DDJ Capital Management LLC ("DDJ") owning approximately 36% of Barry's Jewelers' common stock and funds managed and controlled by Hutchins Asset Management, Inc. owing approximately 20% of Barry's Jewelers' common stock. In addition, Barry's Jewelers' newly constituted board determined, in connection with certain transactions consummated pursuant to the plan, to change Barry's Jewelers' name to Samuels Jewelers, which, as I understand it, was Barry's Jewelers' most successful and, to the consumer, easily recognizable division. Barry's Jewelers also moved its headquarters from California to Austin, Texas.

4. It is my understanding that on August 4, 2003, in order to, among other things, restructure an unsupportable debt load, Samuels Jewelers filed a chapter 11 bankruptcy case. Samuels Jewelers emerged on March 30, 2004, with funds managed by DDJ owning a majority of Samuels Jewelers. In December of 2006, I understand that Gitanjali Gems Ltd. ("Gitanjali"), an Indian public company, acquired a 97% ownership interest in Samuels Jewelers from DDJ and subsequently purchased the remaining 3% from Randy McCullough, the company's former chief executive officer. Accordingly, Gitanjali is currently the 100% equity

RLF1 19824269v.1

owner of Samuels Jewelers.  In November 2007, I understand that Gitanjali acquired Rogers LTD ("Rogers"), a jewelry chain founded in 1920 and operating under the trade names of Rogers Jewelers and Andrews Jewelers.  On March 31, 2010, Rogers merged with and into Samuels Jewelers, with Samuels Jewelers being the survivor.  Samuels Jewelers operates under the Rogers Jewelers, Andrews Jewelers, Schubach Jewelers and Samuels Diamonds trade names in certain regions.

5.　　　Today, Samuels Jewelers, which continues to be headquartered in Austin, Texas, has 690 employees and operates an extensive retail network that includes over 120 stores in 23 states.

B.　　Corporate Structure and Management

6.　　　Samuels Jewelers is a Delaware corporation and a direct wholly-owned subsidiary of Gitanjali.  My understanding is that Samuels Jewelers has no subsidiaries but has numerous domestic and international affiliates.  The most recent chart depicting the corporate organizational structure of the Debtor and its non-debtor affiliates to which I understand the Debtor has access is attached hereto as Exhibit A.

7.　　　Samuels Jewelers has three directors:  Mr. Farhad K. Wadia; Mr. Bhavesh Shah and Mr. Rajesh Motwani.  Mr. Wadia has served on the board since February 28, 2018 and also serves as the company's chief executive officer, a position he has held since December 2015, and the company's secretary, a position he has held since February 28, 2018.  Mr. Shah has served on the board since February 28, 2018 and also serves as chief merchandising officer, a position he has held since January 2010.  Finally, Mr. Motwani has served on the board since February 28, 2018.  He formerly served as secretary of Samuels Jewelers from 2006 to 2013 and has served as interim chief financial officer since February 2018.

RLF1 19824269v.1

C.     Retail Operations

8.     Samuels Jewelers' Stores. As of July 31, 2018, Samuels Jewelers operated over 120 stores in 23 states across the United States. These stores are located primarily in strip-mall centers, major shopping malls and as stand-alone stores. Samuels Jewelers offers a variety of fine jewelry items in a wide range of styles and prices, with a principal emphasis on diamond and gemstone jewelry.

9.     Samuelsjewelers.com. In addition to its retail store locations, Samuels Jewelers sells products and provides information to its customers through its website at http://www.samuelsjewelers.com. Online customers can purchase, return and exchange certain products through its website, and customers may pick up, exchange and return items purchased through the website at Samuels Jewelers stores.

D.     Employees

10.     As of the Petition Date, the Debtor has 690 full and part-time hourly and salaried employees in the United States. The Debtor has three union employees who are party to one collective bargaining agreement with the United Food and Commercial Workers Union Local 428, AFL-CIO. That collective bargaining agreement expires July 18, 2020.

E.     Samuels Jewelers' Properties

11.     The Debtor's headquarters and retail stores are leased. The Debtor does not own any real property. The aggregate monthly rent due under the leases (collectively, the "Leases") is approximately $1.7 million. The Debtor's retail store Leases generally have initial terms of ten years with varying options to extend. As of the Petition Date, the remaining terms under the Debtor's existing store Leases were widely variant, but the majority of the Leases currently will expire in or before 2023. The remainder of the Leases currently will expire

between 2024 and 2028. As of the Petition Date, the Debtor owes approximately $3.0 million in unpaid current lease obligations.

