# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| SAMUELS JEWELERS, INC.,[1] | : | Case No. 18-11818 (KJC) |
| | : | |
| Debtor. | : | **Hearing Date: Oct. 22, 2018 at 11:00 a.m. (ET)** |
| | : | **Obj. Deadline: Oct. 15, 2018 at 4:00 p.m. (ET)** |
| | : | |

## DEBTOR'S MOTION FOR (I) AN ORDER ESTABLISHING BID PROCEDURES AND GRANTING RELATED RELIEF AND (II) AN ORDER APPROVING THE SALE OF THE ASSETS

The above-captioned debtor (the "Debtor") moves the Court, pursuant to sections 105, 363, 365 and 503 of the Bankruptcy Code, Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for the entry of: (i) an order (the "Bidding Procedures Order"), substantially in the form attached hereto as Exhibit A: (a) approving proposed auction and bid procedures (the "Bidding Procedures") in connection with the sale (the "Sale") of substantially all or any portion of the Debtor's assets (collectively, the "Assets"), (b) authorizing the Debtor, in its discretion, to enter into an asset purchase agreement with a stalking horse bidder, subject to court approval of any stalking horse protections, (c) scheduling an auction (the "Auction") and a final sale hearing (the "Sale Hearing") in connection with the Sale, (d) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"), and approving the form and manner of notice of the proposed assumption and assignment of executory contracts and unexpired leases in

---

[1] The last four digits of the Debtor's taxpayer identification number are 6316 and its address is 2914 Montopolis Drive, Suite 200, Austin, Texas 78741.

the form attached hereto as <u>Exhibit B</u> (the "<u>Assumption and Assignment Notice</u>") and (e) approving the form and manner of notice of the Auction and the Sale Hearing, including the form and manner of notice (the "<u>Auction and Hearing Notice</u>") attached hereto as <u>Exhibit C</u>; and (ii) an order (the "<u>Sale Order</u>"):[2] (a) authorizing the Sale to the successful bidder(s), free and clear of all liens, claims and encumbrances, (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale and (c) granting certain related relief as described herein. In support of this motion, the Debtor incorporates the statements contained in the Declaration of Robert J. Duffy in Support of First Day Pleadings (the "<u>First Day Declaration</u>") filed on the Petition Date (as defined below) and further respectfully represents as follows:

## **Background**

1. On August 7, 2018 (the "<u>Petition Date</u>"), the Debtor commenced a case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is continuing in possession of its properties and is managing its businesses, as a debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. On August 16, 2018, the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") appointed the Official Committee of Unsecured Creditors (the "<u>Committee</u>") [D.I. 108]. On October 3, 2018, the Court entered an order directing the U.S. Trustee to appoint an examiner pursuant to section 1104(c) of the Bankruptcy Code [D.I. 294]. As of the filing of this motion, the U.S. Trustee has not yet appointed such an examiner.

---

[2] The Debtor will file and serve the proposed Sale Order in advance of the Sale Hearing.

3.     Samuels Jewelers, Inc. ("Samuels Jewelers") operates more than 100 specialty retail jewelry stores located across the United States in shopping malls, strip centers and as stand-alone stores.  Samuels Jewelers sells fine jewelry items in a wide range of styles and prices, with a principal emphasis on diamond and gemstone jewelry, and has been serving jewelry customers since its founding in 1891.

4.     Additional information regarding the Debtor and this case, including the Debtor's business, corporate structure, financial condition, and the reasons for and objectives of this case, is set forth in the First Day Declaration and incorporated herein.

### *Preliminary Sale Efforts*

5.     By this motion, the Debtor seeks authority to commence a sale process to sell substantially all or any portion of the Assets.  Since before the commencement of this case and as this case has progressed, the Debtor has sought to maximize the value of its estate for its creditors.  As described in further detail in the First Day Declaration, in the period leading up to the Petition Date, the Debtor focused on negotiating with its lenders to develop a consensual path forward that would minimize costs and maximize value for the benefit of all stakeholders.  To that end, the Debtor explored and pursued multiple avenues, with the support of its lenders, to (a) stabilize operations and enhance liquidity and (b) preserve and maximize value.  Those efforts culminated in the Debtor securing a debtor in possession financing facility and obtaining court approval of various relief that ensured a smooth transition into this chapter 11 case.

6.     Prior to the Petition Date, the Debtor pursued a potential sale and received some indication of interest in a going concern sale.  While, following the commencement of this case, the Debtor has continued excess inventory sales, it continues to believe that pursuing a sale of substantially all or a portion of its assets through a robust sale process will maximize value for

creditors.  In support of that effort, the Debtor retained SSG Advisors, LLC ("SSG") to serve as its investment banker in connection with a sale process.[3]  With the assistance of SSG and its other advisors, the Debtor developed the proposed Bidding Procedures and sale process.

