## Exhibit A

## Executed APA

**PURCHASE AGREEMENT**

between

**SAMUELS JEWELERS, INC.**

and

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

**Dated as of February 28, 2019**

# TABLE OF CONTENTS

**Page**

I. DEFINITIONS....................................................................................... 2

   1.1   Certain Definitions ................................................................ 2

   1.2   Other Definitional and Interpretive Matters ........................... 6

II. PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES............. 8

   2.1   Purchase and Sale of Assets ................................................ 8

   2.2   Excluded Assets ................................................................. 9

   2.3   Assumption of Liabilities ..................................................... 10

   2.4   Excluded Liabilities ............................................................ 10

   2.5   Cure Costs........................................................................ 10

   2.6   Non-Assignment of Assets; Possession of Assets................... 10

   2.7   Further Conveyances and Assumptions ................................. 11

III. CONSIDERATION; RELEASE; PROFESSIONAL EXPENSES ESCROW ....... 12

   3.1   Consideration .................................................................... 12

   3.2   Release............................................................................. 12

   3.3   Professional Expenses Escrow.............................................. 12

IV. CLOSING AND TERMINATION ........................................................... 12

   4.1   Closing Date ...................................................................... 12

   4.2   Deliveries by Seller ............................................................ 12

   4.3   Deliveries by Purchaser ...................................................... 13

   4.4   Termination of Agreement .................................................. 13

   4.5   Procedure Upon Termination................................................ 14

   4.6   Effect of Termination.......................................................... 14

V. REPRESENTATIONS AND WARRANTIES OF SELLER ............................... 14

   5.1   Organization and Good Standing........................................... 15

   5.2   Authorization of Agreement ................................................ 15

   5.3   Conflicts; Consents of Third Parties...................................... 15

   5.4   Title to Purchased Assets .................................................... 16

   5.5   Inventory; Accounts Receivable............................................ 16

   5.6   Intellectual Property ........................................................... 16

   5.7   Validity of Purchased Contracts............................................ 17

**TABLE OF CONTENTS**
(continued)

Page

|  |  |  |
|---|---|---|
| 5.8 | Litigation | 17 |
| 5.9 | Financial Advisors | 17 |
| 5.10 | Tax Matters | 17 |
| 5.11 | No Other Representations or Warranties; Schedules | 18 |
| VI. | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 18 |
| 6.1 | Organization and Good Standing | 19 |
| 6.2 | Authorization of Agreement | 19 |
| 6.3 | Conflicts; Consents of Third Parties | 19 |
| 6.4 | Litigation | 20 |
| 6.5 | Financial Advisors | 20 |
| 6.6 | Financial Capability | 20 |
| 6.7 | Limited Reliance | 20 |
| VII. | BANKRUPTCY COURT MATTERS | 20 |
| VIII. | COVENANTS | 21 |
| 8.1 | Access to Information | 21 |
| 8.2 | Actions Pending the Closing | 21 |
| 8.3 | Consents | 21 |
| 8.4 | Regulatory Approvals | 21 |
| 8.5 | Further Assurances | 22 |
| 8.6 | Publicity | 22 |
| 8.7 | Confidentiality | 22 |
| 8.8 | Bulk Sales | 23 |
| IX. | CONDITIONS TO CLOSING | 23 |
| 9.1 | Conditions Precedent to Obligations of Purchaser | 23 |
| 9.2 | Conditions Precedent to Obligations of Seller | 24 |
| 9.3 | Conditions Precedent to Obligations of Purchaser and Seller | 25 |
| 9.4 | Frustration of Closing Conditions | 25 |
| X. | TAXES | 25 |
| 10.1 | Transfer Taxes | 25 |
| 10.2 | Certain Periodic Non-Income Taxes | 25 |

| | | |
|---|---|---|
| 10.3 | Tax Cooperation | 25 |
| 10.4 | Tax Allocation | 26 |
| XI. | SURVIVAL | 26 |
| 11.1 | Survival of Representations and Warranties | 26 |
| 11.2 | Survival of Covenants | 26 |
| XII. | MISCELLANEOUS | 26 |
| 12.1 | Expenses | 26 |
| 12.2 | Injunctive Relief | 26 |
| 12.3 | Submission to Jurisdiction; Consent to Service of Process | 27 |
| 12.4 | Waiver of Right to Trial by Jury | 27 |
| 12.5 | Entire Agreement; Amendments and Waivers | 27 |
| 12.6 | Governing Law | 28 |
| 12.7 | Notices | 28 |
| 12.8 | Severability | 29 |
| 12.9 | Assignment | 29 |
| 12.10 | Non-Recourse | 30 |
| 12.11 | Counterparts | 30 |

Exhibit A - Form of Professional Expenses Escrow Agreement
Exhibit B - Form of Sale Order

Schedule 2.1(b)(i) - Purchased Inventory
Schedule 2.1(b)(ii) - Purchased Accounts Receivable
Schedule 2.1(b)(iii) - Purchased Intellectual Property
Schedule 2.1(b)(iv) - Purchased Contracts
Schedule 2.3(c) - Certain Assumed Liabilities
Schedule 5.3(a) – Conflicts
Schedule 5.3(b) - Consents of Third Parties
Schedule 5.5(a) – Location of Purchased Inventory
Schedule 5.5(b) – Inventory – November 2018 General Ledger Accounts
Schedule 5.5(c) – Accounts Receivable – November 2018 General Ledger Accounts
Schedule 5.6 – List of Registered Trademarks and Domain Names
Schedule 5.7 - Certain Purchased Contract Matters
Schedule 5.10 - Certain Tax Matters

# PURCHASE AGREEMENT

This PURCHASE AGREEMENT (this "Agreement"), dated as of the date set forth on the signature page hereto, is by and between Wells Fargo Bank, National Association ("Purchaser") and Samuels Jewelers, Inc., a Delaware corporation ("Seller").

## RECITALS:

A.      Seller operates more than one hundred (100) specialty retail jewelry stores located across the United States and sells fine jewelry items with an emphasis on diamond and gemstone jewelry;

B.      Seller is a debtor and debtor in possession under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 7, 2018 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), where Seller's bankruptcy case is administered under Case No. 18-11818(KJC) (the "Bankruptcy Case");

C.      On September 18, 2018, the Bankruptcy Court issued the Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Authorizing the Debtor to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying Automatic Stay, and (VI) Granting Related Relief (the "Final DIP Order");

D.      Purchaser and Seller are parties to the Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of August 10, 2018, as amended by the First Amendment and Limited Waiver to Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of September 18, 2018, and by the Second Amendment to Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of January 25, 2019 (as amended, the "DIP Credit Agreement"), with Seller being the borrower and a debtor-in-possession in the Bankruptcy Case and Purchaser being, among other things, a lender;

E.      Under the DIP Credit Agreement, as of the date hereof, the aggregate principal amount of DIP Revolving Loan Obligations is $52,287,093.87;

F.      On October 3, 2018, Seller filed a motion pursuant to which Seller moved the Bankruptcy Court, pursuant to Sections 105, 363, 365 and 503 of the Bankruptcy Code, Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure and Rules 2002-1 and 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware, for, among other things, the entry of an order approving proposed auction and bid procedures in connection with the sale of substantially all or any portion of Seller's assets;

G.      On October 22, 2018, the Bankruptcy Court issued the Order Establishing Procedures and Granting Related Relief (the "Bidding Procedures Order");

H.     Pursuant to Paragraph 7 of the Bidding Procedures Order and Section 8 of the bidding procedures approved by the Bidding Procedures Order (the "Bidding Procedures"), Purchaser is deemed a "Qualified Bidder";

I.     In accordance with Section 363(k) of the Bankruptcy Code and Section 10 of the Bidding Procedures, Purchaser has submitted a credit bid contemplating that (I) Seller sell to Purchaser the Purchased Assets (defined below) and transfer to Purchaser the Assumed Liabilities (defined below), and (II) Purchaser purchase from Seller the Purchased Assets and assume the Assumed Liabilities, in each case upon the terms and conditions hereinafter set forth;

J.     The execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order (defined below) under, inter alia, sections 363 and 365 of the Bankruptcy Code; and

K.     The parties hereto desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## I. DEFINITIONS

1.1     Certain Definitions.  For purposes of this Agreement, the following terms, when used herein with initial capital letters, have the meanings specified in this Section 1.1 or elsewhere in this Agreement as identified in this Section 1.1:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Business Day" means any day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York or Boston, Massachusetts are authorized or required by Law to close.

"Code" means the Internal Revenue Code of 1986.

"Contract" means any contract, agreement, commitment, promise or undertaking (including any indenture, note, bond or other evidence of indebtedness, lease, instrument, license, purchase order or other legally binding agreement), whether written or oral.

"Cure Costs" means amounts that must be paid and obligations that otherwise must be satisfied under sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of any Purchased Contract, as determined by the Bankruptcy Court.

"DIP Revolving Loan Obligations" has the meaning set forth in the Final DIP Order.

"Excluded Cash Amount" means $7,710,027.96.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, or any agency, authority, department, commission, board, bureau, official or instrumentality of such body, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), whether foreign, federal, state, municipal or local, or any agency, instrumentality or authority thereof, or any court or arbitrator thereof (public or private) of competent jurisdiction.

"IRS" means the Internal Revenue Service.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation or common law requirement.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private), hearings or claims, charges, complaints, notices or any proceedings by or before a Governmental Body.

"Liability" means any debt, loss, liability, claim (including "claim" as defined in the Bankruptcy Code), commitment, undertaking, damage, expense, fine, penalty, cost, royalty, deficiency or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, disclosed or undisclosed, express or implied, primary or secondary, direct or indirect, matured or unmatured, fixed, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due, and whether in contract, tort or otherwise.

"Lien" as applied to any Person means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, restriction or encumbrance or any other similar encumbrance in respect of an asset of such Person, whether imposed by Law, Contract or otherwise.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Permitted Exceptions" means statutory Liens for Taxes not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Professional Expenses Escrow" means the escrow account established pursuant to the terms of the Professional Expenses Escrow Agreement.

"Professional Expenses Escrow Agent" means Kurtzman Carson Consultants, LLC or another escrow agent agreed upon by the parties thereto.

"Professional Expenses Escrow Agreement" means an escrow agreement by and among Purchaser, Seller and the Professional Expenses Escrow Agent substantially in the form of Exhibit A, providing for (a) the establishment of the Professional Expenses Escrow, (b) the disbursement of funds from the Professional Expenses Escrow to counsel and other professional advisors retained, or otherwise to be paid, by Seller pursuant to Orders of the Bankruptcy Court in payment of their fees and expenses from time to time upon entry of an Order by the Bankruptcy Court allowing such fees and expenses or any portion thereof, and (c) after the payment of all such allowed fees and expenses from the Professional Expenses Escrow, the disbursement of the remaining balance of the Professional Expenses Escrow, if any, to Purchaser.

"Professional Expenses Escrow Amount" means $3,161,961.20.

"Purchaser Material Adverse Effect" means any event, change, effect, condition, state of facts or occurrence (regardless of whether such event, change, effect, condition, state of facts or occurrence constitutes a breach of any representation, warranty or covenant of Purchaser hereunder) which has had or would reasonably be expected to have, individually or when considered (a) together with any other event, change, effect, condition, state of facts or occurrence, a material and adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement or perform its obligations under this Agreement or (b) the effect of preventing or materially delaying the consummation of the transactions contemplated by this Agreement.

"Representative" means, with respect to any Person, any and all directors, officers, partners, managers, employees, consultants, financial advisors, counsel, accountants and other agents, including potential financing sources of such Person.

"Sale Order" means an order entered by the Bankruptcy Court: (a) that was on appropriate notice to all parties entitled to notice of any motion relating to the Purchased Assets, this Agreement or the transactions contemplated hereby and (b) that is substantially in the form of Exhibit B.

"Seller Material Adverse Effect" means any event, change, effect, condition, state of facts or occurrence (regardless of whether such event, change, effect, condition, state of facts or occurrence constitutes a breach of any representation, warranty or covenant of Seller hereunder) which has had or would reasonably be expected to have, individually or when considered together with any other events, changes, effects, conditions, states

of facts or occurrences, (a) a material adverse effect on or a material adverse change in or to the Purchased Assets, considered as a whole, (b) a material and adverse effect on the ability of Seller to consummate the transactions contemplated by this Agreement or perform their obligations under this Agreement or (c) the effect of preventing or materially delaying the consummation of the transactions contemplated by this Agreement.

"<u>Taxes</u>" (a) any federal, state, local, or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Section 59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales and use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not, and (b) any Liability for the part of any item described in clause (a) by reason of contract, assumption, transferee or successor Liability, operation of Law, or otherwise.

"<u>Tax Return</u>" means all returns, declarations, reports, claim for refund, estimates, information returns and statements required to be filed in respect of any Taxes (including any schedules, attachments thereto or amendments thereof).

<u>Terms Defined Elsewhere in this Agreement</u>.  For purposes of this Agreement, the following terms have meanings set forth elsewhere in this Agreement as indicated:

| **Term** | **Location** |
| --- | --- |
| Agreement | Preamble |
| Applicable Cure Costs | 2.5 |
| Assumed Liabilities | 2.3 |
| Avoidance Actions | 2.2(g) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bidding Procedures | Recitals |
| Bidding Procedures Order | Recitals |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Credit Bid Amount | 3.1(b) |
| DIP Credit Agreement | Recitals |
| DIP Revolving Loan Obligations | Recitals |
| Excluded Assets | 2.2 |
| Excluded Cash | 2.1(b)(v) |
| Excluded Liabilities | 2.4 |
| Final DIP Order | Recitals |
| Necessary Consent | 2.6 |
| Periodic Non-Income Taxes | 10.2 |
| Petition Date | Recitals |
| Purchased Accounts Receivable | 2.1(b)(ii) |
| Purchased Assets | 2.1(b) |

| Term | Location |
|------|----------|
| Purchased Contracts | 2.1(b)(iv) |
| Purchased Intellectual Property | 2.1(b)(iii) |
| Purchased Inventory | 2.1(b)(i) |
| Purchaser | Preamble |
| Seller | Preamble |
| Termination Date | 4.4(a) |
| Transaction Documents | 5.2 |
| Transactions | 5.2 |

1.2    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action will be extended to the next succeeding Business Day.

Commercially Reasonable Efforts.  When used herein with respect to Seller, the phrase "commercially reasonable efforts" will mean efforts that are reasonable taking into account Seller's limited remaining financial resources and all of Seller's remaining obligations.

Contracts.  Reference to any Contract means such Contract as amended or modified and in effect from time to time in accordance with its terms.

Dollars.  Any reference in this Agreement to $ will mean U.S. dollars.

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule but not otherwise defined therein will be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa.

Headings.  The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any Article, Section, Preamble, Recital, Exhibit or Schedule are to the

corresponding Article, Section, Preamble, Recital, Exhibit or Schedule of or to this Agreement unless otherwise specified.

Herein.  The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Law.  Reference to any Law means such Law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect from time to time, including any successor legislation thereto and any rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, replacement or re-enactment of such section or other provision.

Party.  A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns

(b)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## II.  PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     Purchase and Sale of Assets.

(a)     On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will purchase, acquire and accept from Seller, and Seller will sell, transfer, convey and deliver to Purchaser, for the consideration specified below in Article III, all of Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than those Liens created by Purchaser and the Permitted Exceptions) and Excluded Liabilities.