F.    Significant Prepetition Indebtedness[2]

12.    Revolving Credit Agreement. On December 9, 2011, Samuels Jewelers entered into a revolving credit agreement with a group of lenders, including General Electric Capital Corporation ("GE Capital") as agent (as amended or modified, the "Revolving Credit Agreement"). On September 27, 2013, the agreement was amended and extended for five years from the date of the amendment. Under the Revolving Credit Agreement, GE Capital committed to provide a revolving credit facility (including a letter of credit sub-facility) not to exceed $100 million that is determined based on percentages of eligible inventory and accounts receivable less certain reserves. The Revolving Credit Agreement is secured by a first priority lien on substantially all of Samuels Jewelers' assets. On March 1, 2016, General Electric Company (as successor by merger to GE Capital) sold and assigned the Revolving Credit Agreement and any and all documents, agreements and/or instruments executed and/or delivered in connection therewith to Wells Fargo Bank, N.A. ("Wells Fargo"). No terms were changed in connection with the assignment. As of May 30, 2018, Samuels Jewelers had no remaining availability under the Revolving Credit Agreement pursuant to the borrowing base calculation. On May 28, 2018, Wells Fargo agreed to provide Samuels Jewelers with a $5 million overadvance with the consent of Gordon Brothers Finance Company ("GBFC") pursuant to the Intercreditor Agreement (defined below). The overadvance provided Samuels Jewelers access to funds from Wells Fargo notwithstanding that Samuels Jewelers had no remaining availability given the borrowing base.

---

[2]    This summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

The Debtor ultimately exceeded the $5,000,000 overadvance, with the consent of Wells Fargo and GBFC, and the balance of the overadvance as of the Petition Date was $7.75 million.

13.     As of the Petition Date, there is approximately $84,000,000 in aggregate principal amount outstanding under the Revolving Credit Agreement.

14.     <u>Term Loan Agreement</u>.  On December 18, 2013, Samuels Jewelers entered into a $10,000,000 term loan agreement (as amended or modified, the "<u>Term Loan Agreement</u>") with GB Credit Partners, LLC, a Delaware limited liability company, as agent.  The agreement terminates on the earlier of September 27, 2018, the termination of the Revolving Credit Agreement or the date on which Samuels Jewelers' obligations could be accelerated in the event of default.  The Term Loan Agreement is secured on a second priority basis by substantially all the assets of Samuels Jewelers.  As of the Petition Date, there is approximately $10,000,000 in aggregate principal amount outstanding under the Term Loan Agreement.

15.     <u>Intercreditor Agreement</u>.  The agents for the Revolving Credit Agreement and the Term Loan Agreement are parties to an intercreditor agreement dated as of December 18, 2013 (as amended or modified, the "<u>Intercreditor Agreement</u>").  The Intercreditor Agreement governs the respective rights, interests, obligations, priority and positions of the secured parties under the Revolving Credit Agreement and the Term Loan Agreement with respect to the assets and properties of the Debtor.  The Debtor has acknowledged and agreed to the Intercreditor Agreement.

16.     <u>Trade Debt</u>.  As a retailer with over 120 stores in the United States, the Debtor purchases inventory from numerous vendors, including certain consignment vendors. The Debtor purchases inventory under normal purchase commitments in the ordinary course of business.  It is my understanding that, as set forth below, prior to March 2018, the Debtor

purchased significant merchandise inventory from affiliated entities. To the best of my knowledge, since March 2018, the Debtor has not purchased inventory from entities known to be affiliates. As of July 25, 2018, the Debtor estimates that it owes approximately $28,050,000 million for products and other obligations for goods and services to non-related parties.

## II.
## EVENTS LEADING TO THE COMMENCEMENT OF THIS CHAPTER 11 CASE

17. Over the past six years, the Debtor has faced increasing competition in the retail jewelry industry, including competition by discount and other retailers, including online retailers. Based on financial statements provided to me by management, for the fiscal year ending March 31, 2018, Samuels Jewelers generated net sales of approximately $112.0 million but suffered net operating losses of approximately $14.9 million, compared to net sales of approximately $119.4 million and a net operating loss of approximately $3.1 million the prior year. Net sales decreased while expenses also increased, resulting in a decrease in net income of $11.8 million as of March 31, 2018 from the previous year, as compared to a $4.10 million decrease between March 31, 2016 to March 31, 2017. Additionally, a higher percentage of Samuels Jewelers' inventory than would be expected is over 2 years old. It is my understanding that the accumulation of inventory was caused by a number of factors, including the fact that certain of the goods did not match the preferences of Samuels Jewelers' customers.