### Relief Requested and Basis Thereof

7.      By this motion, the Debtor seeks entry of the Bidding Procedures Order:

    a.      approving (i) the Debtor's proposed Bidding Procedures for marketing the Assets, which procedures are attached as Exhibit 1 to the Bidding Procedures Order, (ii) the Auction and Hearing Notice and (iii) the Assumption and Assignment Notice;

    b.      authorizing the Debtor to enter into an asset purchase agreement with a stalking horse bidder, subject to court approval of any stalking horse protections;

    c.      approving procedures to determine cure amounts for the Debtor's executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale;

    d.      establishing December 5, 2018 at 4:00 p.m. (prevailing Eastern Time) as the deadline for the submission of bids (the "Bid Deadline");

    e.      scheduling the Auction, if necessary, no later than December 11, 2018; and

    f.      scheduling the Sale Hearing for December 18, 2018, subject to the Court's availability, to consider the sale of the Assets to the successful bidder(s) at the Auction.

8.      In addition, the Debtor respectfully requests the entry of the Sale Order:[4]

    a.      approving the sale of substantially all or any portion of the Assets to the successful bidder(s) at the Auction, free and clear of all liens, claims and encumbrances except for certain assumed liabilities;

    b.      approving the assumption and assignment of executory contracts and unexpired leases in connection with the Sale;

---

[3]      One September 13, 2018, the Court entered an order [D.I. 227] approving the Debtor's retention of SSG.

[4]      The Debtor will file and serve the proposed Sale Order in advance of the Sale Hearing.

c.  finding that the successful bidder(s) is a "good faith purchaser," as that term is defined in section 363(m) of the Bankruptcy Code, and has not violated section 363(n) of the Bankruptcy Code;

d.  waiving the fourteen-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d); and

e.  granting certain related relief.

***The Proposed Asset Purchase Agreement***

9.  The Debtor will provide a form asset purchase agreement (the "Asset Purchase Agreement") to Potential Bidders (as defined below).  Potential Bidders will be required to submit a revised Asset Purchase Agreement to the Debtor prior to the Bid Deadline. The Debtor, with the consent of each of the DIP Agents (as defined below), will also entertain the possibility of entering into an agreement (the "Stalking Horse Agreement") with a stalking horse purchaser (the "Stalking Horse Purchaser") prior to the Bid Deadline.  If the Debtor, with the consent of each of the DIP Agents (as defined below), selects a Stalking Horse Purchaser, the Debtor will file and serve notice of the proposed Stalking Horse Agreement no later than two days after execution of the agreement.  The notice will include the type and amount of bid protections (the "Bid Protections") (as may be agreed between the Debtor and the Stalking Horse Purchaser, subject to the consent of each of the DIP Agents (as defined below)), any necessary modifications or amendments to the Bid Procedures, as well as a summary of the key terms of the Stalking Horse Agreement.  The Debtor, following consultation with the Consultation Parties (as defined below), will request that the Court set a hearing to approve the Stalking Horse Agreement no later than seven days after execution of the Stalking Horse Agreement.

***The Proposed Bidding Procedures***

10.  The Debtor is requesting that the Court approve Bidding Procedures for the sale of substantially all or any portion of the Assets with a final sale hearing to occur on

December 18, 2018.[5]  The Debtor, at various points throughout the bidding and sale process as set forth herein and in the Bidding Procedures, will consult with (a) Wells Fargo Bank, National Association, in its capacity as DIP Working Capital Agent and the Prepetition Revolving Loan Agent (each as defined in the Final DIP Order)[6] (the "DIP Working Capital Agent"), (b) Gordon Brothers Finance Company, in its capacity as DIP Term Agent and the Term Agent (each as defined in the Final DIP Order) (the "DIP Term Agent," and together with the DIP Working Capital Agent, the "DIP Agents") and (c) the Committee (collectively (a) through (c), the "Consultation Parties").

11.     In accordance with Local Rule 6004-1(c), the following is a summary of the Debtor's proposed Bidding Procedures.

12.     <u>Participation Requirements</u>.  Unless otherwise ordered by the Court, to participate in the bidding process, each person or entity (each, an "Interested Party") will be required to deliver the following materials to SSG Advisors, LLC (Five Tower Bridge, Suite 420, 300 Barr Harbor Drive, West Conshohocken, Pennsylvania 19428 (Attn:  J. Scott Victor, email:  jsvictor@ssgca.com):  (a) an executed confidentiality agreement in form and substance satisfactory to the Debtor, which by its terms will inure to the benefit of the Successful Bidder(s) (as defined below); (b) a statement and other factual support demonstrating to the Debtor's satisfaction a *bona fide* interest in purchasing; (c) sufficient information to allow the Debtor to determine that the Interested Party has the financial wherewithal to complete a sale transaction (a "Sale Transaction"); and (d) the items comprising a bid.  A person or entity that has a *bona fide*

---

[5]     The form of Bidding Procedures Order contains dates proposed by the Debtor.  These dates are subject to the availability of the Court and may change.

[6]     The "Final DIP Order" refers to the Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Authorizing the Debtor to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying Automatic Stay, and (VI) Granting Related Relief [D.I. 252].

interest in any of the Assets and delivers the required information in (a) through (c) to the Debtor is hereinafter referred to as a "Potential Bidder."  After a Potential Bidder delivers all of the materials required in (a) through (c), the Debtor will allow each such Potential Bidder access to the data room.

13.     Determination by the Debtor.  The Debtor will (a) determine, with the assistance of its advisors and in consultation with the Consultation Parties, whether any person or entity is a Qualified Bidder (as defined below), (b) receive bids from Qualified Bidders, (c) evaluate and negotiate such bids and (d) conduct the Auction.  Neither the Debtor nor its representatives will be obligated to furnish any information relating to the Debtor to any person who is not a Potential Bidder.