(b)     The term "Purchased Assets" means all of the following properties, assets and rights of Seller (other than the Excluded Assets) existing as of the Closing:

(i)     the inventory that is described on Schedule 2.1(b)(i) (the "Purchased Inventory");

(ii)     the accounts receivable that are described on Schedule 2.1(b)(ii) (the "Purchased Accounts Receivable");

(iii) the intellectual property that is described on Schedule 2.1(b)(iii) and all rights of action and remedies for past, present and future infringements of any of the foregoing (collectively, the "Purchased Intellectual Property");

(iv) the Contracts to which Seller is a party that (A) are listed on Schedule 2.1(b)(iv), (B) are unexpired as of the Closing Date (including those Contracts that have been previously unrenewed), and (C) have not been rejected (and are not the subject of a notice of rejection or a pending rejection motion) by Seller (collectively, the "Purchased Contracts");

(v) all cash and cash equivalents, excluding cash equal to the Excluded Cash Amount or all cash of Seller existing as of the Closing if the amount thereof is less than the Excluded Cash Amount (the "Excluded Cash"); and

(vi) all rights, claims, causes of action and credits owned by Seller to the extent relating to any Purchased Asset or Assumed Liability, including (A) any such item arising under any guarantee, warranty, indemnity, right of recovery, right of set-off or similar right in favor of Seller in respect of any Purchased Asset or Assumed Liability and (B) any causes of action arising under chapter 5 of the Bankruptcy Code, relating to the Purchased Assets that are against or otherwise involving any counterparty to any Purchased Contract.

(c) For the avoidance of doubt, the term "Purchased Assets" does not include the Post-Petition Consignment Merchandise (as defined in the Final DIP Order). As set forth in the Final DIP Order, the Post-Petition Consignment Merchandise remains the exclusive property of the applicable Eligible Consignor (as defined in the Final DIP Order), and neither Purchaser nor Seller has any right, title or interest in, to or under any of the Post-Petition Consignment Merchandise.

2.2 Excluded Assets. Notwithstanding anything to the contrary set forth in this Agreement, nothing herein contained will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller will retain all right, title and interest to, in and under the Excluded Assets. The term "Excluded Assets" means all assets, properties and rights of Seller other than the Purchased Assets, including:

(a) all equipment, furniture, furnishings, in-store displays and other tangible personal property owned or leased by Seller;

(b) all real property and any buildings, improvements and fixtures thereon and furniture thereat and any leasehold interests in real property, including any prepaid rent, security deposits and options to renew or purchase in connection therewith;

(c) all rights, claims, causes of action and credits to the extent relating to any Excluded Asset or Excluded Liability, including any such item to the extent arising under any guarantee, warranty, indemnity or similar right in favor of Seller in respect of an Excluded Asset or Excluded Liability;

(d)     all rights, claims and causes of action to the extent relating to Investigation (as defined in the Final DIP Order);

(e)     any shares of capital stock or other equity interest of Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of Seller;

(f)     all books and records, including Tax Returns and financial statements; provided, however, that Purchaser will have the right to make copies of any portions of such retained books and records that relate to the Purchased Assets;

(g)     all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof (collectively, the "Avoidance Actions"), except as provided in Section 2.1(b)(vi);

(h)     subject to Section 2.6, any Purchased Contract that requires the consent of a third party to be assumed and assigned hereunder as to which, by the Closing Date, such consent has not been obtained;

(i)     all rights in or to assets leased by Seller;

(j)     all refunds of deposits with utilities, suppliers or service providers and all refunds, credits and rebates of Taxes; and

(k)     all inventory other than the Purchased Inventory, all accounts receivable other than the Purchased Accounts Receivable, all intellectual property other than the Purchased Intellectual Property and all Contracts other than the Purchased Contracts and all Excluded Cash.

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will assume, effective as of the Closing, and will timely perform and discharge in accordance with their respective terms, the following Liabilities existing as of the Closing Date (collectively, the "Assumed Liabilities"):

(a)     all Liabilities arising from the ownership or operation of the Purchased Assets by Purchaser after the Closing;

(b)     all Liabilities of Seller under the Purchased Contracts that arise on or after the Closing Date; and

(c)     all Liabilities described on Schedule 2.3(c).

2.4     Excluded Liabilities.  Notwithstanding anything to the contrary set forth herein, Purchaser will not assume and will be deemed not to have assumed, and Seller will remain liable with respect to, the Excluded Liabilities. "Excluded Liabilities" means any and all Liabilities of Seller arising out of, relating to or otherwise in respect of the Purchased Assets prior to the Closing, and all other Liabilities of Seller, other than the Assumed Liabilities.

2.5    <u>Cure Costs</u>.  At the Closing and pursuant to section 365 of the Bankruptcy Code, Seller will assume the Purchased Contracts (to the extent not previously assumed) and, subject to the terms herein, assign the Purchased Contracts to Purchaser, and Purchaser, subject to the terms herein, will assume the Purchased Contracts. All Cure Costs with respect to the Purchased Contracts (the "<u>Applicable Cure Costs</u>") will be paid by Seller pursuant to the Sale Order.

2.6    <u>Non-Assignment of Assets; Possession of Assets</u>.

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not effect the assignment or transfer of any Purchased Asset if (i) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "<u>Necessary Consent</u>"), would constitute a breach, default or violation thereof or of any Law or Order or in any way adversely affect the rights of Purchaser thereunder and (ii) the Bankruptcy Court has not entered an Order providing that such Necessary Consent is not required. In such event, such assignment or transfer is subject to such Necessary Consent being obtained and each of Seller and Purchaser will use its commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request; <u>provided</u>, <u>however</u>, that Seller will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Legal Proceedings to obtain any such consent or approval. If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would be ineffective or would adversely affect the rights of Purchaser to such Purchased Asset following the Closing, Seller and Purchaser will cooperate in a mutually agreeable arrangement, to the extent feasible, under which Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including subcontracting, sub-licensing, or sub-leasing to Purchaser, or under which Seller would enforce for the benefit of Purchaser all of its rights thereunder and with Purchaser assuming Seller's obligations and any and all rights of Seller against a third party thereto.

(b)    From and after the Closing, Seller and Purchaser shall reasonably cooperate to allow and facilitate Purchaser's (i) taking physical possession of the Purchased Assets, where applicable, (ii) obtaining copies of any portions of Seller's books and records that relate to the Purchased Assets and (iii) collecting payment of any Purchased Accounts Receivable. Seller shall use its commercially reasonable efforts to assist Purchaser, as reasonably requested by Purchaser, in connection with the resolution of any dispute with an account obligor in respect of Purchased Accounts Receivable; <u>provided</u>, <u>however</u>, that Purchaser shall reimburse Seller for any and all reasonable out-of-pocket costs and expenses incurred by Seller in providing such requested assistance promptly upon Purchaser's receipt from Seller of an invoice specifying such costs and expenses in reasonable detail and accompanied by reasonable supporting documentation.  If, after the Closing, Seller receives payment of any Purchased Accounts Receivable, Seller will promptly deliver (or cause to be delivered)

such amount to Purchaser. If, after the Closing, Purchaser receives or possesses any Excluded Assets, Purchaser will promptly deliver (or cause to be delivered) such Excluded Assets to Seller. The party hereto receiving or possessing any asset of the other party will hold it in trust for such other party until such other party has possession of such asset.

(c)     Notwithstanding anything herein to the contrary, at any time prior to the date that is the later of (i) five (5) days after the final resolution of any dispute with a non-debtor party to an Purchased Contract relating to Cure Costs or adequate assurance and (ii) the conclusion of the cure objection hearing relating to any particular Purchased Contract as to which a cure objection has been timely filed, Purchaser will be entitled, in its sole discretion, to remove any Contract from Schedule 2.1(b)(iv) by providing written notice thereof to Seller and any Contract so removed will be deemed to be an "Excluded Asset" for all purposes hereunder; provided, however, that no such notice may be delivered by Purchaser after February 28, 2019. Seller will not reject or seek to reject any Contract under the Bankruptcy Case that is a Purchased Contract without the consent of Purchaser; provided, however, that Seller may reject or seek to reject any such Contract without the consent of Purchaser if any dispute with a non-debtor party thereto relating to Cure Costs or adequate assurance has not been finally resolved on or prior to February 28, 2019.

2.7     Further Conveyances and Assumptions.  From time to time following the Closing, Seller and Purchaser will, and Purchaser will cause its Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser, the assignment of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to Seller, the assumption of the Liabilities intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated hereby; provided that nothing in this Section 2.7 will require Purchaser or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities.

## III.  CONSIDERATION; RELEASE; PROFESSIONAL EXPENSES ESCROW

3.1     Consideration.  The aggregate consideration for the Purchased Assets will be:

(a)     the assumption of the Assumed Liabilities; and

(b)     the offset of a portion of the DIP Revolving Loan Obligations in the amount of Sixteen Million Dollars ($16,000,000) plus the amount of Applicable Cure Costs (the "Credit Bid Amount").

3.2     Release.  Upon the Closing, a portion of the DIP Revolving Loan Obligations equal to the Credit Bid Amount, and all Liens related thereto, shall be deemed to be released, satisfied and discharged in full as of the Closing. The remaining balance of the

DIP Revolving Loan Obligations will be unaffected and shall continue to be outstanding and due and owing in accordance with the terms of the DIP Credit Agreement.

3.3 <u>Professional Expenses Escrow</u>. At the Closing, Purchaser will deposit with the Professional Expenses Escrow Agent, by wire transfer of immediately available funds, the Professional Expenses Escrow Amount for the Professional Expenses Escrow Agent to hold in and disburse from the Professional Expenses Escrow pursuant to the terms of the Professional Expenses Escrow Agreement.

## IV. CLOSING AND TERMINATION

4.1 <u>Closing Date</u>. Subject to the satisfaction of the conditions set forth in <u>Sections 9.1</u>, <u>9.2</u> and <u>9.3</u> (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in <u>Article II</u> (the "<u>Closing</u>") will take place at Jones Day, 717 Texas, Suite 3300, Houston, Texas, 77002 at 10:00 a.m. (Central time) on the date that is one (1) Business Day following the satisfaction or waiver of the conditions set forth in <u>Article IX</u> (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place and time as the parties hereto may designate in writing. The date on which the Closing is held is referred to in this Agreement as the "<u>Closing Date</u>."

4.2 <u>Deliveries by Seller</u>. At the Closing, Seller will deliver to Purchaser:

(a) one or more duly executed bills of sale in a form to be agreed upon by the parties hereto;

(b) one or more duly executed assignment and assumption agreements in a form to be agreed upon by the parties hereto;

(c) a duly executed Professional Expenses Escrow Agreement;

(d) the officers certificate required to be delivered pursuant to <u>Sections 9.1(a)</u> and <u>9.1(b)</u>;

(e) a certificate, in such form as is reasonably satisfactory to Purchaser, certifying that Seller is not a foreign person for purposes of Code Section 1445;

(f) copies of all consents, waivers, approvals, Orders, authorizations, declarations, filings or notifications contemplated by <u>Schedule 5.3(b)</u> that have been obtained, made or given; and

(g) all other assignments and other instruments of conveyance and transfer, reasonably requested by Purchaser, to convey and assign the Purchased Assets to Purchaser and vest title therein in Purchaser.

4.3 <u>Deliveries by Purchaser</u>. At the Closing, Purchaser will deliver to Seller:

(a) if the Excluded Cash is less than the Excluded Cash Amount, an amount of cash, payable by wire transfer of immediately available funds, equal to such deficiency;

(b) if reasonably requested by Seller, a duly executed document evidencing the release, satisfaction and discharge of a portion of the DIP Revolving Loan Obligations equal to the Credit Bid Amount and all Liens related thereto;

(c) one or more duly executed assignment and assumption agreements in a form to be agreed upon by the parties hereto;

(d) a duly executed Professional Expenses Escrow Agreement

(e) the officers certificate required to be delivered pursuant to Sections 9.2(a) and 9.2(b); and

(f) all other documents, instruments and certificates, reasonably requested by Seller, to evidence the assumption by Purchaser of the Assumed Liabilities.

4.4    Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a) by Purchaser or Seller, if the Closing has not occurred by 4:00 p.m. Central time on February 28, 2019 (the "Termination Date"); provided, however, that if the Closing has not occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or Seller, then such breaching party may not terminate this Agreement pursuant to this Section 4.4(a);

(b) by mutual written consent of Seller and Purchaser;

(c) by Purchaser, if Seller breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in Sections 9.1 or 9.3 and such breach has not been cured by the Termination Date; provided that Purchaser is not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement;

(d) by Seller, if Purchaser breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in Sections 9.2 or 9.3 and such breach has not been cured by the Termination Date; provided that Seller is not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement; and

(e) by Seller or Purchaser if there is in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions.

4.5    Procedure Upon Termination.    In the event of termination pursuant to Section 4.4, the terminating party will give written notice thereof to the other party, and this Agreement will terminate as described in Section 4.6, and the purchase of the Purchased Assets hereunder will be abandoned, without further action by Purchaser or Seller.

4.6    Effect of Termination.    In the event that this Agreement is terminated as provided herein, then each of the parties hereto will be relieved of its duties and obligations arising under this Agreement after the date of such termination and will have no further Liability hereunder; provided, however, that the provisions of this Section 4.6, and Article XII and, to the extent necessary to effectuate the foregoing enumerated provisions, Section 1.1 hereof, will survive any such termination and will be enforceable hereunder; provided further that nothing in this Section 4.6 will be deemed to release any party from Liability for any intentional breach of this Agreement prior to termination.

## V.  REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser that the following representations and warranties contained in this Article V are true and correct as of the date hereof (except to the extent that such representations or warranties are expressly made as of a particular time or relate solely to a particular date or period, in which case such representations or warranties shall be true and correct as of such time, date or period, as applicable):

5.1    Organization and Good Standing.    Seller is an entity duly organized, validly existing and in good standing under the Laws of the State of Delaware and, subject to the limitations imposed on Seller as a result of having filed a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted. Seller is duly qualified or licensed to do business in each jurisdiction in which the actions to be performed hereunder or in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary for the operation of Seller's business as now conducted, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

5.2    Authorization of Agreement.    Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, Seller has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby (collectively with this Agreement, the "Transaction Documents") to which it is or will become a party and to perform its respective obligations hereunder and thereunder. The execution and delivery of this Agreement and each other Transaction Document to which it is or will become a party and the consummation of the transactions contemplated hereby and thereby (collectively, the "Transactions") have been duly authorized by all requisite corporate action on the part of Seller. This Agreement has been duly and validly executed and delivered, and each other Transaction Document to be executed and delivered by Seller at or prior to the Closing has been or

will be duly and validly executed and delivered, by Seller, and (assuming the due authorization, execution and delivery by the other party hereto or thereto and the entry of the Sale Order) this Agreement and each other Transaction Document to which it is a party constitutes, or when executed and delivered by Seller, will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3     Conflicts; Consents of Third Parties.

(a)     Except as set forth on Schedule 5.3(a), the execution and delivery by Seller of this Agreement and each other Transaction Document to which it is a party, the consummation of the Transactions and compliance by Seller with any of the provisions hereof and thereof do not and will not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or give rise to any obligation of Seller to make any payment under or to the increased, additional, accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Liens upon any of the Purchased Assets or cancellation under any provision of (i) the certificate of incorporation and by-laws of Seller, (ii) subject to entry of the Sale Order, any Purchased Contract, (iii) subject to entry of the Sale Order, any Order, or (iv) subject to entry of the Sale Order, any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

(b)     Except as set forth on Schedule 5.3(b) and except to the extent not required if the Sale Order is entered, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller in connection with the execution and delivery of this Agreement or any other Transaction Document to which Seller is a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the Transactions or the taking by Seller of any other action contemplated hereby or thereby (with or without notice or lapse of time, or both), except for (i) the entry of the Sale Order and (ii) immaterial consents, waivers, approvals, Orders, authorizations, declarations, filings and notifications.

5.4     Title to Purchased Assets.  Subject to the entry of the Sale Order, at the Closing, Purchaser will be vested with good and valid title to the Purchased Assets, free and clear of all Liens (other than Permitted Exceptions) and Excluded Liabilities, to the fullest extent permissible under Law, including section 363(f) of the Bankruptcy Code.

5.5     Inventory; Accounts Receivable.

(a)     As of the date of this Agreement, the Purchased Inventory (other than Purchased Inventory in transit) is kept at the locations listed on Schedule 5.5(a).