18. Compounding the Debtor's existing difficulties, on January 31, 2018, the Indian Central Bureau of Investigation (akin to the Federal Bureau of Investigation in the United States) launched an investigation into Gitanjali, Gitanjali's chairman and managing director, Mehul Choksi, and several related and unrelated entities and other individuals for allegedly defrauding multiple Indian banks, including Punjab National Bank ("Punjab"). The fraud

RLF1 19824269v.1

allegations center around letters of undertaking allegedly fraudulently obtained from the banks beginning in or about 2011.[3]

19.      On February 23, 2018, India's National Company Law Tribunal (the "NCLT") issued an order, with certain injunctive provisions, naming Gitanjali, Mr. Choksi and several related and unrelated entities and individuals as entities or individuals implicated in the fraud.  It is my understanding that since at least February, Gitanjali has been without leadership and is no longer operating.  Neither Samuels Jewelers nor any of its current directors or officers were named in the NCLT order.  However, in addition to being the chairman and director of Gitanjali, my understanding is that Mr. Choksi also served as the director and board member of Samuels Jewelers from the time of Gitanjali's purchase of the company in 2006 until his resignation in February 2018 following the allegations in India.  Additionally, I have been informed that Nehal Modi, who I have been told was a director and former chief executive officer of Samuels Jewelers until December 2015, was also named in the NCLT order, as was Sunil Varma, who I have been told was a former chief financial officer and president of Samuels Jewelers from January 2017 to February 2018.

20.      The fraud allegations have been widely publicized since at least February 2018, both domestically and internationally.  In addition, new details and allegations continue to arise, and certain news reports have included assertions relating to Samuels Jewelers.  As of the date hereof, to the best of my knowledge, neither Samuels Jewelers nor any of its current officers or directors has been charged with a crime either domestically or in India, or to their knowledge, is subject to investigation by Indian or U.S. authorities.

---

[3]      Letters of undertaking are guarantees by an issuing Indian bank guaranteeing repayment of loans made to the bank's customer by a foreign lender.  A bank issuing a letter of undertaking agrees to pay to the foreign lender the full amount of the loan plus accrued interest if the importer fails to pay back the foreign lender.

-11-

21.     The allegations with respect to its equity owner, Gitanjali, and Mr. Choksi have amplified the headwinds impacting Samuels Jewelers.  First, Samuels Jewelers lost a major source of products, given that a significant portion of its merchandise was purchased from Gitanjali or other non-debtor affiliates.  Second, Samuels Jewelers lost the ability to potentially obtain funding from Gitanjali, a source I'm told it previously had been able to access in times when incremental funding was required.  Finally, and perhaps most importantly, news reports with respect to the fraud allegations caused concern among vendors doing business with Samuels Jewelers, including third-party vendors and suppliers, resulting in damaged and terminated vendor relationships and an interruption in the supply of consigned merchandise.  Together with the loss of affiliate suppliers, this loss in vendor confidence worsened the company's existing distress, caused significant liquidity issues (particularly given the borrowing base covenants in company's credit facilities) and left Samuels Jewelers with limited options to address those issues.

22.     Based on the above challenges, Samuels Jewelers ultimately reached the conclusion that it would be in its best interest to seek chapter 11 protection.  To prepare for a chapter 11 filing, Samuels Jewelers has, in recent weeks, engaged in extensive negotiations with its lenders to develop a consensual path forward that will minimize costs and maximize value for the benefit of all stakeholders.  In that regard, Samuels Jewelers explored and pursued multiple avenues, with the support of its lenders, to (a) stabilize operations and enhance liquidity and (b) preserve and maximize value.

23.     In particular, Samuels Jewelers, with the assistance of its advisors, are pursuing a potential going concern sale.  While it has entered into no definitive documentation as of the date hereof, Samuels Jewelers has received some indication of interest in a going concern

sale and remains hopeful that such a sale will be a possibility.  In that regard, Samuels Jewelers is in the process of retaining an investment banker and desires to move forward with that process in this case to assist in its pursuit of a going concern sale.

24.     While Samuels Jewelers pursued the possibility of a going concern sale, it also determined, with the assistance of its advisors and based on an analysis of the performance of its stores and the market in which Samuels Jewelers operates, that it would be necessary, particularly given the significant amount of inventory on hand, to engage an experienced asset disposition firm to begin the process of efficiently and quickly selling excess inventory in order to maximize recoveries to the estate.  To that end, Samuels Jewelers solicited bids from leading asset disposition firms and ultimately, received two bids, with two of the leading national asset disposition firms submitting one joint bid and two other leading national asset disposition firms submitting another joint bid.  Both bids contemplated consulting agreements.  After vigorous negotiations among all parties that resulted in, among other things, a significant improvement to initial proposed fees, Samuels Jewelers, together with its advisors, determined to enter into a consulting agreement (the "Consulting Agreement") with Gordon Brothers Retail Partners, LLC ("Gordon Brothers")[4] and Hilco Merchant Resources, LLC ("Hilco" and together with Gordon Brothers, the "Consultant").   Pursuant to the Consulting Agreement, the Consultant gives advice, assistance and management oversight to the company regarding the inventory sale process but does not take on all costs and responsibilities of the sales.