14.     Due Diligence.  The Debtor has established an electronic data room into which substantial information about the Debtor and its business will be deposited.  All Potential Bidders will be granted full access to the data room by SSG.  The Debtor, with the assistance of SSG, will coordinate all reasonable requests for additional information and due diligence access from Potential Bidders.  In the event that any such due diligence material is in written form and has not previously been provided to any other Potential Bidder, the Debtor will simultaneously provide access to such materials to all Potential Bidders and the Consultation Parties.  Except as provided above with respect to access to the data room, the Debtor reserves the right, in its reasonable discretion and following consultation with the Consultation Parties, to withhold or limit access to any information that the Debtor determines to be commercially sensitive or otherwise not appropriate to disclose to any Potential Bidder.

15.     Bid Deadline.  On or before the Bid Deadline, a Potential Bidder that desires to make a bid is required to deliver electronic and written copies of its bid in both

Portable Document Format (.pdf) and Microsoft Word (.doc/.docx) format to representatives of the Debtor and the Debtor's counsel, investment banker and financial advisor and counsel to each of the DIP Agents on or before December 5, 2018 at 4:00 p.m. (prevailing Eastern Time), provided that the Debtor, with the consent of each of the DIP Agents, may extend the Bid Deadline without further order of the Court, subject to providing notice to the Consultation Parties.

16.     <u>Bid Requirements</u>.  All bids must:  (a) identify the legal name of the Potential Bidder (including any equity holders or other financial backers, if the Potential Bidder is an entity formed for the purpose of consummating the Sale Transaction); (b) include an affidavit verifying that the Potential Bidder has no relationship (familial, business or otherwise) with or connection to Gitanjali Gems, Ltd. and Mehul Choksi; (c) state that all necessary filings under applicable regulatory, antitrust and other laws will be made (pursuant to the terms and conditions in the applicable bid documents) and that payment of the fees associated with such filings will be made by the Potential Bidder; (d) be formal, binding and unconditional (except for those conditions expressly set forth in the applicable bid documents), not be subject to any due diligence and be irrevocable until the first business day following the closing of the Sale Transaction; (e) include a revised Asset Purchase Agreement that sets forth the terms of the proposed Sale Transaction; (f) include a commitment to close the transactions contemplated by the bid no later than January 31, 2019; (g) not entitle such Potential Bidder to a breakup fee, termination fee, expense reimbursement or similar type of payment or reimbursement and include a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Assets; (h) provide that the Potential Bidder agrees to serve as a backup bidder (the "<u>Next Best Bidder</u>") if the Potential Bidder's

Qualified Bid (as defined below) is the next highest and/or best bid after the Successful Bid (as defined below) (such bid being the "Next Best Bid") with respect to the relevant Assets; (i) be accompanied by a cash deposit, with an escrow agent selected by the Debtor, equal to 10 percent of the gross consideration payable at closing pursuant to the applicable bid documents, as calculated in good faith by the Debtor; and (j) be received by the Bid Deadline.

17.     A Potential Bidder must accompany its bid with:  (a) written evidence of available cash, a commitment for financing (not subject to any conditions other than those expressly set forth in the applicable bid documents) or such other evidence of ability to consummate the transaction contemplated by the bid documents (and, as applicable, to provide adequate assurance of future performance of all obligations to be assumed in such Sale Transaction), as the Debtor may reasonably request; (b) adequate assurance of future performance with respect to the Assumed and Assigned Agreements; (c) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed; (d) a covenant to cooperate with the Debtor to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; and (e) if the purchase price includes non-cash consideration, an analysis in reasonable detail of the value of the non-cash consideration and sufficient back-up documentation.  A bid received from a Potential Bidder for substantially all or any portion of the Assets that is determined by the Debtor to meet the above requirements will be considered a "Qualified Bid" and each Potential Bidder that submits such a Qualified Bid will be considered a "Qualified Bidder."  The DIP Working Capital Agent and the DIP Term Agent are each deemed a Qualified Bidder.  The Debtor, after consultation with the Consultation Parties, will

determine whether a bid received from a Potential Bidder for substantially all or any portion of the Assets is a Qualified Bid. The Debtor may determine, in its business judgment and after consultation with the Consultation Parties, which Qualified Bids are the highest and/or best offers for all or any portion of the Assets.

18.     The Debtor, after consultation with the Consultation Parties, may value a Qualified Bid based on any and all factors that the Debtor deems pertinent, including, among others: (a) the purported amount of the Qualified Bid, including non-cash consideration, if applicable; (b) the value to be provided to the Debtor under the Qualified Bid; (c) contingencies with respect to the Sale Transaction and the ability to close the proposed Sale Transaction on a basis acceptable to the Debtor, and any incremental costs to the Debtor in closing delays; and (d) the ability to obtain any and all necessary antitrust or other applicable regulatory approvals for the proposed transaction.