(b)     Schedule 5.5(b) sets forth, as of the last day of Seller's November 2018 fiscal month, a list of all accounts on Seller's general ledger that are described or categorized as inventory, indicating the balance thereof.

(c)     Schedule 5.5(c) sets forth, as of the last day of Seller's November 2018 fiscal month, a list of all accounts on Seller's general ledger that are described or categorized as accounts receivable, indicating the balance thereof.

5.6     Intellectual Property.

(a)     Schedule 5.6 sets forth a true and correct list of the following intellectual property owned by Seller: (i) trademarks that are registered or subject to applications for registration and (ii) internet domain names;

(b)     Seller owns the Purchased Intellectual Property and has valid rights in and to the Purchased Intellectual Property, including all rights in the trademarks and trademark registrations therefor (as set forth on Schedule 5.6), any common law rights to such trademarks and the goodwill of the business associated with and symbolized by the Purchased Intellectual Property.

(c)     As of the date of this Agreement, the Purchased Intellectual Property is not the subject of any ownership, validity, use or enforceability challenge or claim received by Seller in writing or any outstanding Order restricting the use by Seller thereof or adversely affecting any of the rights of Seller thereto, except as would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

5.7     Validity of Purchased Contracts.  Except as set forth on Schedule 5.7, as of the date of this Agreement, each Purchased Contract is in full force and effect and is a valid and binding obligation of Seller and, to the knowledge of Seller, the other parties thereto in accordance with its terms and conditions, except as such validity and enforceability may be limited by (a) bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally, (b) equitable principles of general applicability (whether considered in a proceeding at law or in equity) and (c) the obligation to pay Applicable Cure Costs under Section 2.5. Except as set forth on Schedule 5.7, as of the date of this Agreement, Seller has not received any written notice of the intention of any party to terminate any Purchased Contract. Except as set forth on Schedule 5.7, to the knowledge of Seller, as of the date of this Agreement, no event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default under or a violation of any such Purchased Contract or would cause the acceleration of any obligation of Seller or, to the knowledge of Seller, any other party thereto or the creation of a Lien upon any Purchased Asset, except for such events that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect. Seller has delivered or made available to Purchaser copies of all of the Purchased Contracts, together with all amendments, modifications or supplements thereto, as of the date of this Agreement.

5.8    Litigation.    Except for the Bankruptcy Case and except for Legal Proceedings that do not have and would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect, as of the date of this Agreement, there are no Legal Proceedings pending or, to the knowledge of Seller, threatened against Seller. Except for the Bidding Procedures Order and except for Orders that do not have and would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect, as of the date of this Agreement, Seller is not subject to, and the Purchased Assets are not bound by, any Order.

5.9    Financial Advisors.    Seller has not incurred any Liability for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement or the Transactions for which Purchaser is or will become liable.

5.10    Tax Matters.

(a)    Except as set forth in Schedule 5.10, Seller has filed or caused to be filed on a timely basis all Tax Returns required to have been filed by Seller with respect to the Purchased Assets. All such Tax Returns are true, correct and complete in all material respects. Other than as excused or prohibited from being paid as a result of the Bankruptcy Code or an Order of the Bankruptcy Court, Seller has timely paid all Taxes due for all periods covered by such Tax Returns or otherwise, or pursuant to an assessment received by Seller, that relate to the Purchased Assets, except such Taxes, if any, as are listed in Schedule 5.10, all of which are being contested in good faith. Except as disclosed in Schedule 5.10, Seller is not a beneficiary of any extension of time within which to file any Tax Return relating to the Purchased Assets. Seller has not received any notice from any Governmental Body in a jurisdiction where Seller does not file Tax Returns asserting that it is, or may be, subject to taxation by that jurisdiction with respect to the Purchased Assets. There are no Liens for Taxes on any of Purchased Assets other than Permitted Exceptions.

(b)    No Taxes with respect to the Purchased Assets are currently under audit, examination or investigation by any Governmental Body or are the subject of any judicial or administrative proceeding. Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to any Tax assessment or deficiency, in each case to the extent relating to the Purchased Assets.

(c)    No power of attorney with respect to any Tax matter is currently in force with respect to the Purchased Assets that would, in any manner, bind, obligate or restrict Purchaser.

(d)    No closing agreements, private letter rulings, technical advice memoranda or similar documents that relate to Taxes with respect to any Purchased Asset that would be binding on Purchaser for any taxable period (or portion thereof) ending after the Closing Date have been entered into with or issued by any Governmental Body.

5.11   <u>No Other Representations or Warranties; Schedules</u>.   Except for the representations and warranties contained in this <u>Article V</u> (as modified by the applicable Schedules hereto), neither Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, the Purchased Assets, the Assumed Liabilities or the Transactions, and Seller disclaims any other representations or warranties, whether made by Seller or any of Seller's Representatives. Except for the representations and warranties contained in this <u>Article V</u> (as modified by the applicable Schedules hereto), Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Purchaser or its Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to Purchaser by any Representative of Seller). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Purchased Assets or the use thereof. The disclosure of any matter or item in any Schedule referred to in this <u>Article V</u> will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter could result in a Seller Material Adverse Effect.

## VI.   REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that the following representations and warranties contained in this <u>Article VI</u> are true and correct as of the date hereof (except to the extent that such representations or warranties are expressly made as of a particular time or relate solely to a particular date or period, in which case such representations or warranties shall be true and correct as of such time, date or period, as applicable):

6.1   <u>Organization and Good Standing</u>.   Purchaser is an entity duly organized, validly existing and in good standing under the laws of the state of its organization.

6.2   <u>Authorization of Agreement</u>.   Purchaser has the requisite power and authority to execute and deliver this Agreement and each other Transaction Document to which it is or will become a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and each other Transaction Document to which it is or will become a party and the consummation of the Transactions have been duly authorized by all requisite corporate or similar action on the part of Purchaser. This Agreement has been duly and validly executed and delivered, and each other Transaction Document to be executed and delivered by Purchaser at or prior to the Closing has been or will be duly and validly executed and delivered, by Purchaser, and (assuming the due authorization, execution and delivery by the other party hereto or thereto) this Agreement and each other Transaction Document to which Purchaser is a party constitutes or, when executed and delivered by Purchaser, will constitute, legal, valid and binding obligations of Purchaser enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting

creditors' rights and remedies generally and to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3 <u>Conflicts; Consents of Third Parties</u>.

(a) The execution and delivery by Purchaser of this Agreement and each other Transaction Document to which Purchaser is or will become a party, the consummation of the Transactions, or compliance by Purchaser with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the charter or comparable governing documents of Purchaser, (ii) any Contract to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound, (iii) any Order, or (iv) any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

(b) No consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement or any other Transaction Document to which Purchaser is or will become a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the Transactions or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order and (ii) immaterial consents, waivers, approvals, Orders, authorizations, declarations, filings and notifications.

6.4 <u>Litigation</u>. There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party, before any Governmental Body, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect. Purchaser is not subject to any Order except to the extent the same would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

6.5 <u>Financial Advisors</u>. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

6.6 <u>Financial Capability</u>. The amount of the DIP Revolving Loan Obligations as of the date of this Agreement is $52,287,093.87. Purchaser is capable of satisfying the conditions contained in section 365(b)(1)(C) of the Bankruptcy Code with respect to Purchased Contracts. Purchaser has sufficient funds in cash to pay all amounts required to be paid by Purchaser in connection with the Transactions, and to effect the Transactions.

6.7     Limited Reliance.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making, and Purchaser is not relying on, any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article V (as modified by the Schedules hereto), and Purchaser acknowledges and agrees that, except for the representations and warranties contained in Article V, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis.

## VII.  BANKRUPTCY COURT MATTERS

Seller has filed with the Bankruptcy Court a motion seeking entry of the Sale Order. Seller will pursue diligently the entry of the Sale Order, and Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser of the Purchased Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Seller will give Purchaser reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Sale Order and Purchaser will have the right to attend and seek to be heard at any such hearings.

## VIII.  COVENANTS

8.1     Access to Information.   From the date hereof through the Closing Date, Purchaser will be entitled, through its Representatives, to make such investigation of the Purchased Assets and the Assumed Liabilities as it reasonably requests. Any such investigation and examination will be conducted upon reasonable advance notice and under reasonable circumstances and will be subject to restrictions under applicable Law. Seller will direct and use its commercially reasonable efforts to cause its Representatives to cooperate with Purchaser and Purchaser's Representatives in connection with such investigation and examination, and Purchaser will, and will direct and use its commercially reasonable efforts to cause its Representatives to, cooperate with Seller and its Representatives. Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would require Seller to disclose information that would cause material competitive harm to Seller or would violate attorney-client privilege. No investigation by Purchaser prior to or after the date of this Agreement will affect or be deemed to modify any of the representations, warranties, covenants or agreements of Seller contained in this Agreement.  From the date hereof through the Closing Date, Seller will promptly deliver to Purchaser all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed by Seller, or received by Seller, in any Legal Proceeding related to the Purchased Assets or the Transactions, except to the extent such papers are available to Purchaser from the Bankruptcy Court.

8.2     Actions Pending the Closing.   Except (i) as required by applicable Law or by order of the Bankruptcy Court, (ii) as otherwise expressly contemplated by this

Agreement, or (iii) with the prior written consent of Purchaser, during the period from the date of this Agreement to and through the Closing Date, Seller will use commercially reasonable efforts to:

> (a) defend and protect the Purchased Assets from infringement or deterioration; and

> (b) comply with applicable Laws other than with respect to the failure of such compliance as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

8.3     <u>Consents</u>.  Seller and Purchaser will use their commercially reasonable efforts to obtain at the earliest practicable date all consents and approvals contemplated by this Agreement, including the consents and approvals referred to in <u>Section 5.3(b)</u> and the Necessary Consents; <u>provided</u>, <u>however</u>, that neither Seller nor Purchaser will be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Legal Proceedings to obtain any such consent or approval.

8.4     <u>Regulatory Approvals</u>.  Each of Purchaser and Seller will use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Transactions. Each such party will promptly inform the other of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such application or filing or the Transactions. No party hereto will independently participate in any formal meeting with any Governmental Body in respect of any such application or filing, or any investigation or other inquiry in connection with the Transactions, without giving the other party hereto prior written notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.

8.5     <u>Further Assurances</u>.  Subject to the other provisions of this Agreement, each of Purchaser and Seller will use its commercially reasonable efforts to (a) take all actions necessary or appropriate to consummate the Transactions, (b) provide the other party hereto with reasonable cooperation and take such actions as such other party may reasonably request in connection with the consummation of the Transactions, (c) following the Closing, execute and deliver such additional documents, instruments, assignments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions of this Agreement and the other Transaction Documents and give effect to the Transactions, and (d) cause the fulfillment at the earliest practicable date of all of the conditions set forth in <u>Article IX</u>.

8.6     <u>Publicity</u>.  The initial press release concerning this Agreement and the transactions contemplated hereby will be in substantially the form previously agreed by Purchaser and Seller. Prior to the Closing, neither of the parties hereto will issue any press release concerning this Agreement or the Transactions without obtaining the prior written approval of the other, which approval will not be unreasonably withheld,

conditioned or delayed, unless, in the sole judgment of Purchaser or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, <u>provided</u>, <u>however</u>, that the party intending to make such release uses its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof. After the Closing, the parties hereto may issue public announcements regarding the Transactions so long as such announcements, in the case of announcements made by Seller, do not disclose the specific terms or conditions of this Agreement or any other Transaction Document except where such terms and conditions have already been disclosed as required by Law or in filings that Seller has made in the Bankruptcy Court; <u>provided</u>, <u>however</u>, that the issuing party will use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

8.7     <u>Confidentiality</u>.     Purchaser acknowledges and understands that this Agreement may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement or otherwise. Seller acknowledges that from and after the Closing, all non-public information relating to the Purchased Assets and the Assumed Liabilities will be valuable and proprietary to Purchaser and its Affiliates. Seller agrees that, from and after the Closing, Seller will not disclose to any Person any information relating to Purchaser and its Affiliates, the Purchased Assets or the Assumed Liabilities, except as required by Law or as otherwise becomes available in the public domain other than through any action by Seller in violation of its obligations under this <u>Section 8.7</u>. Seller acknowledges and agrees that the remedies at law for any breach or threatened breach of this <u>Section 8.7</u> by Seller are inadequate to protect Purchaser and its Affiliates and that the damages resulting from any such breach are not readily susceptible to being measured in monetary terms. Accordingly, without prejudice to any other rights or remedies otherwise available to Purchaser or its Affiliates, each party hereto acknowledges and agrees that upon any breach or threatened breach by Seller of the terms and conditions of this <u>Section 8.7</u>, Purchaser will be entitled to immediate injunctive relief and to seek an order restraining any threatened or future breach from any court of competent jurisdiction without proof of actual damages or posting of any bond in connection with any such remedy. The provisions of this <u>Section 8.7</u> will survive the Closing.

8.8     <u>Bulk Sales</u>.     Purchaser and Seller hereby waive compliance with the provisions of all applicable Laws relating to bulk transfers or bulk sales.

## IX.  CONDITIONS TO CLOSING

9.1     <u>Conditions Precedent to Obligations of Purchaser</u>.     The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or

all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Seller contained in this Agreement that are not qualified by materiality or Seller Material Adverse Effect or similar qualification shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of a particular time or relate solely to a particular date or period, in which case such representations and warranties shall be true and correct in all material respects as of such time, date or period, as applicable, and the representations and warranties of Seller contained in this Agreement that are qualified by materiality or Seller Material Adverse Effect or similar qualification shall be true and correct in all respects on and as of the Closing, except to the extent expressly made as of a particular time or relate solely to a particular date or period, in which case such representations and warranties shall be true and correct in all respects as of such time, date or period, as applicable, and Purchaser shall have received a certificate signed by an authorized officer of Seller on behalf of Seller, dated the Closing Date, to the foregoing effect;

(b)     Seller shall have performed and complied with, in all material respects, all obligations and agreements required in this Agreement to be performed or complied with by it prior to or on the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller on behalf of Seller, dated the Closing Date, to the forgoing effect;

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2;

(d)     the Bankruptcy Court shall have entered one or more Sale Orders in form and substance reasonably satisfactory to Purchaser, and such Sale Order(s) shall be final and nonappealable; and

(e)     there shall be no Legal Proceeding pending that, in the event of an unfavorable outcome therein, would reasonably be expected to result in an Order (i) preventing the consummation of the Transactions, (ii) causing the Transactions to be rescinded following consummation thereof, or (iii) having any similar consequences with respect to the Transactions.

9.2     Conditions Precedent to Obligations of Seller.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchaser contained in this Agreement that are not qualified by materiality or Purchaser Material Adverse Effect or similar qualification shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of a particular time or relate solely to a

particular date or period, in which case such representations and warranties shall be true and correct in all material respects as of such time, date or period, as applicable, and the representations and warranties of Purchaser contained in this Agreement that are qualified by materiality or Purchaser Material Adverse Effect or similar qualification shall be true and correct in all respects on and as of the Closing, except to the extent expressly made as of a particular time or relate solely to a particular date or period, in which case such representations and warranties shall be true and correct in all respects as of such time, date or period, as applicable, and Seller shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect;

(b)     Purchaser shall have performed and complied with, in all material respects, all obligations and agreements required in this Agreement to be performed or complied with by Purchaser prior to or on the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect;

(c)     Purchaser shall have delivered to Seller all of the items set forth in Section 4.3;

(d)     as of the Closing, Seller shall have in its possession cash in an amount not less than the Excluded Cash Amount; and

(e)     as of the Closing, Escrow Agent shall have established the Professional Expenses Escrow and the Professional Expenses Escrow shall have been funded with cash equal to the Professional Expenses Escrow Amount.

9.3     Conditions Precedent to Obligations of Purchaser and Seller.     The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(b)     the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect and not subject to stay.

9.4     Frustration of Closing Conditions.     No party may rely on the failure of any condition set forth in Sections 9.1, 9.2 or 9.3, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

## X.  TAXES

10.1     Transfer Taxes.     Any transfer Taxes or similar Taxes which result from the Transactions shall be borne solely by Purchaser.