---

[4]     Gordon Brothers Retail Partners, LLC's parent company, Gordon Brothers Group, owns a minority interest in, has certain contractual relationships with, and from time to time may provide contractual services to, GBFC in the ordinary course of its business. GBFC is a secured lender to the Debtor. Pursuant to Section 10(B) of the Consulting Agreement, the Debtor waived any actual or perceived conflict resulting from any of the foregoing.

25.     Finally, a key effort in stabilizing operations and ensuring that key employees would be retained and management appropriately incentivized, was the negotiation of retention and incentive programs that would not be objectionable to Samuels Jewelers' lenders. Ultimately, after extensive negotiations, Samuels Jewelers adopted both retention and incentive programs and achieved agreement from its lenders that they would not object to these programs in the context of a chapter 11 case.  Samuels Jewelers intends to seek court approval of these programs in the near term.

B.     Key Relief Related to Timeline and Objectives.

26.     In order to obtain necessary financing and continue going out of business sales without interruption, the Debtor is, among other requests, seeking the following relief, all of which is critical to implement a process designed to maximize value for the benefit of creditors:  (a) approval of debtor in possession financing to ensure a smooth transition into chapter 11 and completion of the proposed process to maximize creditor recoveries and (b) authorization to assume the Consulting Agreement and continue the inventory sale process without interruption.

*Debtor in Possession Financing*

27.     As discussed above, the Debtor is seeking authority to enter into a debtor in possession credit agreement (the "DIP Credit Agreement") that will provide (a) postpetition financing in the form of a senior secured superpriority revolving credit facility in an aggregate principal amount of approximately $4,000,000 on an interim basis and $100,000,000 following the entry of a final order (the "DIP Working Capital Facility"), and (b) following the entry of a final order, a senior secured superpriority term loan facility in an aggregate principal amount of $10,000,000 (the "DIP Term Facility" and together with the DIP Working Capital Facility, the "DIP Facility"), with (c) a roll-up (to be sought only on a final basis) of loans and letter of credit

-14-

obligations in an aggregate amount up to approximately $84,160,000 outstanding under the Revolving Credit Agreement and obligations in an aggregate approximate amount up to $10,020,000 outstanding under the Term Loan Agreement. The facility will also provide for a letter of credit sub-facility for the issuance of new letters of credit in an aggregate face amount not to exceed $500,000.

28. The DIP Facility will provide the Debtor with access to additional borrowing capability that would not otherwise be available under the Revolving Credit Agreement. The DIP Facility also will provide the Debtor with access to the use of cash collateral of the debtor in possession lenders.

29. The Debtor has an immediate and critical need to access new incremental liquidity that will become available under the DIP Credit Agreement and to use cash collateral for, among other things, working capital purposes and to pay expenses incurred in this chapter 11 case in accordance with a proposed budget approved by the lenders. As indicated above, the Debtor has recently faced issues that compounded its existing financial distress and resulted in severely diminished liquidity. In particular, credit available under the Revolving Credit Agreement has been greatly constrained. In order to pay vendors, Samuels Jewelers has had to fund payments, in part, through borrowings under the Revolving Credit Agreement. However, as described above, Samuels Jewelers also has been unable to obtain necessary inventory from vendors as it had in the past, reducing the borrowing base and availability under the Revolving Credit Agreement. Indeed, as explained above, since May of 2018, the Debtor's primary source of financing has been the overadvance agreed to by Wells Fargo and GBFC, the balance of which was $7.75 million as of the Petition Date. Without immediate access to the incremental liquidity made available pursuant to the proposed postpetition financing and the use of cash

collateral, the Debtor would be unable to meet payroll and otherwise operate its business, and the Debtor's ability to preserve and maximize the value of its assets and operations would be irreparably harmed.

30.     The Debtor, with the assistance of its professional advisors, including BRG, explored its options with respect to postpetition financing.  These options were limited by the Debtor's circumstances described above as well as the Debtor's prepetition debt structure, which likely would have necessitated a third party lender priming the senior liens of Wells Fargo and GBFC, which extend to substantially all of the Debtor's assets, or satisfying the outstanding obligations under the Revolving Credit Agreement.  Neither Wells Fargo nor GBFC would agree to the priming of their liens.  The Debtor ultimately determined that a financing proposal by its existing lenders under the Revolving Credit Agreement and the Term Loan Agreement, with whom the Debtor has been working collaboratively, provided the Debtor with the best opportunity to continue operations and maximize value for the benefit of its creditors and estate. Among other things, financing by its existing lenders, who have familiarity with the Debtor and its prepetition debt documents, involved less risk than a third-party proposal given the urgent need for financing and short time in which such financing would have to be negotiated, documented and closed.  Additionally, Wells Fargo provides the majority of the Debtor's critical banking services, and thus, postpetition financing provided, in part, by Wells Fargo created less risk to a potential disruption of these services.