19.     <u>Baseline Bids</u>. Qualified Bidders that have submitted Qualified Bids are eligible to participate in the Auction. The Debtor, after consultation with the Consultation Parties, will select what it determines to be the highest and/or best Qualified Bid or combination of Qualified Bids for substantially all or any portion of the Assets (the "<u>Baseline Bid(s)</u>") to serve as the starting point at the Auction taking into account all relevant considerations, including the financial condition of the applicable bidder and certainty of closing. As soon as reasonably practicable and not later than two days prior to the Auction, the Debtor will identify the Baseline Bid(s) and provide to the Qualified Bidders and the Consultation Parties copies of the Baseline Bid(s) (with such distribution permissible by electronic means, including posting to a data room).

20.     <u>Right to Credit Bid</u>.  Any Qualified Bidder who has a valid and perfected lien on any Assets of the Debtor's estates (a "<u>Secured Creditor</u>") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claim within the meaning of section 363(k) of the Bankruptcy Code.  Each of the DIP Agents shall have the right to credit bid all or any portion of the aggregate amount of its applicable outstanding secured obligations pursuant to section 363(k) of the Bankruptcy Code, and any such credit bid will be considered a Qualified Bid.

21.     <u>Potential Stalking Horse Purchaser</u>.  The Debtor, with the consent of each of the DIP Agents, will entertain the possibility of entering into a Stalking Horse Agreement for the sale of the Assets.  If the Debtor enters into an agreement with a Stalking Horse Purchaser, the Debtor, with the consent of each of the DIP Agents, will file and serve notice of the proposed Stalking Horse Agreement on all interested parties no later than two days after execution of the Stalking Horse Agreement.  The notice will include the type and amount of bid protections (as may be agreed between the Debtor and the Stalking Horse Purchaser, subject to the consent of each of the DIP Agents), any necessary modifications or amendments to the Bidding Procedures, a summary of the key terms of the Stalking Horse Agreement and a copy of the Stalking Horse Agreement.  The Debtor, following consultation with the Consultation Parties, will request that the Court set a hearing to approve the Stalking Horse Purchaser and Stalking Horse Agreement no later than seven days after execution of the Stalking Horse Agreement.  The Stalking Horse Purchaser shall be deemed to be a Qualified Bidder and the Stalking Horse Purchaser's bid shall be deemed a Qualified Bid.

22.     <u>Auction</u>.  If at least two Qualified Bids in respect of substantially all or the same portion of the Assets is received by the Bid Deadline, the Debtor will conduct the Auction.

The Auction will take place at the offices of Jones Day, 717 Texas, Houston, Texas 77019, at 10:00 a.m. (prevailing Central Time) on December 11, 2018. The Debtor, with the consent of each of the DIP Agents, may adjourn the Auction without further order of the Court, subject to providing notice to the Consultation Parties. The Consultation Parties shall be permitted to attend the Auction. The Auction will be conducted openly and will be transcribed, at the Debtor's option. At the Auction, participants will be permitted to increase their bids and improve their terms; provided that any such increased or improved bid must be a Qualified Bid (except that the Bid Deadline will not apply). Bidding for the Assets will start at the purchase price and terms proposed in the applicable Baseline Bid. The Debtor will announce the bidding increments for bids on some or all of the Assets at the outset of the Auction (the "Minimum Overbid"). The Debtor, after consultation with the Consultation Parties may at any time adopt rules for the Auction that the Debtor reasonably determines are appropriate to promote the goals of the bidding process and not in conflict with the Bidding Procedures, including one or more adjournments of the Auction. Prior to the conclusion of the Auction, the Debtor, in consultation with the Consultation Parties, will: (a) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale Transaction; (b) in the exercise of its good faith business judgment and consistent with the Bidding Procedures, identify the highest and/or otherwise best offer or collection of offers for the Assets (the "Successful Bid(s)"); and (c) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the successful bidder or bidders (the "Successful Bidder(s)") and the amount and other material terms of the Successful Bid(s). After determining the Successful Bid(s) for the Assets, the Debtor may determine, in its reasonable business judgment and in consultation with

the Consultation Parties, which Qualified Bid(s) are the next best bids for the relevant Assets (the "Next Best Bid(s)").

23.     The terms of each Successful Bid and Next Best Bid must be reasonably acceptable to each of the DIP Agents and shall, among other things, either (x) provide for cash proceeds in an amount sufficient to repay in full in cash all of the Debtor's obligations under the DIP Documents (as defined in the Final DIP Order) and, if applicable, all of the Debtor's obligations under the Prepetition Documents (as defined in the Final DIP Order), or (y) be approved and consented to by each of the DIP Agents.

24.     Not later than one day following the conclusion of the Auction, the Debtor shall file a notice identifying the Successful Bidder(s) and serve such notice upon:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) counsel to the DIP Working Capital Agent; (d) counsel to the DIP Term Agent; (e) all parties who have asserted a lien or security interest against any of the Assets; (f) each party identified in the applicable Cure Schedule; (g) applicable taxing authorities, including the Internal Revenue Service; (h) all state attorneys' general in states where the Assets are located; (i) municipalities in which the Assets are located; (j) all parties known to the Debtor who have expressed an interest in the Assets during the past six months; (k) the Debtor's current employees; (l) all parties requesting notice in this chapter 11 case; and (m) all other known creditors in this chapter 11 case.