10.2 <u>Certain Periodic Non-Income Taxes</u>. Seller shall be responsible for any real or personal property or other periodic Taxes not based on income or receipts ("<u>Periodic Non-Income Taxes</u>") that are assessed on, or in respect of, the Purchased Assets and attributable to the pre-Closing ownership of the Purchased Assets, and to the extent Purchaser is legally obligated to pay such Periodic Non-Income Taxes to a Governmental Body, promptly after receipt of proof of such payment from Purchaser, Seller will pay to Purchaser the amount of such Periodic Non-Income Taxes paid by Purchaser.

10.3 <u>Tax Cooperation</u>. Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request and as promptly as practicable, such cooperation, documentation, information and assistance (including access to books and records) as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or audit, or the prosecution or defense of any claim, suit or proceeding relating to Tax matters with respect to the Purchased Assets. The requesting party shall bear all out-of-pocket costs and expenses incurred by the other party hereto in providing such assistance. Seller shall retain copies of all Tax Returns, schedules, work papers, records and other documents in its possession relating to Tax matters with respect to the Purchased Assets for periods or portions thereof before the Closing Date until sixty (60) days after the expiration of the applicable statute of limitations with respect to such Tax matters and shall not dispose of such items without first offering those items to Purchaser.

10.4 <u>Tax Allocation</u>. Purchaser shall prepare an allocation of the Credit Bid Amount (and all other items required to be included in gross purchase price as determined for United States federal income tax purposes) among the Purchased Assets in accordance with Code Section 1060 and the Treasury Regulations thereunder (and any similar provisions of state, local, or non-U.S. law, as appropriate), which allocation shall be binding on Seller. Purchaser shall deliver such allocation to Seller within sixty (60) days after the Closing Date. Purchaser and Seller shall report, act and file Tax Returns (including, but not limited to, IRS Form 8594 (and any supplements to such form)) in all respects and for all purposes consistent with such allocation prepared by Purchaser. Seller shall timely and properly prepare, execute, file and deliver all such documents, forms and other information as Purchaser may reasonably request to prepare such allocation. Neither Purchaser nor Seller shall take any position (whether in audits, Tax Returns, or otherwise) that is inconsistent with such allocation unless required to do so by applicable Law.

## XI. SURVIVAL

11.1 <u>Survival of Representations and Warranties</u>. The representations and warranties contained in this Agreement will not survive the Closing, and after the Closing, neither party will have the Liability to the other for any breach thereof.

11.2 <u>Survival of Covenants</u>. The covenants and agreements contained in this Agreement which by their terms are not intended to be performed and discharged in full on or prior to the Closing Date will survive the Closing until the expiration of the applicable statute of limitations or for such shorter period explicitly specified therein.

## XII.MISCELLANEOUS

12.1 <u>Expenses</u>. Except as otherwise expressly provided in this Agreement, whether or not the Transactions are consummated, Seller shall pay, or reimburse Purchaser for, all expenses incurred by either party hereto in connection with the negotiation and execution of this Agreement and each other Transaction Document and the consummation of the Transactions, in each case as provided in the DIP Credit Agreement. Seller's obligations to pay or reimburse Purchaser under this <u>Section 12.1</u> shall be deemed DIP Revolving Loan Obligations.

12.2 <u>Injunctive Relief</u>.

(a) The parties hereto agree that irreparable damages would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto will be entitled to injunctive relief to prevent any such breach, and to specifically enforce specifically the terms and provisions of this Agreement, including without limitation specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this <u>Section 12.2</u> will be in addition to any other rights which a party hereto may have at law or in equity pursuant to this Agreement.

(b) The parties hereto hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Purchaser or Seller or to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of Purchaser or Seller under this Agreement all in accordance with the terms of this <u>Section 12.2</u>.

12.3 <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a) Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in <u>Section 12.7</u> hereof; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases have been closed pursuant to Section 350 of the Bankruptcy Code, the parties hereto agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware until the six-month anniversary of the Closing (or in the event (but only in the event) that such court does not

have subject matter jurisdiction over such action in the United States District Court for the District of Delaware) and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereto hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.7; provided, however, that such service will not be effective until the actual receipt thereof by the party being served.

12.4     Waiver of Right to Trial by Jury.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

12.5     Entire Agreement; Amendments and Waivers.  This Agreement represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior discussions and agreements between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including any investigation by or on behalf of any party hereto, will be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

12.6     Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and performed in such State.

12.7     Notices.  All notices and other communications under this Agreement will be in writing and will be deemed given (a) when delivered personally by hand, (b) when sent by facsimile (with written confirmation of transmission) or (c) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or

facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller, to:

Samuels Jewelers, Inc.
2914 Montopolis Drive, Suite 200
Austin, TX 78741
Attention: Chief Executive Officer and Interim Chief Financial Officer
Facsimile: (512) 369 – 1510

With a copy (which will not constitute notice) to:

Jones Day
717 Texas, Suite 3300
Houston, TX 77002
Attention: Paul M. Green
Facsimile: (832) 239.3600

If to Purchaser, to:

Wells Fargo Bank, N.A.
One Boston Place, 19th Floor
Boston, MA 02108
Attention: Samuels Relationship Manager
Facsimile: (866) 328-8599

With copies (which will not constitute notice) to:

Morgan, Lewis & Bockius LLP
One Federal Street
Boston, MA 02110
Attention: Sandra Vrejan and Gitte Blanchet
Facsimile: (617) 341-7700

and:

Reed Smith LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801
Attention: Kurt F. Gwynne
Facsimile: (302) 778-7575

12.8    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected

in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

12.9    _Assignment_.  This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person not a party to this Agreement. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other party hereto and any attempted assignment without the required consents will be void, _provided_, _however_, that (a) Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more of its wholly owned Affiliates and (b) Seller may assign some or all of its rights or delegate some or all of its obligations hereunder to successor entities (including any liquidating trust) pursuant to a Chapter 11 plan confirmed by the Bankruptcy Court. No assignment of any obligations hereunder will relieve the parties hereto of any such obligations. Upon any such permitted assignment, the references in this Agreement to Seller or Purchaser will also apply to any such assignee unless the context otherwise requires.

12.10   _Non-Recourse_.  No past, present or future director, officer, employee, incorporator, member, partner or equityholder of the parties to this Agreement will have any liability for any obligations or liabilities of Seller or Purchaser, as applicable, under this Agreement or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. In no event will any Person be liable to another Person for any remote, speculative or punitive damages with respect to the transactions contemplated hereby.

12.11   _Counterparts_.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

[_Signature page follows_]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, dated as of the first above written.

<u>**PURCHASER:**</u>

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By: _____

Name:  Jennifer Cann

Title:  Managing Director

**SELLER:**

SAMUELS JEWELERS, INC.

By: _____
    Name: Kyle Richter
    Title: Co-Chief Restructuring Officer

## FORM OF
## PROFESSIONAL EXPENSES ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is entered into as of February __, 2019, by and among Samuels Jewelers, Inc., a Delaware corporation ("Seller"), Wells Fargo Bank, National Association ("Purchaser" and, together with Seller, sometimes referred to individually as a "Party" or collectively as the "Parties") and Kurtzman Carson Consultants, LLC, a Delaware limited liability company, as Escrow Agent (together with its affiliates including Computershare, Inc., "Escrow Agent").

WHEREAS, Seller is a debtor and debtor in possession under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 7, 2018 in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), where Seller's bankruptcy case is administered under Case No. 18-11818(KJC) (the "Bankruptcy Case");

WHEREAS, on October 3, 2018, Seller filed a motion pursuant to which Seller moved the Bankruptcy Court, pursuant to Sections 105, 363, 365 and 503 of the Bankruptcy Code, Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure and Rules 2002-1 and 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware, for, among other things, the entry of an order approving proposed auction and bid procedures in connection with the sale of substantially all or any portion of Seller's assets;

WHEREAS, on October 22, 2018, the Bankruptcy Court issued the Order Establishing Procedures and Granting Related Relief (the "Bidding Procedures Order");

WHEREAS, in accordance with the Bidding Procedures Order and the bidding procedures approved thereby, Seller and Purchaser have entered into that certain Purchase Agreement, dated as of February __, 2019 (the "Purchase Agreement") (unless otherwise provided herein, capitalized terms used but not defined in this Agreement shall have the respective meanings set forth in the Purchase Agreement);

WHEREAS, Section 3.3 of the Purchase Agreement provides that an escrow account will be established (the "Professional Expenses Escrow") for the purpose of paying the fees and expenses of counsel and other professional advisors retained, or otherwise to be paid, by Seller pursuant to Orders of the Bankruptcy Court listed on Exhibit A (each, a "Professional"); and

WHEREAS, the Parties have agreed that $ _____ (the "Deposit Amount") shall be deposited by Purchaser with Escrow Agent and held by Escrow Agent for disbursement in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby irrevocably acknowledged, the Parties hereto agree as follows:

1.    Appointment.  The Parties hereby appoint Escrow Agent as their escrow agent for the purposes set forth herein, and Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.

2.    Fund.  Pursuant to Section 3.3 of the Purchase Agreement, concurrently with the execution and delivery of this Agreement, Purchaser shall deposit with Escrow Agent the Deposit Amount, by wire transfer of immediately available funds in accordance with the instructions provided by Escrow Agent.  Escrow Agent shall be authorized to establish accounts (each, an "Account") with financial institutions as agent for Parties  to accept, hold and distribute the Deposit Amount (the "Fund") as provided in this Agreement.  All Accounts established under this Agreement shall be demand deposit accounts with commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P Global Ratings (Long-Term Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings (Long-Term Issuer Default Rating) (each as reported by Bloomberg Finance L.P.). These shall be deemed to have been opened at the direction of the Parties.  Escrow Agent may from time to time receive interest or other earnings in connection with such deposits.   Parties acknowledges that the Account will be held and maintained by Escrow Agent as agent for the Parties.  Escrow Agent will not pass through any bank fees charged in connection with maintenance of the Account and Escrow Agent shall be solely responsible for the payment of such fees.  The amounts held in the Account, once transferred into the Account, are held at the sole risk of the Parties.

3.    Disposition and Termination.

(a)    Escrow Agent shall disburse all or any portion of the Fund as follows:

(i)    upon receipt by Escrow Agent of a joint written instruction signed by an Authorized Representative (as defined below) of Seller and by an Authorized Representative of Purchaser ("Joint Instruction") to pay the fees and expenses of any Professional, in which case Escrow Agent shall, within four (4) Business Days of receipt of such Joint Instruction, disburse from the balance of the Fund (to the extent that funds are available therefor) such amount of the Fund to such Professional(s) listed in the Joint Instruction; or

(ii)    upon receipt by Escrow Agent from an Authorized Representative of Seller of a written instruction (with a copy to Purchaser) (the "Court Ordered Disbursements Notice") accompanied by a copy of (A) an Order of the Bankruptcy Court allowing all or a portion of the fees and expenses of any Professional, or (B) a certificate of no objection filed with the Bankruptcy Court, in each case, in accordance with the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, Escrow Agent shall, within two (2) Business Days of receipt of the Court Ordered Disbursements Notice, disburse from the balance of the Fund (to the extent that funds are available therefor) such amount of the Fund to such Professional(s) listed in the Court Ordered Disbursements Notice.  The

Court Ordered Disbursements Notice shall state that (A) a copy thereof has been delivered by Seller to Purchaser, (B) the accompanying Order constitutes a final, non-appealable Order of the Bankruptcy Court, and (C) each payee listed in the Court Ordered Disbursements Notice is a Professional entitled to receive the amount indicated in such Court Ordered Disbursements Notice. Escrow Agent shall have no obligation to review the Order of the Bankruptcy Court.

(iii)     Notwithstanding any provision to the contrary herein, but subject to an Order of the Bankruptcy Court instructing Escrow Agent and/or the Parties to make a payment that is inconsistent with this provision, Escrow Agent shall not, and the Parties shall not instruct Escrow Agent to, disburse to any Professional any amount, which taken together with all previous disbursements to such Professional pursuant hereto, if any, that would exceed the amount set forth opposite that Professional on Exhibit A.

(b)     On the date that the fees and expenses of all Professionals and Escrow Agent have been paid in full in accordance with this Agreement, the balance, if any, of the Fund shall be disbursed to Purchaser (or its designee), as follows:

(i)     upon receipt by Escrow Agent of a Joint Instruction stating that the fees and expenses of all Professionals and Escrow Agent have been paid in full, in which event Escrow Agent shall, within four (4) Business Day of receipt of such Joint Instruction, disburse any remaining balance of the Fund to Purchaser (and Purchaser and Seller each covenant to give such Joint Instructions promptly after the fees and expenses of all Professionals and Escrow Agent have been paid in full); or

(ii)     upon receipt by Escrow Agent of a written instruction (with a copy to Seller) from an Authorized Representative of Purchaser ("Purchaser Instruction") stating that (A) the Bankruptcy Case has been converted to a case under Chapter 7 of the Bankruptcy Code, (B) the fees and expenses of all Professionals and Escrow Agent have been paid in full, and (C) Purchaser simultaneously provided a copy of such Purchaser Instruction to Seller, Escrow Agent shall, within four (4) Business Days of receipt of such Purchaser Instruction, disburse any remaining balance of the Fund to Purchaser.

(c)     Any instructions setting forth, claiming, containing, objecting to or in any way related to the transfer or distribution of any portion of the Fund must be in writing or set forth in a Portable Document Format ("PDF") document, executed by the applicable Party or Parties as evidenced by the signatures of the person or persons signing this Agreement or one of their designated persons as set forth in Schedule 1 (each an "Authorized Representative"), and delivered to Escrow Agent only by confirmed facsimile or attached to an email on a Business Day only at the fax number or email address set forth in Section 8 below.  No instruction for or related to the transfer or distribution of all or any portion of the Fund shall be deemed delivered and effective unless Escrow Agent actually shall have received the instruction on a Business Day by facsimile or as a PDF attached to an email at the fax number or email address set forth

in <u>Section 8</u> and as evidenced by a confirmed transmittal to the Party's transmitting fax number or email address and Escrow Agent has been able to satisfy any applicable security procedures as may be required hereunder. With regard to any disbursement to any Professional or to Purchaser anticipated by this Agreement, the applicable Joint Instruction, Court Ordered Disbursement Notice or Purchaser Instruction shall (i) include, for the recipient of such disbursement, instructions indicating the account information necessary to wire funds to such recipient (unless such instructions have been previously included in a Joint Instruction, Court Ordered Disbursement Notice or Purchaser Instruction or otherwise have been previously furnished to Escrow Agent, in a form reasonably acceptable to Escrow Agent, by or on behalf of such recipient) and (ii) be accompanied by an IRS Form W-9 for the recipient of such disbursement (unless such IRS Form W-9 has previously accompanied a Joint Instruction, Court Ordered Disbursement Notice or Purchaser Instruction or otherwise has been previously furnished to Escrow Agent by or on behalf of such recipient).

(d)     Escrow Agent is authorized to seek confirmation of funds transfer instructions by a single telephone call-back to one of the Authorized Representatives, and Escrow Agent may rely upon the confirmation of anyone purporting to be that Authorized Representative. The persons and telephone numbers designated for call-backs may be changed only in a writing executed by an Authorized Representative of the applicable Party and actually received by Escrow Agent via facsimile or as a PDF attached to an email. Except as set forth in <u>Section 3(a)</u> or <u>Section 3(b)</u> above, no Funds will be disbursed until an Authorized Representative is able to confirm such instructions by telephone callback. Escrow Agent and the beneficiary's bank in any Funds transfer may rely solely upon any account numbers or similar identifying numbers provided by the Parties and confirmed by an Authorized Representative.

(e)     Upon disbursement in full of the Fund by Escrow Agent, this Agreement shall terminate, subject to the provisions of <u>Section 6</u>.