31.     Without the incremental liquidity being provided pursuant to the DIP Credit Agreement and the use of cash collateral, the Debtor would have insufficient funds to meet its postpetition liquidity needs.  The Debtor has been unable to obtain unsecured credit allowable as an administrative expense.  The Debtor has also been unable to obtain credit:

(a) having priority over that of administrative expenses; (b) secured solely by a lien on property of the Debtor and its estate that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtor and its estate that is subject to a lien.  Additionally, the Debtor was unable to obtain the agreement of its prepetition lenders to a consensual use of cash collateral outside the term of the proposed DIP Facility.  Accordingly, the Debtor requires both the additional liquidity provided by the debtor in possession credit facility and the continued use of cash collateral.  Financing on a postpetition basis is not otherwise available and is not available on terms more favorable than the terms contained in the proposed financing facility.

32.    The DIP Credit Agreement is the result of good faith arm's-length negotiations among the Debtor, its advisors, including BRG, and the proposed postpetition lenders and their respective advisors.  The Debtor believes that terms and conditions of the DIP Facility and the DIP Credit Agreement and related documents, and the fees paid and to be paid thereunder, are fair, reasonable and the best available to the Debtor under the circumstances, are ordinary and appropriate for secured financing to a debtors in possession, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and are supported by reasonably equivalent value and consideration.  In particular, the fees were the subject of negotiation between the Debtor and the DIP Lenders, are an integral component of the overall terms of the DIP Facility, and were required by the applicable DIP Agents and DIP Lenders as consideration for the extension of postpetition financing.  Under the Debtor's circumstances, the fees reflected in the DIP Agreement are reasonable as compared to fees in similar financings.

33.    In addition, as set forth above, the DIP Credit Agreement provides for the rollup of the outstanding obligations under the Revolving Credit Agreement and the outstanding obligations under the Term Loan Agreement (upon the entry of a final order and the consent of

Wells Fargo and GBFC). It is the Debtor's understanding that the rollup of the prepetition secured obligations, upon entry of the Final Order and the consent of Wells Fargo and GBFC, is a condition of the postpetition lenders' provision of financing pursuant to the DIP Credit Agreement. In particular, the Debtor understands that certain provisions of the Intercreditor Agreement would prevent Wells Fargo from providing further liquidity to the Debtor, including on a postpetition basis, without GBFC's consent. The consent of both Wells Fargo and GBFC thus is necessary, and both lenders have required a rollup of their outstanding prepetition obligations upon entry of the Final Order and the further consent of Wells Fargo and GBFC. Additionally, the rollup, following the entry of the Final Order, will result in approximately $485,000 in interest savings to the Debtor. Accordingly, the Debtor, after extensive negotiations, agreed to the rollup provisions as consideration for, and solely on account of, the agreement of the postpetition lenders to provide incremental liquidity, and provide certain concessions and other considerations to the Debtor, under the DIP Credit Agreement.

34. As explained above, the additional liquidity provided pursuant to the DIP Credit Agreement is critical to enable the Debtor to continue to operate its business and to administer this chapter 11 case. Moreover, because the rollup is approved solely in connection with the entry of a final order, the rights of other parties in interest will not be prejudiced as the rollup will be subject to the review of such parties in interest, including any official committee of unsecured creditors appointed in this case. As a result, the Debtor, in consultation with its advisors, determined that entry into the DIP Credit Agreement is best option available to the Debtor under the circumstances and is in the best interests of the Debtor, its creditors and estate. I understand that the Debtor, subject to approval by the Court, is qualified and authorized to enter into the DIP Credit Agreement.

RLF1 19824269v.1

*Authorization to Assume the Consulting Agreement and Conduct Store Closing Sales*

35.     Assumption of the Consulting Agreement.  The Debtor is seeking to assume the Consulting Agreement and sell excess inventory and assets in accordance therewith.

36.     As indicated above, to assure that the Debtor obtains the highest possible recovery from the inventory sale process, the Debtor and its advisors contacted four national asset disposition firms that specialize in the sale of assets of the type and scale owned by the Debtor.  After detailed discussions with the asset disposition firms, the Debtor determined to execute the Consulting Agreement with Hilco and Gordon Brothers.

37.     The Debtor believes that the assumption of the Consulting Agreement is beneficial to the Debtor's estate and a reasonable exercise of the Debtor's business judgement. As an initial matter, assumption of the Consulting Agreement will not eliminate the Debtor's ability to pursue a potential going concern sale.   As set forth above, though the Debtor has commenced the necessary process of selling excess inventory, the Debtor continues to pursue the possibility of a going concern sale.  To that end, the Consulting Agreement includes a "fiduciary out" provision that allows the Debtor to terminate the Consulting Agreement to pursue, among other things, a going-concern or partial going-concern sale, so long as the Debtor terminates the Consulting Agreement "prior to the point at which Consultant has materially performed" its obligations.  In addition, continuing the asset disposition process at the outset of these cases will ensure that the Debtor can fully utilize the fully maximum period set forth by the Bankruptcy Code to maximize recoveries to the estate in the event that a going-concern sale fails to materialize.