25.     Acceptance of Qualified Bids.  The Debtor's selection and submission to this Court of the Successful Bid(s) will not constitute the Debtor's acceptance of the bid.  The Debtor will have accepted a Qualified Bid only when a contract therefor has been executed and such Qualified Bid has been approved by the Court at the Sale Hearing.  If the Successful Bidder does not close the Sale by the date agreed to by the Debtor and the Successful Bidder, then the

Debtor shall be authorized, but not required, to close with the party that submitted the Next Best Bid (the "Next Best Bidder"), without a further court order.

26.     Modification of Bidding Procedures.  The Debtor, in consultation with the Consultation Parties and with the consent of the DIP Agents, may amend the Bidding Procedures or the bidding process at any time and from time to time in any manner that it determines in good faith will best promote the goals of the process, including extending or modifying any of the dates described herein.

27.     Return of Good Faith Deposit.  The Good Faith Deposits of all Qualified Bidders will be held in escrow by the escrow agent and while held in escrow will not become property of the Debtor's bankruptcy estate unless released from escrow pursuant to terms of the applicable escrow agreement or pursuant to further order of the Court.  The escrow agent will retain the Good Faith Deposits of the Successful Bidder(s) until the closing of the Sale Transaction(s) unless otherwise ordered by the Court.  The Good Faith Deposits of the other Qualified Bidders will be returned on the earlier of February 1, 2019 and the first business day following the closing of the Sale Transaction.  At the closing of the Sale Transaction contemplated by the Successful Bid, the Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit.  Upon the return of the Good Faith Deposits, their respective owners will receive any and all interest that has accrued thereon.

28.     The Debtor believes that the proposed Bidding Procedures provide an appropriate framework for selling the Assets and will enable the Debtor to fully review, analyze and compare all Bids received to determine which Bid is in the best interests of the Debtor's estate.

NAI-1504537482v5

*Proposed Notice of the Auction and Sale Hearing*

29.    Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide its creditors with twenty-one days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the Sale.  The Debtor proposes that the deadline for objecting to approval of the proposed Sale be (a) December 11, 2018 at 4:00 p.m. (prevailing Eastern Time) for all general objections to the Sale and (b) December 14, 2018 at 4:00 p.m. (prevailing Eastern Time) solely for any additional issues raised by the notice identifying the Successful Bidder(s).

30.    Within two business days after entry of the Bidding Procedures Order or as soon as practicable thereafter, the Debtor will serve the Auction and Hearing Notice by first-class mail, postage prepaid upon the following parties:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) counsel to the DIP Working Capital Agent; (d) counsel to the DIP Term agent; (e) all parties who have asserted a lien or security interest against any of the Assets; (f) all parties to the Debtor's executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (the "Assumed and Assigned Agreements"); (g) applicable taxing authorities, including the Internal Revenue Service; (h) all state attorneys' general in states where the Assets are located; (i) municipalities in which the Assets are located; (j) all parties known to the Debtor who have expressed an interest in the Assets during the past six months; (k) the Debtor's current employees; (l) all parties requesting notice in this chapter 11 case; and (m) all other known creditors in this chapter 11 case.  The Auction and Hearing Notice shall indicate that copies of this motion can be obtained on the website of the Debtor's claims and noticing agent, Prime Clerk LLC, at http://www.primeclerk.com/samuelsjewelers.  Further, within five business days after entry of the Bidding Procedures Order, or as soon as practicable thereafter,

the Debtor will place a publication version of the Auction and Hearing Notice for one day in the national edition of *The Wall Street Journal*, *USA Today* or another national publication.

31.     The Auction and Hearing Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the Sale once they are set by the Court, and therefore, will comply with Bankruptcy Rule 2002(c).  The Debtor submits that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed sale of the Assets.  Therefore, the Debtor respectfully requests that this Court approve the notice procedures proposed above.

***Proposed Assumption and Assignment Procedures***

32.     Additionally, the Debtor, as part of the Sale, may assume and assign all or some of the Assumed and Assigned Agreements.  By no later than ten business days after entry of the Bidding Procedures Order, the Debtor will file a schedule of cure obligations (the "Cure Schedule") for the Assumed and Assigned Agreements.  The Cure Schedule will include a description of each Assumed and Assigned Agreement that may be assumed and assigned to a potential buyer and the amount, if any, the Debtor believes is necessary to cure any defaults under such agreements pursuant to section 365 of the Bankruptcy Code (the "Cure Costs").  A copy of the Cure Schedule, together with the Assumption and Assignment Notice, will be served on each of the non-Debtor parties listed on the Cure Schedule by first class mail on the date that the Cure Schedule is filed with the Court.