4.     <u>Escrow Agent</u>. Escrow Agent shall have only those duties as are specifically and expressly provided herein and no other duties shall be implied. Escrow Agent has no knowledge of, nor any requirement to comply with, the terms and conditions of any other agreement between the Parties, including, without limitation, the Purchase Agreement, nor shall Escrow Agent be required to determine if any Party has complied with any other agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement shall control the actions of Escrow Agent. Escrow Agent shall be entitled to seek the advice of legal counsel with respect to any matter arising under this Agreement and shall have no liability and shall be fully protected with respect to any action taken or omitted pursuant to the written advice of such legal counsel, except with respect to Losses (as defined below) that are caused by Escrow Agent's bad faith, gross negligence or willful misconduct. Escrow Agent may conclusively rely upon any written notice, document, instruction or request delivered by any Party believed by it to be genuine and to have been signed by an Authorized Representative(s), as applicable, without inquiry and without requiring substantiating evidence of any kind and Escrow Agent shall be under

no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that Escrow Agent's bad faith, gross negligence or willful misconduct was the cause of any Loss to either Party. Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through Affiliates or agents.

5. <u>Resignation or Removal; Succession</u>. Escrow Agent may resign by furnishing written notice of its resignation to the Parties, and the Parties may remove Escrow Agent by furnishing to Escrow Agent a joint written notice of its removal along with payment of all fees and expenses to which it is entitled through the date of termination. Such resignation or removal, as the case may be, shall be effective thirty (30) days after the delivery of such notice or upon the earlier appointment of a successor, and Escrow Agent's sole responsibility thereafter shall be to safely keep the Fund and to deliver the same to a successor escrow agent as shall be appointed by the Parties, as evidenced by a joint written notice filed with Escrow Agent, or in accordance with an Order. If the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following the delivery of such notice of resignation or removal, Escrow Agent may (a) petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the Parties, or (b) tender into the custody of any court of competent jurisdiction all funds and other property then held by Escrow Agent hereunder, and Escrow Agent shall thereafter be relieved of all further duties and obligations under this Agreement. Any entity into which Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business may be transferred, shall be Escrow Agent under this Agreement without further act.

6. <u>Compensation</u>.

(a) Upon execution of this Agreement and from time to time thereafter, Escrow Agent will be compensated for the services to be rendered hereunder and reimbursed for its costs and expenses in acting hereunder, all as described in <u>Schedule 2</u>. Any amounts payable to Escrow Agent pursuant to this Agreement shall be paid solely and exclusively from the Fund (to the extent that funds are available therefor).

(b) To request the payment of the fees and expenses of Escrow Agent (which such request shall include an invoice of Escrow Agent setting forth fee and expense detail), Escrow Agent shall submit a written request to both (i) an Authorized Representative of Seller and (ii) an Authorized Representative of Purchaser (each, an "<u>Escrow Agent Request</u>"). Upon receipt of an Escrow Agent Request, each such Authorized Representative shall have four (4) Business Days to object to any amount set forth in the Escrow Agent Request by delivering a written notice to Escrow Agent setting forth in reasonable detail the particulars of such objection, including the amount that such Authorized Representative disputes (any such disagreements so notified in writing within such timeframe, the "<u>Disputed Items</u>"). If an Authorized Representative of

Seller or an Authorized Representative of Purchaser does timely deliver notice of Disputed Items and Escrow Agent and the applicable Authorized Representative(s) are unable to agree on a final resolution of any Disputed Item within ten (10) business days following delivery of such notice, then either Escrow Agent or the applicable Authorized Representative(s) may seek resolution of such Disputed Items before a court in accordance with <u>Section 11(c)</u>. The Authorized Representative of Seller and the Authorized Representative of Purchaser will be deemed to have agreed with all amounts contained in the Escrow Agent Request that are not Disputed Items. Escrow Agent shall be authorized to disburse to itself from the Fund (to the extent that funds are available therefor) any amounts set forth in the Escrow Agent Request that are not Disputed Items and any such amounts that are Disputed Items that are finally resolved in accordance with this <u>Section 6</u>. Notwithstanding any provision to the contrary herein, Escrow Agent shall not disburse to itself any amount, which taken together with all previous disbursements to itself pursuant hereto, if any, that would exceed $[●]; <u>provided</u>, <u>however</u>, that, if as a result of such cap, Escrow Agent has not been paid in full, Escrow Agent shall be authorized to disburse to itself from the fund (to the extent funds are available therefor) any amounts that would have been disbursed to itself absent such cap prior to any disbursement to Purchaser pursuant to <u>Section 3(b)</u>.

(c)     The obligations of Seller and Purchaser to Escrow Agent pursuant to this <u>Section 6</u> are joint and several, but solely as between Seller and Purchaser, Purchaser shall reimburse Seller for any amounts paid to Escrow Agent pursuant to this <u>Section 6</u>. Escrow Agent may from time to time receive interest or other earnings in connection with such deposits as partial compensation for its services hereunder; <u>provided</u>, <u>that</u>, such earnings shall in no event be taken out of the Fund.

7.     <u>Indemnification; Punitive or Consequential Damages</u>.     Seller and Purchaser jointly and severally agree to indemnify and hold harmless Escrow Agent and its Affiliates and their respective successors, assigns, directors, agents and employees (the "<u>Indemnitees</u>") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, costs or expenses (including, without limitation, the fees and expenses of outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "<u>Losses</u>"), arising out of or in connection with (a) Escrow Agent's performance of this Agreement, except to the extent that such Losses are determined by a court of competent jurisdiction through a final Order to have been caused by the gross negligence, willful misconduct, or bad faith of such Indemnitee; and (b) Escrow Agent's following any instructions or directions, whether joint or singular, from the Parties received in accordance with this Agreement. Anything in this Agreement to the contrary notwithstanding, in no event shall Escrow Agent be liable for special, incidental, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. The payment of any obligations to Escrow Agent pursuant to this <u>Section 7</u> shall in no event be taken out of the Fund. The obligations of Seller and Purchaser to Escrow Agent under this <u>Section 7</u>

are joint and several, but solely as between Seller and Purchaser, Purchaser shall reimburse Seller for any amounts paid to Escrow Agent pursuant to this <u>Section 7</u>.

8.    <u>Notices</u>.  All notices and other communications under this Agreement will be in writing and will be deemed given (a) when delivered personally by hand, (b) when sent by facsimile (with written confirmation of transmission) or (c) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Purchaser:

Wells Fargo Bank, N.A.
One Boston Place, 19th Floor
Boston, MA 02108
Attention: Samuels Relationship Manager
Facsimile:  (866) 328-8599
Email:  Jennifer.Cann@wellsfargo.com

with copies (which shall not constitute notice) to:

Morgan, Lewis & Bockius LLP
One Federal Street
Boston, MA 02110
Attention: Sandra Vrejan
Facsimile: (617) 341-7700
Email:  sandra.vrejan@morganlewis.com

and:

Reed Smith LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801
Attention: Kurt F. Gwynne
Facsimile: (302) 778-7575
Email: kgwynne@reedsmith.com

If to Seller:

Samuels Jewelers, Inc.
2914 Montopolis Drive, Suite 200
Austin, TX 78741
Attention:  Co-Chief Restructuring Officer
Facsimile: (857) 702-0519
Email:  krichter@thinkbrg.com

with copies (which shall not constitute notice) to:

Jones Day
717 Texas, Suite 3300
Houston, TX 77002
Attention:   Paul M. Green
Facsimile:  (832) 239.3600
Email:  pmgreen@jonesday.com

If to Escrow Agent:

Kurtzman Carson Consultants, LLC
2335 Alaska Avenue
El Segundo, CA  90245
Attention: Angela Nguyen
Facsimile: 310.751.1542
E-Mail: anguyen@kccllc.com

9.      <u>Compliance with Court Orders</u>.  In the event that any of the Fund shall be attached, garnished, levied upon or otherwise be subject to any Order, or the delivery thereof shall be stayed or enjoined by an Order, Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all such Orders so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that Escrow Agent obeys or complies with any such Order it shall not be liable to any of the Parties or to any other Person by reason of such compliance irrespective of whether such Order is subsequently reversed, modified, annulled, set aside or vacated.

10.     <u>Tax Reporting</u>.  A tax identification number shall be established for the Fund by the Escrow Agent.  Escrow Agent shall be the administrator of the Fund for tax purposes under applicable tax rules and regulations.  The Fund shall be responsible for any tax withholding or reporting required by law to be performed with respect to the Fund (including with respect to any interest or other earnings thereon or disbursements thereof), and Escrow Agent, as administrator, shall remit any taxes withheld to the applicable taxing authorities.  The Parties shall provide such documentation as may be reasonably required in order for Escrow Agent to perform the reporting obligations under this Section 10 including, without limitation, providing appropriate tax verification forms (e.g., W-9 forms).

11.     <u>Miscellaneous</u>.

(a)      The provisions of this Agreement may be waived, altered, amended or supplemented only by a writing signed by Escrow Agent and the Parties.  Neither this Agreement nor any right or interest hereunder may be assigned by any Party without the prior consent of Escrow Agent and the other Party; <u>provided</u>, <u>that</u>, if the Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code, the trustee

appointed in such converted case shall automatically succeed to the rights and obligations of Seller hereunder; provided, however, that the Authorized Representatives of Seller immediately prior to such conversion shall remain the Authorized Representatives of Seller thereafter, in each case for purposes of this Agreement. In the event of any such proposed assignment, an amendment to this Agreement, in form and substance reasonably acceptable to Escrow Agent, shall be executed and delivered in the event Escrow Agent reasonably deems such an amendment to be necessary or desirable.

(b)    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and performed in such State.

(c)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 8 hereof; provided, however, that if the Bankruptcy Case has been closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware or the Delaware Court of Chancery and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d) Each Party waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

(e) This Agreement, and any joint instructions from the Parties, may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument or instruction, as applicable.  All signatures of the parties to this Agreement may be transmitted by facsimile or by emailed PDF documents, and such facsimile will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.

(f) If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or

unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

(g) The provisions of <u>Sections 6</u>, <u>7</u> and <u>10(a)</u> shall survive the termination of this Agreement and any resignation or removal of Escrow Agent. Except as expressly provided in <u>Section 7</u> hereof, nothing in this Agreement, whether express or implied, shall be construed to give to any Person other than Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of the Fund or this Agreement.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement effective as of the date set forth above.

<u>**PURCHASER**</u>**:**

WELLS FARGO BANK, N.A.

By: _____
      Name: Jennifer Cann
      Title: Duly Authorized Signatory

<u>**SELLER**</u>**:**

SAMUELS JEWELERS, INC.

By: _____
      Name:
      Title:

<u>**ESCROW AGENT**</u>**:**

KURTZMAN CARSON CONSULTANTS, LLC

By: _____
      Name:
      Title:

## <u>SCHEDULE 1</u>

**Telephone Numbers and Authorized Signatures for**
**<u>Person(s) Designated to Give Instructions and Confirm Funds Transfer Instructions</u>**

| For Purchaser: | | |
|---|---|---|
| <u>Name</u> | <u>Telephone Number</u> | <u>Signature</u> |
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| For Seller: | | |
| <u>Name</u> | <u>Telephone Number</u> | <u>Signature</u> |
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile or set forth in a PDF attached to an email, must include the signature of the Authorized Representative authorizing said funds transfer on behalf of such Party.



## **SCHEDULE 2**

## **SCHEDULE OF ESCROW AGENT FEES**

**Consulting Services & Rates[1]**

| Position | Hourly Rate |
| --- | --- |
| *Analyst/Consultant/Senior Consultant/Director* | *$40 - $195* |

KCC's Analysts, Consultants, Senior Consultants and Directors are ready to facilitate and ensure a seamless deposit experience.   KCC pushes the work down to the lowest billing employee who can accomplish the task successfully.

**Fiduciary Administration Services**

| | |
| --- | --- |
| Monthly Bank Fees | Waived |
| Wire/Transfer Fees | Waived |
| Unlimited Transactions | No Fees |
| No Minimum Balance | |
| No Withdrawal Penalty | |

**Check Disbursement**

| | |
| --- | --- |
| Check Fee (Printing & Postage Only) | $1.75/check |

**1099 Disbursement**

| | |
| --- | --- |
| 1099 Fee (Printing & Postage Only) | $2.75/1099 |
| 1099 Tax Reporting | Pricing upon request |

**W-9 Mailing**

| | |
| --- | --- |
| W-9 Fee (Printing & Postage Only) | $2.75/W-9 |

**Other Document Management/Imaging**

| | |
| --- | --- |
| Electronic Imaging (Scanning & Barcoding) | $0.10 per imaged page |

---

[1] Please note that additional professional services not covered by this proposal will be charged at hourly rates, including any outsourced services performed under our supervision and control.

# EXHIBIT A

## PROFESSIONALS AND FEE/EXPENSE CAPS

| Professional | Cap |
|---|---|
| Alvarez & Marsal Disputes and Investigations, LLC | $[●] |
| Baker & Hostetler LLP | $[●] |
| Berkley Research Group | $[●] |
| Choate, Hall & Stewart LLP | $[●] |
| Cole Schotz P.C. | $[●] |
| Foley & Lardner LLP | $[●] |
| John J. Carney | $[●] |
| Jones Day | $[●] |
| Joseph J. McMahon, Jr. | $[●] |
| Landis Rath & Cobb LLP | $[●] |
| Miller Coffey Tate LLP | $[●] |
| Morgan, Lewis & Bockius LLP | $[●] |
| Plyler, Stallop & Compton, PLLC | $[●] |
| Prime Clerk LLC | $[●] |
| Province, Inc. | $[●] |
| Richards, Layton & Finger, P.A. | $[●] |
| SSG Advisors, LLC | $[●] |
| Whiteford, Taylor & Preston LLC | $[●] |
| **TOTAL** | **$[●]** |

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| SAMUELS JEWELERS, INC.,[1] | : | Case No. 18-11818 (KJC) |
|  | : |  |
| Debtor. | : | **Re: Docket No. 295** |
|  | : |  |

## ORDER (I) AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF ALL LIENS, CLAIMS, LIABILITIES, RIGHTS, ENCUMBRANCES AND OTHER INTERESTS, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF

Upon the motion, dated October 3, 2018 [Docket No. 295] (the "Motion"),[2] of Samuels Jewelers, Inc., as debtor and debtor in possession in the above-captioned case (the "Debtor"), pursuant to Bankruptcy Code sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6003, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of, among other things, (i) an order (the "Bidding Procedures Order") (a) approving the bid procedures (the "Bidding Procedures") in connection with the sale or disposition (the "Sale") of substantially all of the Debtor's assets (the "Assets") or any portion thereof, (b) scheduling an auction (the "Auction") for and a hearing (the "Sale Hearing") to approve the Sale, (c) authorizing and approving certain notice procedures, and (d) granting certain related relief; and (ii) an order (a) approving the Sale

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6316 and its address is 2914 Montopolis Drive, Suite 200, Austin, Texas 78741.