38.     Additionally, assumption of the Consulting Agreement will allow the Debtor to utilize the experience and resources of the Consultant in performing an expeditious and effective asset disposition process in a format that allows the Debtor to retain control over the

-19-

sale process and will provide the maximum benefit to the estate. The Consultant has extensive expertise in conducting sales of excess inventory and can oversee, and assist in the management and implementation of, excess sales in an efficient and cost-effective manner. Additionally, given the Consultant's experience and expertise, assumption of the Consulting Agreement will enable the Debtor to efficiently run the inventory sale process, minimize costs and maximize the value to be received. Indeed, given that the Consultant is already familiar with the Debtor's businesses and the inventory sale process has already commenced, replacing the Consultant with an alternative asset disposition firm would be difficult and highly inefficient. As a result, the Debtor believes that the assumption of the Consulting Agreement is beneficial to the Debtor's estate and a reasonable exercise of the Debtor's business judgement.

39. The expeditious assumption of the Consulting Agreement and the uninterrupted sale of the Debtor's excess inventory is critical to the Debtor's ability to maximize recoveries for creditors. In order to maximize the value of its estate, the Debtor must sell a significant amount of inventory prior to the conclusion of the maximum period to assume or reject leases provided for in the Bankruptcy Code. Any delay in the inventory sale process will jeopardize the value that can be recovered during this bankruptcy case. In particular, the estate would lose the benefit of the momentum and preparation that began prior to the Petition Date when the inventory sale process began. Delay in or interruption of the inventory sale process would lead to a loss of value and increased administrative expense. As a result, the Debtor is requesting that the Court hold a hearing on the Debtor's motion to assume the Consulting Agreement and provide interim relief to allow the inventory sale process to continue as soon as possible.

RLF1 19824269v.1

# III.
## FIRST DAY PLEADINGS

40.     Concurrently with the filing of this chapter 11 case, the Debtor filed the First Day Pleadings requesting various forms of relief.  Generally, the Debtor narrowly tailored the First Day Pleadings to enable the Debtor to meet its goals of:  (a) continuing its operations in chapter 11 with as little disruption as possible; (b) maintaining the confidence and support of its employees, vendors and service providers during this chapter 11 case; and (c) establishing procedures for the smooth and efficient administration of this chapter 11 case.

41.     Given the importance of the relief sought in the First Day Pleadings to the Debtor's ability to preserve value as it pursues store closing sales and also a potential sale or sales of substantially all of its assets, the Debtor will move for entry of an order scheduling an expedited hearing on the First Day Pleadings.  The Debtor anticipates that the Court will conduct a hearing soon after the commencement of its chapter 11 case (the "First Day Hearing") at which hearing the Court will hear and consider certain First Day Pleadings.  Those First Day Pleadings that the Debtor anticipates will be heard at the First Day Hearing are described below.[5]

42.     I have reviewed each of the First Day Pleadings filed contemporaneously herewith.  To the best of my knowledge, I believe that the facts set forth in the First Day Pleadings are true and correct.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings.

43.     Further, as a result of my personal knowledge, information supplied to me by other members of the Debtor's management, my review of relevant documents, or upon my opinion based upon my experience, discussions with the Debtor's advisors, and knowledge of the

---

[5]     Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined have the meanings given to them in the applicable First Day Pleadings.

RLF1 19824269v.1

Debtor's operations and financial condition, I believe the relief sought in the First Day Pleadings is necessary for the Debtor to effectuate a smooth transition into chapter 11 bankruptcy, is necessary to avoid irreparable harm to its business and estate and will maximize value and recoveries for the benefit of the Debtor's creditors.

44.     It is my further belief that, with respect to those First Day Pleadings requesting authority to pay discrete prepetition claims or continue selected prepetition programs (e.g., those First Day Pleadings seeking relief related to the Debtor's obligations to its employees, customers, taxing authorities, warehousemen and insurers), the relief requested is essential to the Debtor's operations and necessary to avoid immediate and irreparable harm to the Debtor, its estate, employees, creditors and other parties-in-interest.  Specifically, the success of this case depends in large part on the continuing operation of the Debtor's business in as normal course as possible.  Impairment of the Debtor's operations at the early stages of this case would hinder the Debtor's ability to carry out an organized and efficient store closing sale process and pursue a potential going concern sale and potentially damage the value of the Debtor's estate.

45.     I respectfully request that all the relief requested in the First Day Pleadings, and such other further relief as may be just and proper, be granted.