33.     The Debtor proposes that any objections to the assumption and assignment of any executory contract or unexpired lease identified on the Cure Schedule (other than objections relating to adequate assurance of future performance) or to the Cure Costs set forth on

such schedule, must be in writing, filed with the Court, and be actually received on or before 4:00 p.m. (prevailing Eastern Time) on November 20, 2018 by (a) Samuels Jewelers, Inc., 2914 Montopolis Drive, Suite 200, Austin, Texas 78741 (Attn: Farhad Wadia), email: farhad.wadia@smjw.com; (b) Jones Day, 17 Texas Street, Suite 3300, Houston, Texas 77002 (Attn: Paul M. Green, Esq.), email: pmgreen@jonesday.com; (c) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Zachary I. Shapiro, Esq.), email: shapiro@rlf.com; (d) SSG Advisors, LLC, Five Tower Bridge, Suite 420, 300 Barr Harbor Drive, West Conshohocken, Pennsylvania 19428 (Attn: J. Scott Victor), email: jsvictor@ssgca.com; (e) Berkeley Research Group, LLC, 75 State Street, 18th Floor, Boston, Massachusetts 02109 (Attn: Kyle Richter), email: krichter@thinkbrg.com; (f) counsel to any Stalking Horse Purchaser; (g) Foley & Lardner LLP, Washington Harbour, 3000 K Street, N.W., Suite 600, Washington, D.C. 20007 (Attn: Erika L. Morabito, Esq.), email: emorabito@foley.com; (h) Whiteford, Taylor & Preston LLC, The Renaissance Centre, Suite 500, 405 North King Street, Wilmington, Delaware 19801 (Attn: L. Katherine Good, Esq.), email: kgood@wtplaw.com; (i) Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110 (Attn: Julia Frost-Davies, Esq. and Christopher L. Carter, Esq.), email: julia.frost-davies@morganlewis.com and christopher.carter@morganlewis.com; (j) Reed Smith LLP, 1201 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn: Kurt F. Gwynne, Esq.), email: kgwynne@reedsmith.com; (k) Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110 (Attn: John F. Ventola, Esq. and Jonathan D. Marshall, Esq.), email: jventola@choate.com and jmarshall@choate.com; (l) Womble Bond Dickinson, 222 Delaware Avenue, 15th Floor, Wilmington, Delaware 19802 (Attn: Matthew P. Ward, Esq.), email: Matthew.Ward@wbd-us.com; and (m) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox

NAI-1504537482v5

35, Wilmington, Delaware 19801 (Attn: Jane Leamy, Esq.), email: jane.m.leamy@usdoj.gov (collectively, the "Notice Parties"). Any such objection shall set forth a specific default in any Assumed and Assigned Agreements and claim a specific monetary amount that differs from the amount (if any) specified by the Debtor in the Cure Schedule.

34. If no objections are received, then the Cure Costs set forth in the Cure Schedule will be binding upon the non-Debtor parties to the Assumed and Assigned Agreements for all purposes in this chapter 11 case and will constitute a final determination of the total Cure Costs required to be paid in connection with the assumption and assignment of the Assumed and Assigned Agreements. In addition, all counterparties to the Assumed and Assigned Agreements will be (a) forever barred from asserting any additional cure or other amounts with respect to the Assumed and Assigned Agreements, and the Debtor and the Successful Bidder(s) will be entitled to rely solely upon the Cure Costs set forth in the Assumption and Assignment Notice; (b) deemed to have consented to the assumption and assignment and (c) forever barred and estopped from asserting or claiming against the Debtor or the Successful Bidder(s) that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed and Assigned Agreements or that there is any objection or defense to the assumption and assignment of such Assumed and Assigned Agreements.

35. Where a non-Debtor counterparty to an Assumed and Assigned Agreement files an objection asserting a cure amount higher than the proposed Cure Costs (the "Disputed Cure Amount"), then (a) the Debtor will work with the non-Debtor counterparty to reach a consensual resolution with respect to the Disputed Cure Amount, which resolution is subject to the Successful Bidder's consent or (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid under

section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Sale Hearing or at such other date and time as may be fixed by this Court. All other objections to the proposed assumption and assignment of an Assumed and Assigned Agreement will be heard at the Sale Hearing. The Debtor intends to cooperate with counterparties to Assumed and Assigned Agreements to attempt to reconcile any differences with respect to a particular cure amount.

36.     Additionally, by no later than December 7, 2018, the Debtor will serve each Qualified Bidder's adequate assurance of future performance on the non-Debtor counterparties to the Assumed and Assigned Agreements. The Debtor proposes that the deadline for objecting to the assignment of the Assumed and Assigned Agreements to the Successful Bidder(s) on the basis of adequate assurance of future performance be December 14, 2018 at 4:00 p.m. (prevailing Eastern time).

37.     The Debtor requests that any party failing to object to the proposed transactions be deemed to consent to the treatment of its executory contract and/or unexpired lease under section 365 of the Bankruptcy Code. See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). Moreover, the Debtor requests that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment. See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

**Approval of the Sale is Warranted under**
**Section 363 of the Bankruptcy Code**

38.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate."  11 U.S.C. § 363(b).  A debtor must demonstrate a sound business justification for a

sale or use of assets outside the ordinary course of business.  See, e.g., In re Martin, 91 F.3d 389,

395 (3d Cir. 1996) (citing In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991)); Official Comm. of

Unsecured Creditors of LTV Aerospace and Defense Co. v. LTV Corporation (In re Chateaugay

Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390

(6th Cir. 1986); Comm. of Equity Security Holders v. The Lionel Corp. (In re The Lionel Corp.),

722 F.2d 1063, 1070 (2d Cir. 1983).

39.     Courts typically consider the following factors in determining whether a

proposed sale meets this standard:

    a.     whether a sound business justification exists for the sale;

    b.     whether adequate and reasonable notice of the sale was given to
           interested parties;

    c.     whether the sale will produce a fair and reasonable price for the
           property; and

    d.     whether the parties have acted in good faith.