[2]    Unless otherwise indicated, capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion or the APA (as defined herein), as applicable.

free and clear of all claims, liens, liabilities, rights, interests and encumbrances to the successful bidder, (b) approving the assumption and assignment of certain executory contracts in connection with such Sale, including without limitation the Purchased Contracts, and (c) granting certain related relief; and the Court having entered the Bidding Procedures Order on October 22, 2018 [Docket No. 359]; and an Auction having been set for January 24, 2019 in accordance with the Bidding Procedures Order; and the Auction having been adjourned with the consent of each of the DIP Agents and upon providing notice to the Consultation Parties (such terms as defined in the Bidding Procedures Order) [Docket No. 586]; and Wells Fargo Bank, National Association ("Wells Fargo") having submitted a credit bid for certain of the Assets pursuant to section 363(k) of the Bankruptcy Code; and the Debtor and Wells Fargo, following good faith, arm's length negotiations, intend to enter into a Purchase Agreement (as may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and this Order and including any schedules, exhibits or appendices thereto, the "APA"), substantially in the form attached hereto as **Exhibit 1**, contemplating the Sale of certain of the Assets, as set forth in the APA, to Wells Fargo (the "Purchased Assets") free and clear of any Liens and all Excluded Liabilities (the "Sale Transaction"); and the Debtor, in consultation with the Consultation Parties (as defined in the Bidding Procedures Order), having determined that the credit bid submitted by Wells Fargo was the Successful Bid (as defined in the Bid Procedures Order) for the Purchased Assets; and adequate and sufficient notice of the Motion and the relief sought therein having been given to parties in interest in this case in accordance with the Bidding Procedures Order; and all such parties having been afforded due process and an opportunity to be heard regarding the Motion and the relief requested in therein; and it appearing that no other or further notice need be provided; and the Court having reviewed and considered the APA, the relief sought in

2

the Motion, all objections to the Motion, and the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and the Sale Hearing having been held on February 21, 2019, and after due deliberation thereon and sufficient cause appearing;

## THE COURT HEREBY FINDS THAT:[3]

### Jurisdiction and Venue

A.      This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this case and proceedings is proper in this District and this Court under 28 U.S.C. §§ 1408 and 1409.

### Statutory Predicates

B.      The statutory predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363 and 365.  Such relief is also warranted pursuant to Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014.

### Final Order

C.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

### Notice

D.      On August 7, 2018 (the "Petition Date"), the Debtor commenced this chapter 11 case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtor has continued to operate and manage its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

RLF1 20865671v.1

E.     As evidenced by the affidavits of service and publication previously filed with this Court, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate and sufficient notice of the Motion and the relief requested therein, the adjournment and cancellation of the Auction, the Sale Hearing, the APA and the Sale Transaction has been provided in accordance with the Bidding Procedures Order, Bankruptcy Code sections 102(1) and 363, Bankruptcy Rules 2002, 9007, 9008 and 9014, and Local Rules 2002-1 and 6004-1. The aforementioned notices are good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, the adjournment and cancellation of the Auction, the Sale Hearing, the APA or the Sale Transaction is or shall be required.

F.     A reasonable opportunity to object or be heard regarding the relief requested in the Motion and provided in this Order was afforded to all parties in interest.

<u>**Compliance with the Bidding Procedures Order**</u>

G.     As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel at the Sale Hearing, the Debtor has conducted a fair and open sale process in a manner reasonably calculated to produce the highest or otherwise best offer for the Purchased Assets and complied in all material respects with the Bidding Procedures Order.  The Debtor and its professionals have adequately and appropriately marketed the Purchased Assets in compliance with the Bidding Procedures and the Bidding Procedures Order, and in accordance with the Debtor's fiduciary duties.  Creditors, other parties in interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Purchased Assets.  The Debtor and Wells Fargo have negotiated the APA and the Sale Transaction contemplated therein in a diligent, non-collusive, fair and good faith manner.

4

H.     The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders reasonably identified were afforded sufficient notice and a full, fair and reasonable opportunity was provided for any person or party to make a higher or otherwise better offer to purchase the Purchased Assets.  The Debtor conducted the sale process without collusion and in accordance with the Bidding Procedures.  The Debtor determined in consultation with the Consultation Parties and in a valid and sound exercise of its business judgment that the highest and best bid for the Purchased Assets was the credit bid of Wells Fargo.  There was no other bid that met the definition of a Successful Bid as set forth in the Bidding Procedures Order, and Wells Fargo's bid (i) was the highest and otherwise best offer received by the Debtor for the Purchased Assets, (ii) was fair and reasonable, (iii) is in the best interests of the Debtor, its estate, its creditors and all other parties in interest, (iv) maximizes the value of the Purchased Assets, and (v) will provide a greater recovery for Debtor's estate than would have been provided by any other available alternative.  There is no legal or equitable reason to delay consummating the Sale Transaction.

I.     Wells Fargo is the Successful Bidder, and the APA is the Successful Bid (each as defined in the Bidding Procedures Order), for the Purchased Assets in accordance with the Bidding Procedures Order.  Wells Fargo has complied in all respects with the Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the APA, and the Sale Transaction and the APA likewise comply with the Bidding Procedures Order and all other applicable orders of this Court.

**Business Judgment**

J.     The APA, including the form and total consideration to be realized by the Debtor under the APA, (i) constitutes the highest and best offer received by the Debtor for the Purchased

Assets; (ii) is fair and reasonable; and (iii) is in the best interests of the Debtor, its estate, its creditors and all other parties in interest.

K.     The Debtor's determination that the consideration provided by Wells Fargo under the APA constitutes the highest and best offer for the Purchased Assets is a result of due deliberation by the Debtor and constitutes a valid and sound exercise of the Debtor's business judgment.

L.     Consistent with its fiduciary duties, the Debtor has demonstrated good, sufficient and sound business reasons and justifications for entering into the Sale Transaction and the performance of its obligations under the APA, including, but not limited to, the fact that (i) the consideration provided by Wells Fargo under the APA will provide a greater value for the Debtor's estate than would be provided by any other available alternative; and (ii) expeditiously consummating the Sale Transaction  presents the best opportunity to realize the value of the Purchased Assets and avoid decline and devaluation of the Purchased Assets to the detriment of the estate.

M.     The provisions of the APA governing the establishment of the Professional Expenses Escrow are an integral part of the transactions set forth in the APA.

**Corporate Authority**

N.     Subject to entry of this Order, the Debtor (i) has full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, (ii) has all of the necessary corporate power and authority to consummate the transactions contemplated by the APA, including, without limitation, the Sale Transaction and the sale, assumption, and assignment of the Purchased Contracts, (iii) has taken all corporate action necessary to authorize and approve the APA and the consummation by the Debtor of the transactions contemplated

6

thereby, including, without limitation, the Sale Transaction and the sale, assumption, and assignment of the Purchased Contracts, and (iv) pursuant to 8 Del. C. § 303(a), and subject to entry of this Order, needs no consents or approvals, other than those expressly set forth in the APA or this Order, to consummate the transactions contemplated thereby, including, without limitation, the Sale Transaction and the sale, assumption, and assignment of the Purchased Contracts.

## **Good Faith**

O.      The sales process, including, without limitation, the negotiation of the APA by the Debtor and Wells Fargo, was non-collusive, conducted at arm's length, and in good faith, and substantively and procedurally fair to all parties in interest.  Neither the Debtor nor Wells Fargo has engaged in any conduct that would cause or permit the APA or the Sale Transaction to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n).

P.      The Debtor and Wells Fargo have complied, in good faith, in all respects with the Bidding Procedures Order and the Bidding Procedures.  The Debtor and its independent director and representatives, and Wells Fargo and its employees, agents, advisors and representatives, each actively participated in the bidding process, and each acted in good faith.

Q.      Wells Fargo is a good faith buyer within the meaning of Bankruptcy Code section 363(m), and is therefore entitled to the full protection of that provision in respect of the Sale Transaction, each term of the APA (and any ancillary documents executed in connection therewith) and each term of this Order, and otherwise has proceeded in good faith in all respects in connection with this proceeding.  Neither the Debtor nor Wells Fargo has engaged in any conduct that would prevent the application of Bankruptcy Code section 363(m).  The Debtor was free to deal with any other party interested in buying or selling some or all of the Purchased

Assets on behalf of the Debtor's estate. The protections afforded by Bankruptcy Code section 363(m) are integral to the Sale Transaction and Wells Fargo would not consummate the Sale Transaction without such protections.

R. The form and total consideration to be realized by the Debtor under the APA constitutes fair value, fair, full and adequate consideration, reasonably equivalent value and reasonable market value for the Purchased Assets.

S. Neither Wells Fargo nor any of its affiliates, officers, directors, managers, shareholders, members or any of its respective successors or assigns is an "insider" of any of the Debtor, as that term is defined under Bankruptcy Code section 101(31). No common identity of directors, managers, controlling shareholders, or members exists between the Debtor and Wells Fargo.

**No Fraudulent Transfer**

T. The consideration provided by Wells Fargo for the Purchased Assets pursuant to the APA (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a greater recovery for the Debtor's creditors and estate than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, and each state, territory, possession and the District of Columbia.

U. Neither the Debtor nor Wells Fargo proposes to enter into the APA or consummate the Sale Transaction, for the purpose of (i) escaping liability for any of the Debtor's debts or (ii) hindering, delaying or defrauding the Debtor's present or future creditors, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory,

8

possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

## Credit Bid Valid

V.       Wells Fargo, in its capacity as DIP Working Capital Agent and Prepetition Revolving Loan Agent, is a secured creditor of the Debtor, holding valid, senior perfected and non-avoidable first priority liens, claims and encumbrances in and against the Debtor, its estate, and the Purchased Assets arising in connection with the DIP Facility and the Prepetition Revolving Loan Facility (each as defined in the *Final Order (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Authorizing the Debtor to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* (the "Final DIP Order") [Docket No. 252].   Wells Fargo holds allowed secured claims for all principal, interest, and other obligations and amounts (including, without limitation, the DIP Revolving Loan Obligations and the Prepetition Revolving Loan Obligations (as refinanced and rolled up into, the DIP Revolving Loan Obligations) each as defined in the Final DIP Order) owing by the Debtor to Wells Fargo arising under or in connection with the DIP Facility or the Prepetition Revolving Loan Facility, and was authorized to credit bid all of such claims under the APA pursuant to the Final DIP Order and the Bidding Procedures Order.  Wells Fargo's credit bid pursuant to the APA was a valid, proper and enforceable offer pursuant to the Bidding Procedures Order and sections 363(b) and 363(k) of the Bankruptcy Code and is not subject to avoidance, equitable subordination, defense, offset, counterclaim, or recharacterization by any party in interest.  It is binding on the Debtor, the Debtor's estate, the Committee, any trustee or estate representative, all creditors and parties-in-interest, and any of their respective

9

predecessors, successors or assigns. It is based on legal, valid, enforceable, perfected, senior and non-avoidable liens against substantially all of the Debtor's assets. Subject to the terms of the APA, the consideration for the Purchased Assets will be an offset of a portion of the DIP Revolving Loan Obligations in the amount of $16,000,000 plus all Applicable Cure Costs with respect to the Purchased Contracts, which amount is referred to as the Credit Bid Amount in the APA. The Debtor shall pay all Applicable Cure Costs, as provided below. The Debtor is authorized and directed to pay all of the Applicable Cure Costs (whether pre-petition or post-petition) accrued in relation to the Purchased Contracts at the Closing. The Closing shall not affect the remaining balance of the DIP Revolving Loan Obligations not subject to the credit bid (the "Remaining DIP Balance"), and the Remaining DIP Balance shall continue to be outstanding and due and owing in accordance with the terms of the DIP Documents; provided however, that, as contemplated by the APA, at the Closing, cash equal to the Excluded Cash Amount shall be on deposit in an operating account of the Debtor mutually acceptable to the Debtor and DIP Working Capital Agent, and such cash shall not be swept under any cash sweep mechanism at or after the Closing; provided further, however, the DIP Agents maintain and are hereby granted and re-granted liens on any portion of such cash that remains following the payment by the Debtor of the disbursements identified in the Wind-down Budget (as defined below). Contemporaneously with the execution and delivery of the APA, the Debtor, the Purchaser and the DIP Working Capital Agent will file with this Court a budget (the "Wind-down Budget") (i) setting forth, among other things, (a) the amount of all Applicable Cure Costs, (b) the Credit Bid Amount, (c) the Remaining DIP Balance; (d) the Excluded Cash Amount, and (e) the Professional Expenses Escrow Amount and (ii) accompanied by a notice that the APA has been executed and delivered and a fully executed copy of the definitive APA.

**Free and Clear**

W.      The transfer of the Purchased Assets to Wells Fargo will be a legal, valid, and effective transfer of the Purchased Assets, and will vest Wells Fargo with all right, title, and interest of the Debtor to the Purchased Assets free and clear of all claims, liens (including, without limitation, any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof), liabilities, interests, rights and encumbrances, including, without limitation, the following:  all mortgages, ad valorem taxes, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, easements, licenses, sublicenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, fines, restitution orders, assignments, preferences, rights of first offer or refusal, reservation of rights, consent rights, offsets, contract rights, rights of setoff, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, environmental rights and claims (including, without limitation, toxic tort claims and Comprehensive Environmental Response, Compensation and Liability Act 42 U.S.C. §§ 9601 et seq. ("CERCLA") claims), labor rights and claims, employment rights and claims, pension rights and claims, other tax claims (including foreign, state and local taxes), regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, claims arising out of collective bargaining agreements, reclamation claims, obligation claims, Employee Retirement Income Security Act of 1974 ("ERISA") claims,

11

demands, guaranties, option rights or claims, rights, contractual or other commitment rights and claims, any rights of licensees or sublicensees (if any) under Bankruptcy Code section 365(n) or any similar statute, rights of tenants and subtenants (if any) under Bankruptcy Code section 365(h) or any similar statute, and all other matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Case, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under any theory, law or doctrine of successor or transferee liability or related theories (all of the foregoing, including, without limitation, liens and liabilities, and Liens and Excluded Liabilities but excluding the Assumed Liabilities collectively being referred to in this Order as "Claims" and, as used in this Order, the term "Claims" includes, without limitation, any and all "claims" as that term is defined in section 101(5) of the Bankruptcy Code.

X.     The Debtor may transfer the Purchased Assets free and clear of all Claims, including, without limitation, rights or claims based on any successor or transferee liability, because, in each case, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied.  Those (a) holders of Claims and (b) non-Debtor parties to the Purchased Contracts who did not object or who withdrew their objections to the Motion, are deemed to have consented pursuant to Bankruptcy Code section 363(f)(2).  Those (i) holders of Claims and (ii) non-Debtor parties to the Purchased Contracts who did object, fall within one or more of the other subsections of Bankruptcy Code section 363(f).

RLF1 20865671v.1

Y.     The Debtor has satisfied the requirements of section 363(b)(1) of the Bankruptcy Code.

Z.     Wells Fargo would not have entered into the APA and would not consummate the transactions contemplated thereby, including, without limitation, the Sale Transaction and the sale, assumption, and assignment of the Purchased Contracts, thus adversely affecting the Debtor, its estate and creditors, (i) if the transfer of the Purchased Assets were not free and clear of all Claims, or (ii) if Wells Fargo would, or in the future could, be liable for any such Claims. Wells Fargo will not consummate the transactions contemplated by the APA, including, without limitation, the Sale Transaction and the sale, assumption, and assignment of the Purchased Contracts, unless this Court expressly orders that Wells Fargo, its affiliates, its respective present or contemplated members or shareholders, or the Purchased Assets will not have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Claims.

AA.     Not transferring the Purchased Assets free and clear of all Claims would adversely impact the Debtor's efforts to maximize the value of its estate, and the transfer of the Purchased Assets other than pursuant to a transfer that is free and clear of all Claims and other interests of any kind or nature whatsoever would be of substantially less benefit to the Debtor's estate.

BB.     Neither Wells Fargo nor any of its affiliates is an alter ego or mere continuation of the Debtor or its estate, there is no continuity or common identity between Wells Fargo, any of its affiliates and the Debtor, and there is no continuity of enterprise between Wells Fargo, any of its affiliates and the Debtor. Neither Wells Fargo nor any of its affiliates are holding themselves out to the public as a continuation of the Debtor. Neither Wells Fargo nor any of its affiliates are

13

a successor to the Debtor or its estate, and none of the transactions contemplated by the APA, including, without limitation, the Sale Transaction and the assumption and assignment of the Purchased Contracts amounts to a consolidation, merger, or *de facto* merger of Wells Fargo or any of its affiliates with or into the Debtor.

CC.     Without limiting the generality of the foregoing, and except as provided in the APA, none of Wells Fargo, its affiliates, its respective present or contemplated members or shareholders, or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Claims relating to any U.S. federal, state or local tax liabilities, that the Debtor may incur in connection with consummation of the transactions contemplated by the APA, including, without limitation, the Sale Transaction and the sale, assumption, and assignment of the Purchased Contracts, or that the Debtor has otherwise incurred prior to the consummation of the transactions contemplated by the APA.