A.     Administrative Motions

46.     The Debtor will file two "administrative" motions, which (a) request a First Day Hearing to consider the relief requested in each of the First Day Motions and (b) seek approval to retain Prime Clerk as claims and noticing agent.

B.     Employee Wages and Benefits

47.     As noted above, the Debtor currently has 690 employees.  The continued and uninterrupted support of the employees is essential to the Debtor's success.  The employees perform a variety of critical functions in the Debtor's retail locations and corporate headquarters.

RLF1 19824269v.1

The skills and experience of the employees, their relationships with key parties to the Debtor's business, such as customers and vendors, and their knowledge of the Debtor's products, infrastructure and business are essential to the preservation of the value of the Debtor's estate and, thus, the ability of the Debtor to maximize its value. Any interruptions in payment of prepetition employee-related obligations will impose hardship on the employees and is certain to jeopardize their continued performance during this critical time.

48.     To minimize the personal hardship that employees will suffer if prepetition employee-related obligations are not paid when due, and to maintain the employees' morale during this critical time, it is important to pay and/or perform, as applicable, employee-related obligations, including the following: (a) pay and honor owed wages, salaries, overtime pay, bonuses, sick pay, vacation pay and other accrued compensation; (b) reimburse certain prepetition business expenses; (c) pay amounts deducted from employee paychecks on behalf of the employees for or with respect to, among other things, the Debtor's employee benefit programs, loan repayments, and garnishments or amounts due third parties and on account of various federal, state or local income, FICA, Medicare, state disability, workers' compensation, and other taxes to the appropriate parties; (d) pay prepetition contributions to, and benefits under, employee benefit plans; and (e) pay all costs and expenses incident to the foregoing payments and contributions, including payroll-related taxes and related processing and administration costs.

C.      Motions for Payment of Other Prepetition Claims

49.     Customer Obligations.  In the ordinary course of its business, the Debtor maintains numerous programs for the benefit of its customers, including: return and exchange policies, sales promotions, a discount card program, coupons, a gift card program, in-store financing, service contracts and warranties (collectively, the "Customer Programs").  Because the

-23-

Debtor was in the midst of providing goods and services to its customers on the Petition Date, the Debtor has certain outstanding prepetition obligations to its customers under the Customer Programs which otherwise would be honored in the ordinary course of the Debtor's business (collectively the "Customer Obligations").

50.     Given the critical nature of the Debtor's relationship with its customers and the importance of these relationships to the Debtor's business, the Debtor will seek the entry of an order authorizing it to pay Customer Obligations in the ordinary course of the Debtor's business.  Subject to certain limitations set forth in the Customer Obligations motion, the Debtor seeks to treat all Customer Obligations in the same manner and on the same terms and conditions as such obligations were treated prior to the Petition Date, including paying, or providing credit or similar items, for prepetition Customer Obligations.

51.     Taxes.  The Debtor, in the ordinary course of its business, incurs various tax liabilities, including, among others, sales and use taxes, property taxes, franchise taxes, business license fees, annual report taxes and import taxes (collectively, the "Prepetition Taxes") owed to certain taxing authorities (the "Taxing Authorities").  Prior to the Petition Date, the Debtor generally paid its tax obligations as they became due.

52.     The Debtor will seek the entry of an order allowing it to pay the Prepetition Taxes to the Taxing Authorities, including all Prepetition Taxes subsequently determined upon audit to be owed for periods prior to the Petition Date.  The Debtor has ample business justification to pay the Prepetition Taxes because it is my understanding that:  (a) most, if not all, of the Prepetition Taxes would be priority claims under the Bankruptcy Code; (b) certain of the Prepetition Taxes may not constitute property of the Debtor's chapter 11 estate; (c) the Debtor is required to pay the Prepetition Taxes to maintain its good standing in the

jurisdictions in which it does business; (d) a failure to pay certain of the Prepetition Taxes could give rise to liens on certain of the Debtor's property; and (e) the Debtor's directors and officers may face personal liability if certain of the Prepetition Taxes are not paid. Therefore, to prevent immediate and irreparable harm that would result from such disruptions and distractions, the Debtor seeks authority to pay these claims on a first day basis.

53.    Freight Carriers and Service Providers. In connection with the day-to-day operation of its business, the Debtor relies on freight and air transportation operated by third parties (collectively, the "Freight Carriers") to transport products on land and by air from the Debtor's suppliers to its distribution facility and its retail locations. In general, most goods are initially shipped to the Debtor's distribution center, located at its headquarters, and then shipped to individual stores depending upon inventory needs. Certain goods are shipped directly from the stores to warranty providers for repair pursuant to the Debtor's warranty program. In addition, certain vehicles transport high value goods to various of the Debtor's stores for "trunk shows," which are scheduled throughout the year at certain of the Debtor's stores (the "Trunk Shows"). The transportation costs related to the Trunk Shows include increased security costs due to the value of the inventory. In addition, the Debtor utilizes the services of certain third-party service providers, including certain jewelers and laboratories (the "Service Providers"). The Service Providers perform important work for the Debtor, including setting precious stones, repair and analysis. As a result, the Freight Carriers and Service Providers have possession of certain of the Debtor's products in the ordinary course of business.