In re Decora Indus., Inc., 2002 WL 32332749, at * 2 (D. Del. May 20, 2002) (citing Del. &

Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991)).

40.     When a debtor demonstrates a valid business justification for a decision, a

strong presumption arises "that in making [the] business decision the directors of a corporation

acted on an informed basis, in good faith and in the honest belief that the action taken was in the

best interests of the company."  Official Comm. of Subordinated Bondholders v. Integrated Res.,

Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that Delaware business judgment rule has "vitality by analogy" in chapter 11) (citations omitted).

41.     In the instant case, a valid business justification exists for the Sale because the Debtor believes a robust sale process will maximize value for the estate while maintaining its current operations.  Furthermore, notice of the Sale has been reasonable and adequate.  The Debtor is providing direct notice of the sale to all known creditors of the Debtor's estate and is also publishing notice of the sale in the national edition of *The Wall Street Journal*, *USA Today* or another national publication.  Further, the Sale has been proposed in good faith.  Finally, because the Sale is subject to bid procedures and an auction, the price ultimately received as a result of any successful bid should, based on the process alone, be deemed fair and reasonable.

### *Any Successful Bidder Should be Deemed a Good Faith Purchaser*

42.     The Debtor requests that any successful bidder at the Auction receive the protections set forth in section 363(m) of the Bankruptcy Code.  Specifically, section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the United States Court of Appeals for the Third Circuit previously addressed the meaning of the term:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986) (citations omitted).

43.     The Debtor submits that any sale agreement it enters into with such other party that is the successful bidder(s) at the Auction will also have been negotiated at arm's-length and in good faith.  Accordingly, the Debtor seeks a finding that the successful bidder(s) at the Auction is a good faith purchaser under section 363(m) of the Bankruptcy Code and has not violated section 363(n) of the Bankruptcy Code.

***Authority to Enter into a Stalking Horse Agreement and the Provisions of Bid Protections***

44.     To the extent that the Debtor enters into an agreement with a Stalking Horse Purchaser, in certain circumstances, it may be appropriate to provide the Stalking Horse Purchaser with Bid Protections, including an expense reimbursement and/or break-up fee.  The Debtor will enter into a stalking horse agreement with a Stalking Horse Purchaser only if it believes that such will maximize the ultimate sale price for the Assets, and the Bid Protections will remain subject to approval by the Court.  Under Third Circuit precedent, Bid Protections constitute administrative expenses, and therefore, the payment of such fees must provide a postpetition benefit to the bankruptcy estate.  Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533, 536 (3d Cir. 1999).  In O'Brien, the Third Circuit provided two examples of a potential benefit accruing from the payment of a bid protection.  Id.  First, a benefit to the estate may arise if, "assurance of a break-up fee promoted [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  Id. at 537.  Second, bid protections can encourage potential bidders to evaluate thoroughly a debtor's value, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  Id.

45.     Courts have further recognized that bid protections may be used to protect bidders in connection with a sale of assets pursuant to section 363 of the Bankruptcy Code and

that such protections can be "important tools to encourage bidding and to maximize the value of the Debtors' assets." In re Integrated Res., Inc., 147 B.R. at 659. Such protections enable a debtor to assure a sale to a contractually-committed bidder at a price the debtor believes is fair and reasonable, while providing the debtor with the opportunity of obtaining even greater benefits for the estate through an auction process. See In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (stating that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking." (citation omitted)).

46.     As noted above, the Debtor intends to negotiate any stalking horse agreement at arm's-length and in good faith and will enter into an agreement with a Stalking Horse Purchaser only if the Debtor believes it will maximize the return for the sale of the Assets. Thus, the authorization for the Debtor enter into a Stalking Horse Agreement and seek Court approval of any Bid Protections offered to a Stalking Horse Purchaser is justified.

**_Approval of the Sale Free and Clear of Liens, Claims and Encumbrances_**

47.     The Debtor requests approval to sell the Assets free and clear of any and all liens, claims, interests and encumbrances in accordance with section 363(f) of the Bankruptcy Code. Pursuant to section 363(f), a debtor in possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

> a.     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> b.     such entity consents;
>
> c.     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.       such interest is in bona fide dispute; or

e.       such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); <u>see</u> <u>Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)</u>, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve a "free and clear" sale even if only one of the subsections is met).

48.      Furthermore, it is well established that a bankruptcy court has the power, pursuant to section 363(f) of the Bankruptcy Code, to approve the sale of a debtor's assets free and clear of any claims against the debtor.  <u>See</u> <u>In re TWA Airlines, Inc.</u>, 322 F.3d 283, 285, 288-90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of §363(f)); <u>United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)</u>, 99 F.3d 573, 585 (4th Cir. 1996) (same).

49.      The Debtor submits that the sale of its assets free and clear of liens, claims and encumbrances will satisfy the requirements of section 363(f) of the Bankruptcy Code.  The Debtor also believes that service of the Auction and Hearing Notice in accordance with the terms set forth in this motion will afford creditors sufficient notice of and opportunity to object to the Sale.  Any entity that does not object to the Sale should be deemed to have consented.  <u>See</u> <u>Futuresource LLC v. Reuters Ltd.</u>, 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold."); <u>Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)</u>, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale

free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Penn. 1988) (same). Accordingly, the Debtor submits that the sale of its assets free and clear of liens, claims and encumbrances will satisfy the requirements of section 363(f) of the Bankruptcy Code and is justified.