### Validity of Transfer

DD.     The consummation of the transactions contemplated by the APA, including, without limitation, the Sale Transaction and the sale, assumption, and assignment of the Purchased Contracts is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105(a), 363(b), 363(f), 363(m), 363(k), 365(b),and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the transactions contemplated under the APA.

EE.     The Purchased Assets constitute property of the Debtor's estate and good title to the Purchased Assets of the Debtor is vested in the Debtor's estate within the meaning of

Bankruptcy Code section 541(a). The Debtor is the sole and lawful owner of the Purchased Assets, and no other person has any ownership right, title, or interest therein.

FF.    When executed and delivered by the parties, the APA shall be a valid and binding contract between the Debtor and Wells Fargo, and shall be enforceable according to its terms.

GG.    No personally identifiable information will be sold pursuant to the terms of the APA and this Order. Accordingly, appointment of a consumer privacy ombudsman in accordance with sections 363(b)(1) or 332 of the Bankruptcy Code is not required with respect to the Sale Transaction.

## Assumed Contracts

HH.    Notice of the Debtor's assumption and assignment and sale of the Purchased Contracts has been provided to each non-debtor party to a Purchased Contract, together with a statement therein from the Debtor with respect to the amount, if any, to be paid to such non-debtor party to cure any defaults under, and to otherwise comply with the requirements of section 365(b) of the Bankruptcy Code with respect to the Purchased Contract to which such non-debtor is a party. As to each Purchased Contract, payment of the Applicable Cure Costs, as defined below, is sufficient for the Debtor to comply fully with the requirements of section 365(b) of the Bankruptcy Code.

II.    The assumption and assignment of the Purchased Contracts pursuant to the terms of this Order and the APA is integral to the transactions contemplated by the APA and is in the best interests of the Debtor, its estate and creditors, and all other parties in interest, and represents a reasonable exercise of the Debtor's sound and prudent business judgment.

JJ.    Wells Fargo, except as otherwise expressly agreed to between Wells Fargo and the applicable counterparty to a Purchased Contract, provided adequate assurance of cure of any

15

monetary default existing as of and including the Closing Date under any of the Purchased Contracts, within the meaning of Bankruptcy Code section 365(b)(1)(A), (ii) provided compensation, or adequate assurance of compensation, to any party for actual pecuniary loss to such party resulting from a monetary default existing as of and including the Closing Date under any of the Purchased Contracts, within the meaning of Bankruptcy Code section 365(b)(1)(B), and (iii) provided adequate assurance of its future performance under the Purchased Contracts within the meaning of Bankruptcy Code sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B).

KK.    At the Closing and pursuant to sections 363 and 365 of the Bankruptcy Code, the Debtor will assume the Purchased Contracts (to the extent not previously assumed) and, subject to the terms herein, sell and assign the Purchased Contracts to Wells Fargo, and Wells Fargo, subject to the terms herein, will purchase, take and assign the Purchased Contracts.  The Debtors will pay all Applicable Cure Costs. The Debtor is authorized and directed to pay all of the Applicable Cure Costs from the DIP Facility proceeds with respect to the Purchased Contracts at the Closing, as described further in paragraph 8 below.

LL.    All other requirements and conditions under the Bankruptcy Code for the assumption by the Debtor and assignment and sale to Wells Fargo of the Purchased Contracts have been satisfied.  Therefore, the Purchased Contracts may be assumed by the Debtor and assigned and sold to Wells Fargo.

## Compelling Circumstances for an Immediate Sale

MM.   To maximize the value of the Purchased Assets, it is essential that the transactions contemplated by the APA, including, without limitation, the Sale Transaction and the assumption and assignment of the Purchased Contracts occur within the time constraints set forth in the

16

APA. Time is of the essence in consummating the transactions contemplated by the APA, including, without limitation, the Sale Transaction and the sale, assumption and assignment of the Purchased Contracts.

NN.    The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the transactions contemplated by the APA, including, without limitation, the Sale Transaction and the sale, assumption, and assignment of the Purchased Contracts prior to, and outside of, a chapter 11 plan because, among other things, the Debtor's estate will suffer irreparable harm if the relief requested in the Motion is not granted on an expedited basis. The transactions contemplated by the APA, including, without limitation, the Sale Transaction and the sale, assumption. and assignment of the Purchased Contracts, neither impermissibly restructure the rights of the Debtor's creditors nor impermissibly dictates the terms of a chapter 11 plan for the Debtor, and therefore, do not constitute a *sub rosa* plan.

## IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:

### General Provisions

1.    The Motion is granted as provided herein, and entry into and performance under, and in respect of, the APA attached hereto as **Exhibit 1** and the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction and the sale, assumption, and assignment of the Purchased Contracts is authorized and approved.

2.    Any objections and responses to the Motion or the relief requested therein that have not been withdrawn, waived, settled, or resolved, and all reservation of rights are overruled on the merits and denied with prejudice. All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief granted herein.

3.     This Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order are incorporated herein by reference.

### Approval of the APA

4.     The APA and all of its terms and conditions (including the payment of the Credit Bid Amount and the cash funding of the Excluded Cash Amount and the Professional Expenses Escrow Amount ), all ancillary documents thereto, and the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Purchased Contracts are approved.  The failure specifically to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

5.     The Debtor and its independent director Matthew R. Kahn and Co-Chief Restructuring Officers Robert J. Duffy and Kyle Richter (and such other individuals as may be expressly designated in writing by any of Messrs. Kahn, Duffy or Richter), acting for and on behalf of the Debtor, are, and each of them is, authorized and directed to execute, deliver and perform the APA and any and all other agreements, certificates and documents contemplated by the APA to be executed and delivered by the Debtor and to take any and all other actions necessary or appropriate (or reasonably requested by Wells Fargo consistent with the APA) in connection with the consummation of the Sale Transaction and the performance of the Debtor's obligations under the APA, including, without limitation, executing, acknowledging and delivering deeds, assignments, conveyances and other assurance, documents and instruments of transfer for purposes of selling, assigning, transferring, granting, conveying and confirming to Wells Fargo, and reducing to the possession of Wells Fargo, the Purchased Assets.  The Debtor is further authorized and directed to pay, without further order of this Court, whether before, at or

18

after the Closing Date, any expenses or costs that are required to be paid by the Debtor under the APA in order to consummate the Sale Transaction or perform its obligations under the APA.

6.       Following the closing of the Sale Transaction, no holder of any lien, claim, encumbrance or interest in or on the Purchased Assets or other party in interest may interfere with Wells Fargo's use and enjoyment of the Purchased Assets based on or related to such lien, claim, encumbrance or interest, or any actions that the Debtor may take in the chapter 11 case, and no party may take any action to prevent, interfere with or otherwise enjoin consummation of the Sale Transaction.

7.       The sale of the Purchased Assets to Wells Fargo under the APA constitutes a transfer in good faith for reasonably equivalent value and fair consideration and the sale of the Purchased Assets to Wells Fargo may not be avoided under any statutory or common law fraudulent conveyance and fraudulent transfer theories whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

8.       Wells Fargo holds allowed secured claims for all principal, interest, and other obligations and amounts (including, without limitation, the DIP Revolving Loan Obligations and the Prepetition Revolving Loan Obligations, each as defined in the Final DIP Order) owing by the Debtor to Wells Fargo arising under or in connection with the DIP Facility or the Prepetition Revolving Loan Facility, and is authorized to credit bid all or any portion of such claims under the APA.  Wells Fargo's credit bid pursuant to the APA was a valid, proper and enforceable offer pursuant to the Bidding Procedures Order and sections 363(b) and 363(k) of the Bankruptcy Code and is not subject to avoidance, equitable subordination, defense, offset, counterclaim, or recharacterization by any party in interest.  It is binding on the Debtor, the Debtor's estate, the

Committee, any trustee or estate representative, and all creditors and parties-in-interest and any of their respective predecessors, successors or assigns and is based on legal, valid, enforceable, perfected and nonavoidable liens against certain of the Debtor's assets.   Subject to the terms of the APA, the consideration for the Purchased Assets will be an offset of a portion of the DIP Revolving Loan Obligations in the amount of $16,000,000 plus all Applicable Cure Costs with respect to the Purchased Contracts.  The Debtor is authorized and directed to pay the Applicable Cure Costs from the DIP Facility proceeds with respect to the Purchased Contracts at the Closing.   The Closing shall not affect the Remaining DIP Balance, and the Remaining DIP Balance shall continue to be outstanding and due and owing in accordance with the terms of the DIP Documents; provided however, that, as contemplated by the APA, at the Closing, cash equal to the Excluded Cash Amount shall be on deposit in an operating account of the Debtor mutually acceptable to the Debtor and DIP Working Capital Agent, and such cash shall not be swept under any cash sweep mechanism at or after the Closing; provided further, however, the DIP Agents maintain and are hereby granted and re-granted liens on any portion of such cash that remains following the payment of the disbursements identified in the Wind-down Budget. Contemporaneously with the execution and delivery of the APA, the Debtor, the Purchaser and the DIP Working Capital Agent will file the Wind-down Budget with this Court.   As consideration for the funding of the Excluded Cash Amount and the Professional Expenses Escrow Amount, the Debtor shall provide to the Purchaser and the DIP Working Capital Agent a variance report as to actual receipts and disbursements compared to projected receipts and disbursements set forth in the Wind-down Budget on a monthly basis on the last business day of each month until the earlier of dismissal or conversion of this case and upon such dismissal or conversion.

20

## Transfer of the Purchased Assets Free and Clear

9.     Pursuant to Bankruptcy Code sections 105(a) and 363(f), the Purchased Assets, shall be sold free and clear of all Claims.

10.     At Closing, all of the Debtor's right, title and interest in and to, and possession of, the Purchased Assets shall be immediately vested in Wells Fargo pursuant to Bankruptcy Code sections 105(a), 363(b), 363(k) and 363(f) free and clear of any and all Claims.  Such transfer shall constitute a legal, valid, binding and effective transfer of, and shall vest Wells Fargo with good and marketable title to, the Purchased Assets.  All persons or entities, presently or on or after the Closing Date, in possession of some or all of the Purchased Assets are directed to surrender possession of the Purchased Assets to Wells Fargo or its designees on the Closing Date or at such time thereafter as Wells Fargo may request.

11.     This Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents, instruments, or Liens; and each of the foregoing persons and entities is hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale Transaction and the sale, assumption, and assignment of the Purchased Contracts, as contemplated by the APA.  The Purchased Assets are sold free and clear of any reclamation rights and reservation of rights.

RLF1 20865671v.1

12.     Except as otherwise expressly provided in the APA or this Order, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, foreign, federal, state and local governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Claims against the Debtor, or the Purchased Assets arising under or out of, in connection with, or in any way relating to, the Debtor, the Debtor's predecessors or affiliates, the Purchased Assets, the ownership, sale or operation of the Purchased Assets prior to Closing or the transfer of the Purchased Assets to Wells Fargo, are hereby forever barred, estopped and permanently enjoined from asserting or prosecuting any cause of action or any process or other act seeking to collect, offset, or recover on account of any Claims against Wells Fargo, its successors or assigns, its property or the Purchased Assets solely with respect to the Sale Transaction and the transactions contemplated thereby.  Following the Closing, no holder of any Claim shall interfere with Wells Fargo's title to or use and enjoyment of the Purchased Assets based on or related to any such Claim, or based on any action the Debtor may take in the Chapter 11 Case.

13.     The Debtor is authorized and directed (at the reasonable request of Wells Fargo) to execute such documents as may be necessary to release any Claims of any kind against the Purchased Assets as such Claims may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, *lis pendens* or other documents or agreements evidencing Claims against or in the Purchased Assets shall not have delivered to the Debtor prior to the Closing of the Sale Transaction, in proper form for filing and executed by the appropriate parties, lien releases and appropriate UCC amendments with respect to those Claims that the person or entity has with respect to the Purchased Assets, (a) the Debtor is hereby authorized and

22

directed (at the reasonable request of Wells Fargo) to execute and file such lien releases and appropriate UCC amendments with respect to those Claims against the Purchased Assets; (b) Wells Fargo is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all such Claims against Wells Fargo and the applicable Purchased Assets; and (c) Wells Fargo may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction and releases of all such Claims with respect to the Purchased Assets. Notwithstanding the foregoing, or anything herein to the contrary, and notwithstanding any federal, state, local or other laws, rules or regulations purporting to impose any notice, filing, due diligence or other requirement, the provisions of this Order authorizing the sale and assignment of the Purchased Assets free and clear of Claims shall be self-executing, and the failure or refusal of any entity to execute, record or file releases, termination statements, assignments, consents or other instruments shall not impair the consummation and implementation of the provisions of this Order or the APA.

14.     To the maximum extent permitted under applicable law, Wells Fargo shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtor with respect to the Purchased Assets and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to Wells Fargo with respect to the Purchased Assets as of the Closing Date.

15.     No governmental unit (as defined in Bankruptcy Code section 101(27)) or any representative thereof may deny, revoke, suspend or refuse to renew any permit, license or similar grant relating to the operation of the Purchased Assets on account of the filing or

pendency of the Chapter 11 Case or the consummation of the Sale Transaction to the extent that any such action by a governmental unit or any representative thereof would violate Bankruptcy Code section 525.

## No Successor or Transferee Liability

16.     Upon the Closing Date, except as provided in the APA, the entry of this Order and the APA shall not mean that Wells Fargo, as a result of any action taken in connection with the APA, the consummation of the Sale Transaction, or the transfer or operation of the Purchased Assets, shall be deemed to: (a) be a legal successor or successor employer to the Debtor or otherwise be deemed a successor to the Debtor; (b) have, *de facto*, or otherwise, merged or consolidated with or into the Debtor; or (c) be an alter ego or a mere continuation or substantial continuation of the Debtor or the enterprise(s) of the Debtor, including, in the case of each of (a)-(c), without limitation, (x) within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), the WARN Act (29 U.S.C. §§ 2101 et seq.) ("WARN"), CERCLA, the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act, 29 U.S.C. § 151, et seq. (the "NLRA") or (y) in respect of (i) any environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to the Closing Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, (ii) any liabilities, debts or obligations of or required to be paid by the Debtor for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including, without limitation, filing

24

requirements under any such laws, rules or regulations), or (iii) any products liability law or doctrine with respect to the Debtor's liability under such law, rule or regulation or doctrine.

17.     Without limiting the generality of the foregoing, and except as otherwise provided in the APA and this Order, neither Wells Fargo nor any of its affiliates shall have any responsibility for (a) any liability or other obligation of the Debtor or related to the Purchased Assets or (b) any Claims against the Debtor or any of its predecessors or affiliates.  By virtue of Wells Fargo's purchase of the Purchased Assets, neither Wells Fargo nor any of its affiliates shall have any liability whatsoever with respect to the Debtor's (or its predecessors' or affiliates') respective businesses or operations or any of the Debtor's obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental (including, but not limited to CERCLA), successor or transferee liability, *de facto* merger or substantial continuity, labor and employment (including, but not limited to, WARN) or products liability law, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing.  Wells Fargo would not have acquired the Purchased Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

18.     None of Wells Fargo or its affiliates, successors, assigns, equity holders, employees or professionals shall have or incur any liability to, or be subject to any action by the Debtor or its estate, predecessors, successors or assigns, arising out of the negotiation,

investigation, preparation, execution, delivery of the APA and the entry into and consummation of the sale of the Purchased Assets.

19.     Nothing in this Order or the APA shall require Wells Fargo or any of its affiliates to (a) continue or maintain in effect, or assume any liability in respect of any employee, collective bargaining agreement, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which the Debtor is a party or have any responsibility therefor including, without limitation, medical, welfare and pension benefits payable after retirement or other termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

20.     No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions with the Debtor that are approved by this Order, including, without limitation, the APA and the Sale Transaction.