54.    It is essential to the Debtor's business that it maintains a reliable and efficient supply of products for sale to customers through its retail operations. If the Debtor fails to pay the claims of the Freight Carriers and Service Providers (collectively, the "Freight and

Service-Related Claims"), many of the Freight Carriers or Service Providers may stop providing essential services to the Debtor. Delays in receiving products could cause major disruptions to the Debtor's operations, damaging the Debtor's business reputation and undermining the Debtor's ability to generate ongoing operating revenue. Even if suitable alternatives for the Freight Carriers and Service Providers were available, the time necessary to identify these replacements and integrate them into the Debtor's operations likely would cause a significant disruption to the Debtor's retail operations.

55. As a result of the foregoing, the Debtor will seek entry of an order authorizing it to pay the undisputed amounts owed by the Debtor on account of outstanding Freight and Service-Related Claims, and to discharge any liens that the Freight Carries and Service Providers may have on the Debtor's property. Since the amounts owed to Freight Carriers and Service Providers who have lien rights likely are far less than the value of any property securing their claims, such parties are likely fully secured creditors and the payment of their prepetition claims will give them no more than that to which they will likely be entitled to receive in the Debtor's bankruptcy case.

56. Insurance, Including Workers' Compensation Insurance. In the ordinary course of its business, the Debtor maintains various insurance policies (the "Insurance Policies"). Maintenance of insurance coverage under the various Insurance Policies is essential to the operation of the Debtor's business and is required under the U.S. Trustee's Operating Guidelines for Chapter 11 Cases, the laws of the various states in which the Debtor operate sand the Debtor's various financial and other agreements. In connection with the Insurance Policies, the Debtor utilizes the services of third-party service providers, including an agent. Certain third parties may be owed amounts as of the Petition Date. Failure to pay such amounts could result

-26-

in loss of services, which would drastically impact the Debtor's ability to renew coverage and process claims.

57.     The Debtor also maintains workers' compensation insurance in each of the states in which it does business and provides employees with workers' compensation coverage for claims arising in any jurisdiction from or related to their employment by the Debtor.  Because the Debtor is required under the laws of most states to maintain workers' compensation coverage, with drastic remedies if the Debtor fails to comply with those laws, the Debtor is also seeking authorization to allow the Debtor to continue the workers' compensation programs in all applicable states.  In connection therewith, the Debtor will request that the order authorize the Debtor to pay all prepetition premiums, fees and expenses arising under, or related to, the workers' compensation programs.

58.     <u>Utilities</u>.  The Debtor uses various services provided by numerous utility companies (collectively, the "<u>Utility Providers</u>").  Because the Utility Providers deliver essential services to the Debtor and its retail operations, any interruption in utility services could prove devastating.  In fact, the temporary or permanent discontinuation of utilities services at any of the Debtor's locations could irreparably disrupt business operations, and, as a result, fundamentally undermine the Debtor's restructuring efforts.

59.     The Debtor will propose procedures that protect the rights of Utility Providers and also ensure continuous and uninterrupted utility services to the Debtor.  The Debtor further intends to pay all obligations owed to Utility Providers in a timely manner, and I believe that the Debtor has, and will continue to have, sufficient funds from operations and its proposed postpetition financing to satisfy such obligations.

D.     <u>Cash Management.</u>

60.     The Debtor utilizes an integrated, centralized cash management system (the "Cash Management System") to collect, concentrate, manage and disburse funds.  The Cash Management System involves approximately 29 active and 7 dormant bank accounts.  The Debtor maintains current and accurate accounting of all of the Debtor's transactions through the Cash Management System and does not engage in any intercompany transactions.  The Cash Management System includes the necessary accounting controls to enable the Debtor, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.

61.     In connection with its Cash Management System and the Debtor's overall operations, the Debtor established various banking and business practices, including use of numerous business forms.  These practices are tailored to the Debtor's day-to-day and longer-term needs and, as such, were specifically designed and implemented for the Debtor.

## **CONCLUSION**

62.     For all the reasons described herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

Dated:  August 7, 2018

_/s/ Robert J. Duffy_____
Robert J. Duffy

RLF1 19824269v.1

# EXHIBIT A

## (Organizational Chart)



1.  Upon information and belief, Gitanjali Gems Ltd., which directly owns 100% of the equity interests in the Debtor, has numerous subsidiaries.  However, the Debtor has no way of verifying the names of such subsidiaries.  Accordingly, such entities are not identified herein.