***Approval of the Assumption and Assignment of Executory Contracts and Unexpired Leases***

50.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  See, e.g., In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by the business judgment standard and can only be overturned if the decision was a product of bad faith, whim or caprice); see also In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of a lease "will be a matter of business judgment by the bankruptcy court").

51.     The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)).  Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control over the administration of the estate and threaten a court's ability to

control a case impartially.  See Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure[], or provide[] adequate assurance that the [debtor] will promptly cure," any default.  11 U.S.C. § 365(b)(1).

52.     Under section 365(f) of the Bankruptcy Code, a debtor, after assuming a contract, may assign its rights under the contract to a third party.  11 U.S.C. § 365(f); see also LR.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.), 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); see also Leonard v. General Motors Corp. (In re Headquarters Dodge, Inc.), 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f)(1) is to assist the trustee in realizing the full value of the debtor's assets).  Section 365(f)(2)(B) requires, however, the provision of adequate assurance of future performance by any assignee.  11 U.S.C. § 365(f)(2)(B).  The purpose of the adequate assurance requirement is to protect the interests of the non-debtor party to an assigned contract, as section 365(k) of the Bankruptcy Code relieves a debtor from liability for any breach of a contract that may occur after an assignment.  11 U.S.C. § 365(k); see Cinicola v. Scharffenberger, 248 F.3d 110, 120 (3d Cir. 2001).  Adequate assurance of future performance is not required for every term of an executory contract or unexpired lease but only such terms that are "material and economically" significant.  In re Fleming Cos., Inc., 499 F.3d 300, 305 (3d Cir. 2007).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case but should be given a "practical, pragmatic construction."  In re DBSI, Inc., 405 B.R. 698, 708 (Bankr. D. Del. 2009); see also In re Decora Indus., 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment.").  Adequate assurance may be

provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  <u>See</u>, <u>e.g.</u>, <u>In re Bygaph, Inc.</u> 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when the prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business to give it a strong likelihood of success).

53.     To the extent any of the Assumed and Assigned Agreements contain provisions purporting to restrict or prohibit altering and dividing the space or modifying signage, such provisions are unenforceable.  <u>See</u> <u>In re Rickel Home Ctrs., Inc.</u>, 240 B.R. 826, 833 (D. Del. 1998) (holding alterations clauses to be "de facto anti-assignment clauses"); <u>see</u> <u>also</u> 11 U.S.C. § 365(f).  Moreover, in connection with any such build-out, applicable stores may go dark for up to 180 days.  <u>In re Rickel Home Ctrs., Inc.</u>, 240 B.R. at 835 (finding that going dark period of six months to be reasonable).

54.     The Debtor submits that the procedures set forth in this motion, including the notice provisions and the deadlines for counterparties to raise objections with respect to the assumption and assignment of contracts and leases, including on the basis of cure amount and adequate assurance of future performance, are adequate to protect the rights of counterparties to the Debtor's contracts and leases.

## Waiver of Rules 6004(h) and 6006(d)

55.     The Debtor requests that, upon entry of the Sale Order, the Court waive the fourteen-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d).  The Debtor respectfully submits that the Court waive the fourteen-day stay requirements contained in Bankruptcy Rules 6004(h) and 6006(d).

## Consent to Jurisdiction

56.     Pursuant to Local Rule 9013-1(f), the Debtor consents to the entry of a final judgment or order with respect to this motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## Notice

57.     Notice of this motion will be provided to:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) counsel to Wells Fargo Bank, National Association; (d) counsel to Gordon Brothers Finance Company; (e) all state attorneys general in which the Assets are located; (f) all parties known to the Debtor who have expressed an interest in the Assets during the past six months; (g) all non-Debtor parties to the Assumed and Assigned Agreements; and (h) all parties entitled to notice pursuant to Bankruptcy Rule 2002.  Due to the nature of the relief requested herein, the Debtor respectfully submits that no further notice of this motion is necessary.

## No Prior Request

58.     No prior request for the relief sought herein has been made to this Court or any other Court.

WHEREFORE, the Debtor respectfully requests that the Court (i) enter the Bidding Procedures Order, in substantially the form attached hereto as Exhibit A, (ii) enter the Sale Order and (iii) grant such other and further relief to the Debtor as the Court may deem proper.

Dated: October 3, 2018
Wilmington, Delaware

Respectfully submitted,

_/s/ David T. Queroli_____
Daniel J. DeFranceschi (DE 2732)
Zachary I. Shapiro (DE 5103)
David T. Queroli (DE 6318)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
E-mail: defranceschi@rlf.com
      shapiro@rlf.com
      queroli@rlf.com

    -and-

Gregory M. Gordon (TX 08435300)
Amanda S. Rush (TX 24079422)
Jonathan M. Fisher (TX 24082999)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail: gmgordon@jonesday.com
      asrush@jonesday.com
      jmfisher@jonesday.com

    -and-

Paul M. Green (TX 24059854)
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone: (832) 239-3939
Facsimile: (832) 239-3600
E-mail: pmgreen@jonesday.com

ATTORNEYS FOR DEBTOR

NAI-1504537482v5