### Good Faith; Arm's Length Sale

21.     The APA has been negotiated, and the Sale Transaction contemplated by the APA is being undertaken, by Debtor, Wells Fargo and their respective representatives at arm's length, without collusion and in "good faith," as that term is defined in Bankruptcy Code section 363(m). Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction or any term of the APA, and shall not permit the unwinding of the Sale Transaction. Wells Fargo is a good faith purchaser within the meaning of Bankruptcy Code section 363(m) and, as such, is entitled to the full protections of Bankruptcy Code section 363(m).

26

22.     Neither the Debtor nor Wells Fargo has engaged in any conduct that would cause or permit the APA or the Sale Transaction to be avoided or costs or damages to be imposed, under Bankruptcy Code section 363(n).  The consideration provided by Wells Fargo for the Purchased Assets under the APA is fair and reasonable, and the Sale Transaction may not be avoided under Bankruptcy Code section 363(n).  The Sale Transaction constitutes reasonably equivalent value and fair and adequate consideration for the rights to sell and dispose of the Purchased Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transfers Act, and similar laws of the United States, any state, territory, possession thereof or the District of Columbia.  The terms and conditions of the Sale Transaction are fair and reasonable under the circumstances of this Chapter 11 Case and were not entered into with the intent to nor for the purpose of, nor do they have the effect of, hindering, delaying or defrauding the Debtor or its creditors under any applicable laws.  The Debtor and Wells Fargo are not entering into the Sale Transaction or proposing to consummate the Sale Transaction fraudulently, for the purpose of statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction.

## Sale, Assumption, and Assignment of the Purchased Contracts

23.     Except as otherwise expressly provided in the APA or this Order, upon the Closing Date, pursuant to Bankruptcy Code sections 105(a), 363, and 365, the Debtor is authorized to (a) sell, assume, and assign to Wells Fargo each of the Purchased Contracts free and clear of all Claims, and (b) execute and deliver to Wells Fargo such documents or other

instruments as may be reasonably requested by Wells Fargo to assign and transfer the Purchased Contracts to Wells Fargo.

24.     Each Purchased Contract constitutes an executory contract under Bankruptcy Code section 365 and all requirements and conditions under Bankruptcy Code sections 363 and 365 for the assumption by the Debtor and assignment to Wells Fargo of the Purchased Contracts have been, or will be, satisfied.

25.     Upon the assignment to Wells Fargo of the Purchased Contracts in accordance with the terms hereof and payment of the Applicable Cure Costs, in accordance with Bankruptcy Code sections 363 and 365, (a) Wells Fargo shall have no liability arising or accruing under the Purchased Contracts on or prior to the Closing, except as otherwise provided in the APA, and Wells Fargo shall be fully and irrevocably vested with all rights, title and interest of the Debtor under the Purchased Contracts, (b) Wells Fargo shall be deemed to be substituted for the Debtor as a party to the applicable Purchased Contracts, and (c) all defaults or other obligations of the Debtor under the Purchased Contracts arising or accruing prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured and the Debtor shall be relieved, pursuant to Bankruptcy Code section 365(k), from any further liability under the Purchased Contracts.  The counterparties to the Purchase Contracts are barred from asserting against the Debtor, Wells Fargo and their respective successors and assigns, any default or unpaid obligation allegedly arising or occurring before the Closing, any pecuniary loss resulting from such default, or any other obligation under the Purchased Contracts arising or incurred prior to the Closing, other than the Applicable Cure Costs.  Wells Fargo has demonstrated adequate assurance of

28

future performance under the relevant Purchased Contracts within the meaning of Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B).

26.     There shall be no assignment fees, increases or any other fees charged to the Debtor or Wells Fargo as a result of the sale, assumption, and assignment of the Purchased Contracts.   The validity of the transactions contemplated by the APA, including, without limitation, the Sale Transaction and the sale, assumption, and assignment of the Purchased Contracts shall not be affected by any dispute between the Debtor or its affiliates, and another party to a Purchased Contract regarding the payment of any amount.  Upon assignment to Wells Fargo, the Purchased Contracts shall be valid and binding, in full force and effect and enforceable by Wells Fargo in accordance with their respective terms.

27.     Except with respect to Applicable Cure Costs, pursuant to Bankruptcy Code sections 105(a), 363, and 365, all counterparties to the Purchased Contracts are forever barred and permanently enjoined from raising or asserting against the Debtor or Wells Fargo any assignment fee, default, breach or claim of pecuniary loss, or condition to assignment, arising under or related to the Purchased Contracts existing as of and including the Closing Date under the APA or arising by reason of the consummation of transactions contemplated by the APA, including, without limitation, the Sale Transaction and the sale, assumption, and assignment of the Purchased Contracts, and any party that may have had the right to consent to the assignment of an Purchased Contract is deemed to have consented to such assignment for purposes of Bankruptcy Code sections 365(c)(1)(B) and 365(e)(2)(A)(ii) and otherwise if such party failed to object to the sale, assumption, and assignment of such Purchased Contract.

28.     All counterparties to the Purchased Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of Wells Fargo, and shall not charge the Debtor

29

or Wells Fargo for any instruments, applications, consents or other documents which may be required or requested by Wells Fargo or any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale of the Purchased Assets.

**Related Relief**

29.     Except as expressly provided in the APA, nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtor, its estate or, with respect to any DIP Revolving Loan Obligations outstanding following the Closing Date, including any DIP liens related thereto Wells Fargo, from asserting, or otherwise impair or diminish, any right (including, without limitation, any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any Excluded Asset; <u>provided</u> <u>however</u>, that as of the Closing, cash, including the Excluded Cash Amount, shall no longer be swept under the cash sweep mechanism in place prior to the Closing.

30.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to Wells Fargo on the Closing Date.

31.     To the extent this Order is inconsistent with any prior order or pleading filed in the Chapter 11 Case related to the Motion, the terms of this Order shall govern.  To the extent there is any inconsistency between the terms of this Order and the terms of the APA, the terms of this Order shall govern.

32.     This Order shall be binding in all respects upon all pre-petition and post-petition creditors of the Debtor, all interest holders of the Debtor, all non-Debtor parties to the Purchased Contracts, the Committee, all successors and assigns of the Debtor, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in this Chapter 11 Case or upon a

conversion of the Debtor's case to one under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee, and the APA and Sale Transaction shall not be subject to rejection or avoidance under any circumstances. If any order under Bankruptcy Code section 1112 is entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that this Order and the rights granted to Wells Fargo, and the obligations of the Debtor hereunder, shall remain effective and, notwithstanding such conversion or dismissal, shall remain binding on parties in interest. The Debtor's inability to satisfy in full all administrative expense claims of the Debtor's estate shall not be a basis for termination, rejection or avoidance (as applicable) of the APA or the Sale Transaction or non-performance of the Debtor's obligations hereunder.

33. Consistent with the terms of the APA, Wells Fargo is authorized and directed to take appropriate measures to deposit cash in an amount equal to the Professional Expenses Escrow Amount into the Professional Expenses Escrow. Funds in the Professional Expenses Escrow shall not constitute property of the Debtor's estate and the funds deposited therein shall be used to satisfy accrued and unpaid professional expenses incurred (i) by Escrow Agent or (ii) any Professional (each as defined in the Professional Expenses Escrow Agreement), in each case as set forth in the Professional Expenses Escrow Agreement. Funds in the Professional Expenses Escrow may be released as set forth in the Professional Expenses Escrow Agreement, including upon receipt by the Professional Expenses Escrow Agent of a written instruction accompanied by, as applicable, a copy of a certificate of no objection filed in accordance with the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals [Docket No. 231] or an order or orders of the Bankruptcy Court (as defined in the Professional Expenses Escrow Agreement) allowing all or a portion of the fees and expenses of any Professional (as defined in the Professional Expenses Escrow Agreement) and no further

order of the Bankruptcy Court shall be required for payment of such fees from the Professional Expenses Escrow. Upon payment in full of the fees and expenses of all Professionals (as defined in the Professional Expenses Escrow Agreement) and the Escrow Agent any funds remaining in the Professional Expenses Escrow shall be paid to Wells Fargo in accordance with the Professional Expenses Escrow Agreement. The funds held in the Professional Expenses Escrow shall not be subject to disgorgement, avoidance or clawback by any party, including, without limitation, Wells Fargo, any of the Debtor's successors or assigns, or any trustee appointed in the Chapter 11 Case or upon the conversion of such case to a case under chapter 7 of the Bankruptcy Code; provided that nothing in this paragraph shall prejudice Wells Fargo's right to compel a refund of any funds remaining in the Professional Expenses Escrow in accordance with the terms of the Professional Expenses Escrow Agreement, this Order, or if such fees do not constitute allowed fees permitted by an order of this Court. Immediately upon the Closing and the funding of the Professional Expenses Escrow, Wells Fargo (in its capacity as Purchaser, DIP Working Capital Agent and Prepetition Revolving Loan Agent), the DIP Term Agent, the DIP Lenders and the Prepetition Secured Parties shall have no further liability whatsoever for the Carve Out (each of the foregoing as defined in the Final DIP Order) or any subordination in respect thereof and the provisions of paragraph 39(b) of the Final DIP Order with respect to the funding of the Carve Out shall be deemed satisfied. Nothing herein shall be construed as consent to the allowance of any particular fees and expenses of any Professional or shall affect the right of Wells Fargo (as Purchaser), the DIP Agents, the Prepetition Agents or the Prepetition Secured Parties to object to the allowance and payment of such fees and expenses. Wells Fargo (as Purchaser), the DIP Agents, the DIP Lenders and the Prepetition Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Professionals. Nothing in this Order or otherwise shall be construed to obligate Wells Fargo (as Purchaser), the DIP Agents, the DIP Lenders or the

32

Prepetition Secured Parties in any way to pay compensation to or to reimburse expenses of any Professionals, or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement. For the avoidance of any doubt, nothing herein shall affect the resolution of the Committee's sale objection [Docket No. 667] reached between the Debtor, Wells Fargo and the Committee, the terms of which were as follows: (a) payment of all accrued and unpaid fees and expenses of the Committee's professionals as provided for in the Final DIP Order (through February 16, 2019); (b) provision of up to $35,000 from February 16, 2019 to February 28, 2019 on account of fees and expenses of the Committee's professionals; and (c) provision of up to $25,000 of the $350,000 of the post-Carve Out Trigger Notice on account of fees and expenses of the Committee's professionals.

34. This Court shall retain exclusive jurisdiction until the six-month anniversary of the Closing to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party or which have been sold and assigned by the Debtor to Wells Fargo, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transaction, including any and all disputes relating to the sale, assumption and assignment of the Purchased Contracts and all disputes related to the sale of any other Purchased Assets. Thereafter, this Court shall have concurrent jurisdiction over all such matters; provided, however, that, in the event the Court abstains from exercising or declines to exercise such jurisdiction with respect to the APA, the Bidding Procedures Order, or this Order, such abstention, refusal, or lack of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter. This Court retains jurisdiction to compel delivery of the Purchased Assets, to protect the Debtor, its assets, Wells

33

Fargo and the Purchased Assets, from and against any Claims and successor or transferee liability and to enter orders, as appropriate, pursuant to Bankruptcy Code sections 105(a) or 363 (or other applicable provisions) necessary to transfer the Purchased Assets to Wells Fargo and to enforce and effectuate the Sale Transaction and the terms of this Order.

35.     Wells Fargo and the Debtor may terminate the APA pursuant to the terms thereof without any penalty or liability to Wells Fargo, the Debtor (or its estate), except as set forth in the APA.

36.     The APA and any related agreements, documents, or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court; provided however that any such modification, amendment or supplement does not have a material adverse effect on the Debtor or the Debtor's estate.

37.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding any provision in the Bankruptcy Rules to the contrary, including but not limited to Bankruptcy Rule 6004(h), the Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly: (a) the terms of this Order shall be immediately effective and enforceable upon its entry; (b) the Debtor is not subject to any stay of this Order or in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Debtor shall take action and perform any act required under or to effectuate this Order.

38.     Following the entry of this Order and the Closing, Wells Fargo shall not be required to seek or obtain relief from the automatic stay under Bankruptcy Code section 362 in order to give any notice permitted by the APA or to enforce any of its remedies under the APA or any other sale-related document.  The automatic stay imposed by Bankruptcy Code section 362

34

is modified solely to the extent necessary to implement the preceding sentence; provided however, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

39. Comenity Bank's ("Comenity") (a) Objection and Reservation of Rights with Respect to Any Sale, Including Any Assumption and Assignment of the Program Agreement [Docket No. 611] and (b) Supplemental, Limited Objection and Reservation of Rights With Respect to Asset Sale [Docket No. 655] ("Comenity's Supplemental Objection") are resolved as follows:  notwithstanding any provision to the contrary in this Order or the APA, (i) Comenity (and its designee) shall have a non-exclusive, non-cancellable, royalty-free right to continue to use the Purchased Intellectual Property solely in connection with the administration (including servicing, billing and related matters associated with the private label credit card program) and collection of the balances due Comenity on any open-end revolving line of credit accounts established for Samuels' retail customers; (ii) Wells Fargo is not purchasing, shall not be permitted to copy or have access to, and does not intend to receive or have access to the Program Agreement (as defined in Comenity's Supplemental Objection) and any related information (including but not limited to Comenity's marketing programs, reports, trade secrets, business information, financial information, business methods, procedures, know-how, and information related to cardholder accounts (including names, addresses and credit and transaction information of the cardholders)), which information shall remain confidential; and (iii) Comenity hereby acknowledges that the Purchased Assets include accounts receivable arising in connection with the Program Agreement (as defined in Comenity's Supplemental Objection) (if any).  All of Comenity's rights and defenses under the Program Agreement (as defined in Comenity's

35

Supplemental Objection), the prior orders of this Court, and applicable law (including but not limited to setoff, recoupment and chargebacks) are preserved and not affected by this Order.

40.     The Purchased Assets shall not include any Pre-Petition Consignment Merchandise (as defined in the Final DIP Order) belonging to Unique Designs, Inc., GoGreen Diamonds Inc. or Seiko Corporation of America, or any similarly situated goods belonging to Innovative Pearl, Inc. or any other similarly situated third party, and such Pre-Petition Consignment Merchandise and similarly situated goods of Innovative Pearl, Inc. or of any other similarly situated third party, remain the exclusive property of Unique Designs, Inc., GoGreen Diamonds Inc., Seiko Corporation of America, Innovative Pearl, Inc. and any similarly situated third party (as the case may be), and neither Purchaser nor Seller has any right, title or interest in, to or under any of such Pre-Petition Consignment Merchandise or similarly situated goods of Innovative Pearl, Inc. or of any other similarly situated third party.  The Debtor is further hereby authorized and directed to return any Pre-Petition Consignment Merchandise belonging to Unique Designs, Inc. and Seiko Corporation of America to Unique Designs, Inc. and Seiko Corporation of America (as the case may be) and any similarly situated goods of Innovative Pearl, Inc. to Innovative Pearl, Inc. as soon as reasonably practicable and, in each instance, before March 31, 2019.  Additionally, following consultation with the Court-appointed Examiner, the Debtor is authorized to return as soon as reasonably practicable and, in each instance, before March 31, 2019 any other similarly situated consigned goods belonging to third parties to the applicable third party.  With respect to the return of any Pre-Petition Consignment Merchandise belonging to GoGreen Diamonds Inc., the Debtor will work with GoGreen Diamonds Inc. and the Court-appointed Examiner to facilitate the return of such goods;

36

provided, however, if the parties cannot reach a resolution with respect to the return of such goods, then the parties will bring the matter before the Court by no later than March 15, 2019.

41.     The provisions of this Order are non-severable and mutually dependent.

42.     The requirements set forth in Bankruptcy Rule 6004 and Local Bankruptcy Rule 6004-1 have been satisfied or otherwise deemed waived.

43.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

Wilmington, Delaware
Date: February ___, 2019

THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

RLF1 20865671v.1

**Exhibit 1**

**APA**